# THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TENNESSEE,

# AT CHATTANOOGA

RADHA BOLIVAR and
ANGELICA GOATACHE,
               Plaintiffs,

v.

HMD TRUCKING, INC., and
ANTONIO WORTHAM,
               Defendants.

DOCKET NO.  1:24-cv-00155

JUDGE VARLAN

JURY DEMANDED

---

## PLAINTIFFS' MOTION FOR SANCTIONS AGAINST HMD TRUCKING, INC.

---

Plaintiffs, by and through undersigned counsel, respectfully move this Court pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure for the imposition of sanctions against Defendant HMD Trucking, Inc. ("HMD") based on discovery abuses, including spoliation of critical evidence and false and misleading testimony.  This motion arises directly from facts presented in Plaintiffs' April 16, 2025 Motion for Contempt against non-party Netradyne, Inc., and is further supported by testimony from HMD's March 10, 2025 Rule 30(b)(6) deposition.

## I. INTRODUCTION

Throughout discovery, HMD has attempted to evade accountability by concealing evidence and offering misleading testimony regarding its driver safety supervision practices. Central to this conduct is the destruction of Netradyne driver data related to Antonio Wortham— a key source of insight into Wortham's driving behavior and HMD's oversight of him.

HMD's corporate representative testified unequivocally that Netradyne safety scores were used to coach and discipline drivers. If a score dropped below 750, drivers were coached. If it fell below 600, write-ups were issued. Between November 2021 and March 1, 2023, Wortham's truck was equipped with a Netradyne system. HMD admitted this system remained in operation during the time period at issue.

The system recorded both forward-facing video and telematics data such as hard braking, acceleration, and rolling stops, which would trigger "coachable" events. However, HMD's representative admitted that while these alerts existed, the company did not monitor for obstructed camera events and failed to preserve any additional footage from Wortham's vehicle.

Despite using this data for internal safety enforcement, HMD failed to preserve it. The company's representative testified that they simply "didn't think it was relevant" and allowed it to be purged. No one from HMD attempted to contact the safety assistant, Maria—who regularly reviewed Netradyne scores and personally coached drivers—to ask about the records or clarify whether the data still existed.

This is no ordinary lapse. On March 28, 2025, Netradyne's Senior Vice President of Legal informed Plaintiffs that data had been located "in cold storage due to a data hold"—establishing that a hold was in fact requested and implemented. This flatly contradicts HMD's sworn deposition testimony and reveals either dishonesty or gross recklessness with respect to discovery obligations.

## II. FACTUAL BACKGROUND

HMD's failure to preserve, retrieve, or investigate the existence of key safety data is compounded by its evasive conduct and inconsistencies in discovery. Key facts include:

- Wortham's Netradyne safety score was subject to monthly review under a company policy.[1]

- Drivers were coached if their score fell below 750 and formally disciplined below 600.[2]

- A safety assistant, Maria, reviewed and acted on these scores but was never contacted after the crash.[3]

- HMD testified that it had no knowledge of Wortham's score prior to the crash and allowed relevant records to be deleted.[4]

- HMD's corporate representative confirmed that the data existed as of March 1, 2023, but claimed that no effort was made to preserve it.[5]

- In a March 21, 2023 letter, HMD's legal counsel acknowledged the company's obligation to preserve relevant evidence but stated that it would only preserve Netradyne and telematics data for the day of the crash, and objected to preserving records related to Wortham's prior unreported incidents.[6]

- While it remains unclear exactly what data was or was not preserved, the letter confirms that at least some relevant evidence—especially concerning Wortham's driving history and policy violations—was deliberately excluded from preservation.[7]

- Netradyne's legal team later contradicted this claim by confirming that the data had been located in cold storage "due to a data hold."[8]

---

[1] HMD 30(b)(6) Depo., 22-25
[2] *Id.* at 22.
[3] *Id.* at 25.
[4] *Id.* at 25-28, 64
[5] HMD 30(b)(6) Transcript, pp. 29–30, 63–65
[6] Exh. A, Letter from HMD Counsel, Mar. 21, 2023
[7] *See Id.*
[8] Exh. B., Email from Deval Zaveri (March 28, 2025)

- Wortham was involved in at least four prior incidents resulting in damage to his vehicle that were never reported in violation of HMD policy.[9]

- Wortham testified that he could not remember the details of the four prior unreported incidents that led to his written warning in August 2022. [10]

- Wortham no longer possesses the cell phone he used at the time.[11]

- He also could not recall whether he received any safety training after those violations or who he spoke to at HMD when reporting the March 2023 crash.[12]

- The company took no disciplinary action after discovering that Wortham had covered his camera at the time of the crash, and there was no policy in place requiring him to report or correct the obstruction.[13]

- Jacob Clary personally reviewed the March 1, 2023 crash video with Wortham.[14]

- Jacob Clary investigated Wortham's four prior unreported incidents, each of which violated company policy.[15]

- Clary had responsibilities for coaching drivers and post-incident reviews based on safety violations.[16]

- HMD failed to identify Clary in its Rule 26(a)(1) Initial Disclosures or in response to Plaintiffs' interrogatories seeking individuals with relevant knowledge.[17]

---

[9] Wortham Dep. at 28.
[10] Wortham Dep. at 28-29.
[11] Wortham Dep. at 32.
[12] Wortham Dep. at 29–31.
[13] HMD 30(b)(6) Dep., at 31-34, 65–66.
[14] *Id.* at 79.
[15] *Id.* at 98.
[16] *Id.* at 18.
[17] Exh. C, HMD Trucking, Inc.'s Fed. R. Civ. P. 26(a)(1) Initial Disclosures (served Sep. 23, 2024); see also Exh. D, HMD Trucking, Inc.'s Responses to Plaintiff's First Set of Interrogatories (served [date]) at Interrog. No. , 19 and 21.

- Wortham underwent orientation and safety training by HMD in November 2021 as part of his onboarding process.[18]

- HMD failed to supplement its disclosures to identify Clary or the orientation team even after their roles were admitted at deposition.

- HMD plans to defend its conduct in part by arguing that Wortham received adequate orientation and training during this process.[19]

- Wortham told both police and HMD that Plaintiffs entered his lane—an account later admitted to be false.[20]

- Wortham admitted in deposition that if he falsely told police someone entered his lane, that would be dishonest—but claimed he could not recall what he said. [21]

- HMD admitted those failures were violations of its own policy yet took no disciplinary action and continues to employ Wortham.[22]

- HMD's 30(b)(6) representative testified that the company did not receive camera obstruction alerts from the Netradyne system and made no effort to monitor for covered or disabled cameras.[23]

- When asked why inward-facing camera use was not enforced, HMD's representative testified that the company avoided strict camera policies to prevent alienating drivers and harming recruitment and retention.**[24]**

---

[18] HMD 30(b)(6) Dep. at 10-11, 16
[19] *See Id.*
[20] HMD 30(b)(6) Dep. at 86–87; see also Exh. E, Viber Message from Def. Wortham to HMD
[21] Wortham Dep. at 44-45.
[22] HMD 30(b)(6) Dep. at 99-101, 114-15
[23] HMD 30(b)(6) Depo., pp. 34-36
[24] *Id.* at 54-55

5

- After initially testifying that HMD no longer had access to Netradyne data, the corporate representative's testimony was later changed via errata to state: "Incorrect, we have this data.[25]

- HMD also altered sworn testimony regarding its safety policy, changing its position to claim that the manual stating "unreported incidents will be considered preventable" was not in effect at the time of Wortham's orientation.[26]

- HMD reversed its testimony about the limitations of its inward-facing camera system, correcting the original statement that no footage was recorded if the camera was obstructed to now say: "The inward camera does record sometimes when it's covered." [27]

- As shown in Exhibits D and G, HMD interposed boilerplate, non-specific objections to 20 out of 27 Interrogatories, refusing to provide substantive information in most cases.[28]

- As further shown in Exhibits D, G, and H, HMD asserted sweeping, generalized objections to 56 out of 62 Requests for Production, failing to state whether any documents were being withheld, in violation of Rule 34(b)(2)(B).[29]

## III. LEGAL STANDARD

F.R.C.P. 37 gives courts broad authority to address discovery misconduct, including the failure to preserve evidence, evasive responses, and violations of court orders. When a party fails to meet its obligations—whether by giving incomplete answers, improperly designating a

---

[25] HMD 30(b)(6) Depo. Errata Sheet, Page 28, Line 14.
[26] HMD 30(b)(6) Depo. Errata Sheet, Pages 49 and 64.
[27] HMD 30(b)(6) Depo. Errata Sheet, Errata Sheet, Page 66.
[28] Exh. G; see also Exh. D
[29] Exh. G; see also Exhs's D & H.

30(b)(6) witness, or allowing key evidence to be destroyed—courts may issue a range of sanctions to cure the harm and deter further abuse.

Rule 37(e) governs the loss of electronically stored information. If a party fails to take reasonable steps to preserve relevant data it should have known would be needed for litigation— and that information can't be restored or replaced—the court may order appropriate relief. If the court finds the loss was intentional, it may go further: allowing a jury to presume the information was unfavorable, instructing the jury accordingly, or even entering a default or dismissal. See Fed. R. Civ. P. 37(e)(2).

Courts also regularly impose sanctions where a 30(b)(6) witness is unprepared or lacks knowledge on designated topics. That failure is treated as if the company never appeared at all. See Fed. R. Civ. P. 37(a)(3)(B)(ii), (a)(4).

Even beyond the rules, courts have inherent power to sanction parties that act in bad faith or intentionally destroy evidence. As the Fourth Circuit explained in *Silvestri v. General Motors*, Spoliation of evidence can prejudice the opposing party so severely that sanctions are not only appropriate, but necessary. 271 F.3d 583, 590–91 (4th Cir. 2001).

In short, when a party deletes evidence, conceals witnesses, evades basic disclosures, and misleads the other side during sworn testimony, Rule 37 allows the court to step in. That includes issuing adverse inferences, excluding defenses, awarding fees, and entering other just orders needed to level the playing field

## IV. ARGUMENT

### A. HMD's Testimony Confirms the Central Role of Netradyne Data

HMD's corporate representative testified that Netradyne safety scores were a key part of its driver oversight process. Scores were pulled monthly, and drivers who fell below 750 were

coached; if they dropped below 600, they were written up. A safety assistant named Maria was responsible for reviewing those scores and handling the coaching directly.

Despite this system being active in Wortham's truck from late 2021 through the date of the crash, HMD made no effort to review, retrieve, or preserve his data. The company testified that it allowed the data to be deleted because it "didn't think it was relevant." That statement was later reversed in an errata sheet, where HMD changed the testimony to say, "Incorrect, we have this data"—a reversal that speaks for itself and confirms how unreliable and evasive HMD's position has been from the start.

## B. Netradyne's Correspondence Directly Contradicts HMD's Testimony

HMD's assertion that it allowed Wortham's Netradyne data to be purged because it was "not relevant" was not only reckless—it was false. On March 28, 2025, Netradyne's Senior Vice President of Legal, Deval Zaveri, confirmed in writing that responsive data had been located "in cold storage due to a data hold." This was not ambiguous. It confirmed that HMD either requested preservation but failed to disclose it, or failed to preserve data despite knowing it was under a litigation hold.

Either scenario is sanctionable. If HMD knew the data existed and denied it under oath, it misled both Plaintiffs and the Court. If it requested a hold and then disavowed the data as irrelevant, it revealed a deliberate effort to obstruct. HMD cannot now walk back those claims without exposing the full extent of its inconsistent and untrustworthy litigation conduct.

## C. Plaintiffs Have Suffered Concrete and Irreversible Prejudice

Wortham's Netradyne safety history sits at the heart of Plaintiffs' claims. That data would have provided objective insight into how he drove, how HMD monitored him, and whether

8

company policies were actually enforced. But that evidence is now gone. HMD chose not to preserve it—despite relying on the same data to coach, discipline, and track drivers company-wide.

Had the data been preserved, it could have shown:

1. Whether Wortham engaged in unsafe behavior prior to the crash;

2. Whether his score had previously fallen below coaching or write-up thresholds;

3. Whether HMD followed through on its own enforcement policies;

4. And whether patterns of misconduct—like his four unreported damage incidents— were ignored or ever investigated.

Wortham admitted in his deposition that he could not remember the details of those four unreported incidents, nor whether he received any follow-up safety training. He also could not recall who he contacted at HMD after the crash or what steps were taken in response. Netradyne data could have independently verified what Wortham could no longer recall and what HMD failed to document—specifically, the timing, severity, and frequency of his prior incidents.

In addition, it is likely that the four unreported incidents could have been independently verified—or even discovered in the first place—through the Netradyne system, which generated alerts tied to hard braking, abrupt stops, and collisions. HMD's failure to preserve that data raises serious concerns about what else has been concealed, including internal records or communications related to those events. This is especially important in light of HMD's written policy stating that "unreported incidents will be considered an admission that you could have prevented the incident." Despite this policy, and despite receiving a written warning in August 2022, HMD allowed Wortham to continue driving without heightened supervision or corrective action.

The prejudice is clear: Plaintiffs have been deprived of the very data needed to prove negligent supervision, policy enforcement failures, and a pattern of safety violations. HMD made sure that record no longer exists—and now Plaintiffs are left with no reliable way to fill in the gaps.

**D. HMD's March 21, 2023 Letter Confirms Its Awareness of Relevant Evidence and Intentional Decision Not to Preserve It**

Shortly after receiving Plaintiffs' litigation hold letter, HMD responded on March 21, 2023, with a written acknowledgment that it had a duty to preserve relevant materials. But rather than act in good faith, HMD unilaterally declared that it would not preserve critical categories of evidence—including the very information now known to be missing. Specifically, HMD stated that it would not preserve:

1. Netradyne video or data, except for footage from the date of the crash;

2. Telematics data for the six months preceding the collision;

3. Internal documents or communications concerning Wortham's prior damage incidents or related discipline.

By March 2023, HMD already knew that Wortham had been involved in at least four unreported incidents in violation of company policy. It also knew that Netradyne data—including telematics, driver scores, and event-triggered video—was routinely used to supervise and discipline drivers. Despite this, HMD explicitly chose not to preserve any of it. That decision was not accidental. It was a strategic refusal to retain the most objective, verifiable record of Wortham's prior conduct— data that could have shown whether HMD had ignored red flags, failed to discipline him, or simply allowed a repeat offender to remain behind the wheel.

This correspondence reflects willful misconduct, not mere oversight. HMD acknowledged its duty but chose to discard what it believed would be unfavorable. That choice is central to Plaintiffs' spoliation claim and further supports the need for meaningful sanctions.

## E. HMD's Conduct Reflects a Pattern of Evasion, Recklessness, and Bad Faith

HMD's deposition confirms that they took no meaningful steps to preserve or even investigate the existence of key safety data. No one contacted Maria—the safety assistant responsible for reviewing driver scores and coaching at the time of the crash. No inquiry was made to determine what data Netradyne had retained, and no internal review was conducted to locate additional footage, telematics, or monthly scoring reports beyond the crash videos.

This failure to act cannot be written off as negligence. HMD openly acknowledged that it used Netradyne scores to coach and discipline drivers, and yet it allowed that very data to be purged—without documenting what existed, what was reviewed, or why it was discarded. That is not a lapse in procedure; it is an intentional decision to discard potentially damaging evidence while feigning ignorance of its value. It reflects a calculated effort to limit the record and obstruct the discovery process.

## F. HMD Weakened Driver Oversight for Business Convenience—Not Safety.

HMD's corporate representative admitted that the company allowed drivers to cover their inward-facing cameras while operating vehicles, and that there was no system in place to flag or follow up on obstructed footage. Even when a coachable safety event was triggered—such as hard braking or sudden acceleration—HMD had no process to detect whether the camera was obstructed, and took no steps to investigate or discipline drivers for disabling this critical safety feature.

This directly undermines HMD's claim that it exercised meaningful supervision through the Netradyne system. While the company relied on Netradyne scores to justify its safety practices, it also turned a blind eye to one of the system's most important functions: visual monitoring of driver behavior. That contradiction reveals the truth—HMD's oversight was only as strong as what it chose to enforce.

When asked why no measures were taken to prevent or respond to camera obstruction, HMD's corporate representative testified that requiring the use of inward-facing cameras would hurt driver recruitment and retention. In other words, HMD knowingly relaxed safety enforcement in order to avoid upsetting its labor force. That decision was not accidental. It was a business choice made at the expense of accountability and public safety—and it further reflects the company's pattern of placing profit ahead of risk mitigation.

These admissions are not isolated safety issues—they directly reinforce HMD's approach to discovery in this case. Just as the company deliberately avoided enforcing safety rules that might upset drivers, it likewise avoided preserving and producing evidence that might damage its legal position. The decision to permit camera obstruction without consequences mirrors HMD's litigation conduct: disregard for accountability, selective enforcement of its own rules, and calculated inaction when critical information was at risk of disappearing. This consistency between HMD's internal oversight failures and its discovery misconduct supports the inference of willfulness and justifies the imposition of sanctions under Rule 37.

## G. HMD Continued to Employ Wortham Despite Known Dishonesty and Repeated Policy Violations

HMD's corporate representative admitted that Wortham falsely told police that Plaintiffs entered his lane and caused the crash—an account later disproven by dashcam footage. Wortham

also reported the same false version of events to HMD. Despite knowing that Wortham had misled law enforcement and his safety supervisors about the cause of the collision, HMD conducted no reassessment of his employment and took no meaningful action.

This dishonesty did not occur in a vacuum. HMD also admitted that Wortham had previously been involved in at least four unreported vehicle damage incidents, each in direct violation of company policy. Yet again, no meaningful discipline followed. He was issued a written warning in August 2022 but was entrusted with HMD's operating authority with no increased supervision or documentation of follow-up action.

The loss of Netradyne data has further obscured the full scope of Wortham's misconduct. Without access to his safety scores, telematics, or video footage, Plaintiffs are unable to determine whether he had a broader pattern of unsafe or dishonest behavior—or whether HMD had ignored additional warning signs. That data would have served as the most objective record of Wortham's driving performance, frequency of violations, and the company's response. Its absence now shields both the driver and the carrier from scrutiny.

HMD's continued employment of a driver who repeatedly violated policy and lied about a fatal crash speaks directly to its supervisory failures. It also magnifies the prejudice caused by the spoliation of key safety data and supports the imposition of sanctions, including an adverse inference.

This context is essential to understanding the discovery violations in this case. HMD's failure to preserve Netradyne data, identify relevant witnesses, or document Wortham's prior violations was not a simple oversight—it was part of a broader effort to protect a driver whose continued employment posed legal risk. The company had every reason to avoid creating or disclosing records that would reveal it tolerated repeated misconduct and dishonesty. That motive,

coupled with the destruction of relevant data, supports the inference that HMD's discovery conduct was intentional, prejudicial, and intended to limit Plaintiffs' ability to prove their claims.

## I.  HMD Failed to Disclose Jacob Clary and Other Key Witnesses Despite Their Central Roles

Deposition testimony confirms that Jacob Clary is a central figure in this case. Clary personally reviewed the March 2023 crash video with Wortham and handled the company's investigation into Wortham's four prior unreported damage incidents—each of which HMD admits violated company policy. Clary was also responsible for coaching drivers and participating in post-incident reviews.

Despite this, HMD failed to disclose Clary in its Rule 26(a)(1) initial disclosures or in response to discovery requests asking for individuals with relevant knowledge.  This was no oversight. Under Rule 26(a)(1)(A)(i), HMD was required to disclose individuals likely to have discoverable information relevant to the claims or defenses. Clary's role was central: he reviewed crash evidence, evaluated prior violations, and participated in supervisory actions (or inactions) critical to Plaintiffs' negligent supervision claims. By withholding his identity, HMD obstructed Plaintiffs' ability to investigate and prepare their case.

Moreover, Plaintiffs formally requested deposition dates for Mr. Clary on March 12, 2025. As of the date of this filing, HMD has failed to provide any availability. While isolated scheduling delays might be benign, this delay—viewed against HMD's broader pattern of discovery misconduct, including destruction of critical data, false testimony about evidence preservation, and strategic witness concealment—appears calculated to run out the clock and deny Plaintiffs access to key testimony before dispositive deadlines.

HMD's failure to disclose Clary is not an isolated incident. The company also failed to disclose **members of HMD's orientation team**, who trained Wortham upon hiring in 2021 and whose instruction forms the backbone of HMD's anticipated defense that Wortham was properly prepared.

These individuals were never named in HMD's Rule 26(a) disclosures or its interrogatory responses identifying persons with knowledge. Given their direct roles in supervision, training, and post-incident review, there is no plausible explanation for their omission—except the likelihood that their testimony would have confirmed HMD's systemic failures in oversight and driver management. If HMD believed these witnesses would offer favorable testimony, they would have been disclosed. Their omission speaks volumes about the damaging information HMD sought to conceal and further supports the need for meaningful sanctions under Rule 37.

## J. Antonio Wortham's Testimony Further Confirms HMD's Negligence and the Prejudice Caused by Spoliation

The deposition of Antonio Wortham further confirms the discovery misconduct at issue in this motion. Wortham admitted under oath that he received a written warning in August 2022 for failing to report four separate incidents involving vehicle damage—each a violation of HMD's policy requiring all incidents to be reported regardless of severity. Despite these repeated violations, HMD took no meaningful corrective action. Wortham remained employed and continued driving through the time of the March 2023 crash.

Wortham also testified that he could not recall key details about the four prior incidents and no longer possesses the cell phone he used at the time, which may have contained relevant communications. Compounding this, HMD's failure to preserve Netradyne safety data during this period now makes it impossible to independently verify the severity, timing, or frequency of

Wortham's prior misconduct—particularly significant given HMD's policy that "unreported incidents will be considered an admission that you could have prevented the incident."

The record supports that Wortham initially told his company and police that Plaintiffs entered his lane, a claim later disproved by dashcam footage. When confronted about this falsehood, Wortham could not explain why he provided inaccurate information. Wortham's testimony makes clear that, without objective Netradyne data, there is now no reliable way to assess his driving behavior. HMD allowed that evidence to be lost.

This record leaves no doubt about the relevance of the destroyed or withheld evidence. Had HMD preserved Wortham's Netradyne data from 2021 through 2023, Plaintiffs could have shown how many coachable events were ignored, how often Wortham triggered safety alerts, and how HMD systematically failed to intervene. Instead, HMD allowed that record to be erased while continuing to employ a known policy-violator who repeatedly demonstrated a willingness to provide false information when it suited him.

### K. HMD's Pattern of Boilerplate Objections Further Undermines the Integrity of Discovery

Beyond the spoliation, witness concealment, and false testimony detailed above, HMD repeatedly obstructed discovery by refusing to engage with Plaintiffs' requests in good faith. Out of 27 interrogatories served, HMD responded to 20 with nothing more than boilerplate, non-specific objections. Out of 62 Requests for Production, 56 were met with sweeping objections that failed to explain whether any documents were being withheld or on what basis. HMD also asserted seven generalized objections across all discovery responses, without tailoring them to any specific request.

This conduct violates the plain requirements of the discovery rules. Rule 33(b)(4) mandates that objections to interrogatories must be stated with specificity—or they are waived. Rule

34(b)(2)(B) similarly requires that objections to document requests identify what materials are being withheld and why. HMD ignored both.

As a result, Plaintiffs were deprived of the basic transparency necessary to assess what information was being produced, withheld, or hidden. HMD's blanket objections were not designed to protect legitimate interests; they were intended to delay, confuse, and obstruct Plaintiffs' efforts to build their case—just as HMD's broader discovery conduct shows throughout this record.

## L. HMD's Errata Sheet Further Undermines the Integrity of Its Testimony

Following the deposition of HMD's corporate representative, HMD filed an errata sheet altering critical testimony on multiple key issues. These are not clarifications or minor corrections—they are substantive reversals of sworn testimony that go directly to the heart of the misconduct raised in this motion.

Most notably, HMD changed its answer at page 28, line 14 from stating it no longer possessed Netradyne data to: "Incorrect, we have this data." This is not a harmless error; it is a complete reversal that undermines nearly every representation HMD made to Plaintiffs and the Court about data preservation. If HMD did have the data, then its sworn testimony was false. If it did not, then the correction is false. Either way, this change confirms the necessity of sanctions.

Despite narrowing the original Rule 30(b)(6) notice from 55 to just 12 topics, and conferring in good faith to confirm that the witness would be prepared on each topic, HMD still filed blanket objections and then produced a witness who falsely testified that Netradyne data had not been preserved. This was not an accident—it was the result of a calculated decision to shield the company from damaging admissions. The only plausible explanation is that someone within the company deliberately withheld the truth from the witness in order to limit corporate liability.

HMD had every opportunity—through proper designation, preparation, and disclosure—to ensure the witness testified accurately. Instead, it chose to obstruct. That failure undermines the core purpose of Rule 30(b)(6), and it begs the question: how could a witness designated and prepared to speak for the company on these exact topics get such a critical fact so wrong?

HMD also altered testimony at pages 49 and 64 to assert that the referenced safety manual—containing the policy that "unreported incidents will be considered preventable"—was not in effect at the time of Wortham's orientation. This reversal appears calculated to distance HMD from an internal standard that directly damages its defense against Plaintiffs' negligent supervision claims.

Finally, HMD revised its answer at page 66 to claim that inward-facing cameras "do record sometimes when it's covered," contradicting its original testimony that no footage is captured under those circumstances. This is not a clarification—it is a retreat from an admission that exposed how easily HMD's drivers could disable critical safety equipment without oversight. These changes are not innocent. They reflect a strategic effort to rewrite damaging facts after the deposition was completed. The Court should view these errata with skepticism and weigh them heavily in favor of imposing sanctions.

## L. The Discovery Process Has Been Permanently and Irreversibly Tainted by HMD's Conduct

Taken together, HMD's conduct has not merely complicated discovery—it has fundamentally compromised it. Across every stage of this litigation, HMD has demonstrated a pattern of obstruction, including:

- Deletion of critical safety data despite the existence of a litigation hold;

- False and shifting testimony regarding preservation efforts;

- Concealment of material witnesses until revealed through deposition testimony;

- Failure to timely produce or identify individuals with knowledge of key facts;

- Months-long delays in producing witnesses whose depositions were formally requested; and

- Repeated use of boilerplate and generalized objections to avoid substantive discovery responses.

While any one of these failures might have been curable in isolation, their cumulative effect has rendered the discovery process fundamentally unreliable. Plaintiffs cannot meaningfully assess what evidence may exist or has been withheld, cannot trust the disclosures made by HMD, and cannot prepare for dispositive motions or trial with any reasonable confidence in the completeness of the record.

The discovery rules are premised on good faith and transparency. HMD's conduct has destroyed that foundation. Sanctions are necessary not only to address the prejudice inflicted on Plaintiffs, but also to preserve the integrity of the judicial process itself.

## O. The Discovery Process Has Been Permanently and Irrevocably Tainted by HMD's Conduct

HMD's discovery misconduct is not confined to isolated instances. It reflects a broad, consistent pattern of obstruction that has permanently compromised the integrity of these proceedings. Across every stage of this litigation, HMD has demonstrated an ubiquitous willingness to withhold information, destroy evidence, and offer misleading testimony when faced with uncomfortable facts. This includes:

- Deletion of critical Netradyne safety data despite the existence of a litigation hold;

- False and shifting testimony regarding what data existed and whether it was preserved;

- Concealment of key witnesses, including Jacob Clary, until their involvement was revealed through depositions;

- Failure to timely disclose or identify individuals directly involved in Wortham's training and supervision;

- Refusal to timely produce witnesses whose depositions were formally requested; and

- Systematic reliance on boilerplate and non-specific objections to avoid meaningful discovery responses.

Individually, these acts might be addressed through corrective orders. Together, they have fundamentally tainted the discovery process. Plaintiffs cannot meaningfully assess what evidence still exists, what evidence was withheld, or what has already been irretrievably lost. Plaintiffs cannot rely on HMD's representations in disclosures or depositions. Plaintiffs cannot prepare for dispositive motions or trial with a full and fair evidentiary record.

The discovery rules are built on principles of good faith, transparency, and cooperation. HMD's conduct has destroyed those foundations. Sanctions are not only appropriate to address the prejudice inflicted on Plaintiffs, but necessary to preserve the Court's ability to enforce the rules of discovery and maintain the integrity of these proceedings.

**P. The Need for Formal Findings to Preserve Plaintiffs' Right to a Full Trial on Punitive Damages**

HMD's discovery misconduct strikes at the core of Plaintiffs' ability to fully and fairly present their claims—including their right to pursue punitive damages. Under Tennessee law and federal standards, punitive damages are warranted where a defendant acts with reckless disregard, gross negligence, or conscious indifference to the safety of others.

The evidence that HMD has destroyed, concealed, or refused to disclose—including safety alerts, coaching records, and supervision failures—would have gone directly to the heart of these issues. Wortham's pattern of unsafe conduct, combined with HMD's failure to intervene, supervise, or discipline him, are key facts Plaintiffs were entitled to develop.

Without formal findings that HMD acted in bad faith and engaged in spoliation, Plaintiffs face the risk that critical inferences about HMD's culpability will be lost, unfairly limiting the jury's ability to fully assess punitive damages. In addition, without such findings, HMD may seek to improperly argue on summary judgment that Plaintiffs lack sufficient evidence of reckless or grossly negligent conduct.

The Court's intervention is necessary to:

- Preserve Plaintiffs' right to present a full punitive damages case to the jury;

- Prevent HMD from profiting from its destruction and concealment of critical evidence; and

- Ensure that the jury is properly instructed regarding the consequences of HMD's misconduct.

For these reasons, Plaintiffs respectfully request that the Court enter formal findings of bad faith, spoliation, and discovery abuse as part of the sanctions imposed.

## V. RELIEF REQUESTED

For the reasons set forth above, Plaintiffs respectfully request that the Court impose sanctions against Defendant HMD Trucking, Inc., individually or in combination, as the Court deems appropriate, including:

1. **Adverse Inference Instruction**

Instructing the jury that it may infer that the deleted Netradyne safety data, and any

withheld documents relating to Antonio Wortham's prior driving history, safety violations, and supervision, would have been unfavorable to HMD.

2. **Evidentiary Preclusion**

Precluding HMD from introducing evidence, testimony, or argument suggesting that:

- HMD adequately trained or supervised Wortham;
- HMD consistently enforced its internal safety policies;
- Wortham had a satisfactory safety record prior to the crash;
- HMD properly responded to Wortham's prior policy violations.

3. **Witness Preclusion or Limitations**

Prohibiting HMD from calling undisclosed witnesses—such as Jacob Clary, and any orientation or safety personnel involved in Wortham's hiring or supervision—whose involvement was not timely disclosed.

Alternatively, if these witnesses are permitted, requiring HMD to produce them for deposition at its own expense before trial.

4. **Cost-Shifting and Attorneys' Fees**

Awarding Plaintiffs their reasonable attorneys' fees and costs incurred in:

- Preparing and filing this Motion for Sanctions;
- Pursuing remedial discovery necessitated by HMD's misconduct.

5. **Striking of Defenses**

Striking any defense by HMD that asserts it properly trained, supervised, or monitored Wortham, or complied with applicable safety standards.

6. **Formal Findings of Bad Faith and Spoliation**

Entering findings that:

- o HMD engaged in bad faith during discovery;

- o HMD spoliated critical evidence relevant to Plaintiffs' claims;

- o HMD violated its duties under Rules 26 and 37 of the Federal Rules of Civil Procedure.

7. **Mandatory Supplemental Discovery at HMD's Expense**

Ordering HMD to immediately and fully supplement its Rule 26 disclosures and discovery responses to:

- o Identify all persons involved in Wortham's training, supervision, and safety monitoring;

- o Produce all outstanding documents related to Wortham's prior incidents, driving history, coaching, and discipline.

8. **Forensic Inspection of HMD's Files at HMD's Cost**

Alternatively, or in addition, requiring HMD to pay for an independent forensic inspection of its electronic and physical files to identify and recover any data or documents responsive to Plaintiffs' discovery requests relating to Antonio Wortham's employment, supervision, and safety record.

9. **Any Other Relief the Court Deems Just and Proper**

Granting such other and further relief as necessary to remedy the prejudice caused and to deter similar misconduct.

## VI. CONCLUSION

This is not a case of isolated oversight or technical noncompliance. HMD Trucking, Inc. made deliberate choices at every stage of this litigation to obstruct discovery, destroy critical evidence, conceal key witnesses, and revise damaging testimony after the fact. These choices were

not mistakes—they were part of a broader effort to prevent Plaintiffs from uncovering the truth about HMD's supervision of Antonio Wortham, its enforcement of safety policies, and the risks it allowed to persist for the sake of profit.

The cumulative effect of HMD's conduct has permanently tainted the discovery process and left Plaintiffs without critical evidence necessary to fully and fairly present their claims, including their claims for punitive damages. Sanctions are not only appropriate—they are necessary to remedy the prejudice suffered, deter future misconduct, and preserve the integrity of these proceedings.

For all the reasons set forth above, Plaintiffs respectfully request that the Court impose the sanctions detailed herein, along with any other relief the Court deems just and appropriate.

Respectfully submitted,

ALEXANDER SHUNNARAH
TRIAL ATTORNEYS.


By:
Tim O. Henshaw, BPR # 036043
Attorney for Plaintiffs
1604 Reggie White Blvd., Ste. 102
Chattanooga, TN 37402
Direct: (423) 417-9205
Fax: (423) 719-2005
THenshaw@asilpc.com

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing ***MOTION FOR SANCTIONS AGAINST HMD TRUCKING, INC.*** by mailing the same to the attorneys/parties listed via First Class U.S. Mail and/or via electronic mail:

Mary Beth White, Esq. (BPR # 24462)
Ally J. Bojczuk, Esq. (BPR # 42240)
424 Church Street, Suite 2500
P. O. Box 198615
Nashville, TN 37219
mbwhite@lewisthomason.com
abojczuk@lewisthomason.com
ATTORNEYS FOR HMD TRUCKING,
INC. and ANTONIO WORTHAM

This the 30th day of April 2025.

Respectfully submitted,

ALEXANDER SHUNNARAH
TRIAL ATTORNEYS.

By:
Tim O. Henshaw, BPR # 036043
Attorney for Plaintiffs
1604 Reggie White Blvd., Ste. 102
Chattanooga, TN 37402
Direct: (423) 417-9205
Fax: (423) 719-2005
THenshaw@asilpc.com