| | | |
|---|---|---|
| **RADHA BOLIVAR AND ANGELICA** | ) | |
| **GOATACHE,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | No.: 1:24-CV-00155 |
| | ) | |
| **vs.** | ) | **JUDGE MCDONOUGH** |
| | ) | |
| **HMD TRUCKING, INC. AND** | ) | **MAGISTRATE JUDGE** |
| **ANTONIO WORTHAM,** | ) | **DUMITRU** |
| | ) | |
| **Defendants.** | ) | **JURY DEMAND** |

**DEFENDANT HMD TRUCKING, INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS**

Defendant HMD Trucking, Inc. ("HMD"), by and through counsel, pursuant to Federal Rule of Civil Procedure 37 and Local Rules 7.1 and 37.2, hereby responds to Plaintiffs' Motion for Sanctions ("Motion") (doc. 43) as follows:

I.     **INTRODUCTION**

Lacking tangible evidence to support their Motion, Plaintiffs claim that HMD has destroyed "Netradyne driver data related to Antonio Wortham"; concealed Jacob Clary's identification, which obstructed "Plaintiffs' ability to investigate and prepare their case"; and undermined the discovery process by correcting sworn testimony through the use of an errata sheet within three weeks of receiving the transcript. Plaintiffs describe HMD and Mr. Wortham's actions as "dishonest", "evasive", "untrustworthy", "reckless", and acting in "bad faith." A careful and full reading of the deposition testimony, discovery responses, and other sworn testimony does not warrant this name calling. Rather, in reading the said documents as a whole, one recognizes that (1) Plaintiffs have not articulated what Netradyne data HMD allegedly destroyed and, more importantly, have not established that Netradyne data has been lost or destroyed; (2) Jacob Clary

1

was specifically identified in HMD's interrogatory responses provided to Plaintiff in November 2024, so his name was not concealed and Plaintiffs have not been "obstructed" from "investigat[ing] and prepar[ing] their case"; and (3) HMD is in possession of Netradyne data showing Mr. Wortham's score as of March 1, 2023. Despite being armed with this information on April 16, 2025, Plaintiffs never asked HMD for specific Netradyne data and instead filed the pending Motion on April 30, 2025. It seems that Plaintiffs are more interested in seeking unwarranted sanctions than the actual substance of the documents they cannot articulate or prove have been destroyed.

Before addressing the substance of Plaintiff's Motion, it is imperative to step back and assess the matter pending before this Honorable Court and the discovery to date since Plaintiffs have not been completely forthcoming.

### a.    The Incident

The matter relates to a motor vehicle incident occurring on March 1, 2023, around 7:13 p.m. on Interstate 24 in Kimball, Marion County, Tennessee (the "Incident"). Defendant Antonio D. Wortham ("Wortham") was operating a 2022 Peterbilt Conventional tractor with an attached trailer under the motor carrier authority of HMD. Mr. Wortham was traveling westbound on Interstate 24 and was occupying the left lane. At the same time, plaintiff Radha Bolivar was operating a 2022 Toyota Camry and was also traveling westbound on Interstate 24. Plaintiff Bolivar was occupying the right lane. He had one passenger in his vehicle: Angelica Goatache. As Mr. Wortham changed lanes from the left lane to the right lane, he failed to see plaintiff Bolivar to his right and struck the rear left bumper of plaintiff Bolivar's vehicle (the "Incident"). *See*

Complaint (generally) (doc. 1-2); *see also* Tennessee Electronic Traffic Crash Report ("Incident Report") (attached hereto as Exhibit 1)[1].

Both vehicles moved to the shoulder after the Incident occurred. Plaintiffs exited their vehicle without any problems and were able to walk around. (Exhibit 2, Bolivar dep. p. 52-53; Exhibit 3, Goatache dep. p. 20-21). After the investigating officer arrived, he asked Plaintiffs if they were hurt, and Plaintiffs told the investigating officer they were not hurt. (Ex. 2, Bolivar dep. p. 56; Ex. 3, Goatache dep. p. 22; Ex. 1, Incident Report). Plaintiffs did not need or request an ambulance at the scene. *Id.* Plaintiffs drove away from the scene without any problem. (Ex. 2, Bolivar dep. p. 57; Ex. 3, Goatache dep. p. 22.) The investigating officer classified the Incident as "Property Damage" only. (Ex. 1, Incident Report). Plaintiffs were moving from Florida to Kansas City when the Incident occurred. (Ex. 2, Bolivar dep. p. 28-29). Plaintiffs had planned to stay the night near where the Incident occurred. They did that and continued their trip to Kansas City the next day as intended, arriving in Kansas City on March 2, 2023. (Ex. 2, Bolivar Dep. p. 57, 63).

Mr. Wortham reported the Incident to HMD from the scene. Mr. Wortham's tractor was equipped with a Netradyne dash camera, and the dash camera captured the Incident.

Despite not reporting any injury at the scene to Mr. Wortham or the officer, and continuing with their move to Kansas City, Plaintiffs retained legal counsel more than a week after the Incident and then sought medical care, claiming injuries from the Incident. (Ex. 2, Bolivar Dep. p. 64; Ex. 3, Goatache Dep. p. 25-27).

---

[1] HMD recognizes that the Incident Report is not admissible at trial. *See* Tenn. Code Ann. 55-10-114(b). HMD is not attempting to admit it as evidence at trial but has attached it to provide context for the Incident.

### b.     The Preservation Letter

On March 17, 2023, Plaintiff's counsel sent a "Spoliation & Preservation of Evidence Letter, Letter of Representation, and Request for Insurance Coverage Information" to multiple recipients.  (Ex. 4, Plaintiff's March 17, 2023 Letter).  It is a form, boilerplate letter.  It is overly broad, unduly burdensome, and not proportional to the needs of a matter where no one claimed any injury at the scene, all parties refused medical transport at the scene, no citations were issued, the vehicles were driven away from the scene without any issue, and dash camera existed showing the Incident.  The preservation letter demanded that the recipients preserve every bit of data in their possession that conceivably related to twenty-five (25) different broad series of topics.  *Id.* HMD did not ignore the letter. Instead, through its general counsel, HMD responded promptly to it on March 21, 2023. (Exhibit A to Plaintiff's Motion, Letter from HMD, Doc. 43-1).  In it, HMD informed Plaintiff that the tractor was equipped with Netradyne dash camera software and that HMD would preserve data from it for the date of the Incident.  After outlining precisely what it would preserve, HMD invited further conversation with Plaintiffs' counsel about additional preservation efforts.  (*Id*).  Plaintiffs made no further inquiries about the Netradyne dash camera, the Netradyne dash camera software, or Netradyne data despite an open invitation from HMD to do so.  Plaintiffs assertion that HMD "objected to preserving records related to Wortham's prior unreported incidents" (p. 3) is blatantly false and unsupported.

At the time HMD received the preservation letter, it did not have any Netradyne specific data regarding four property damage only incidents involving Mr. Wortham.  (Exhibit 11, Declaration, ¶ 4).  HMD is not aware of any Netradyne dash camera footage, data, or alerts related to the four property damage only incidents involving Mr. Wortham that occurred before the Incident.  *Id.* at ¶ 5.  HMD is not aware of whether Netradyne created any alerts for the four

4

property damage only incidents occurring before the subject one  *Id.*  HMD did have, however, a safety improvement review it performed on Mr. Wortham on August 10, 2022, whereby Mr. Wortham wrote about four prior property damage only incidents that occurred over the course of several months, and HMD preserved it and produced it.  (Ex. 8, HMD's Supplemental Document Production produced as Confidential, bates stamped HMD TRUCKING 000123[2]).  Moreover, HMD preserved and produced the safety and compliance review it performed on Mr. Wortham related to the Incident (Exhibit 7, HMD's Document Production, bates stamped HMD TRUCKING 000047), along with twenty-five different one minute dash camera clips showing before, at, and after the Incident. (*Id.*[3], bates stamped HMD TRUCKING 000001 – HMD TRUCKING 000025)[4]. Contrary to Plaintiff's contention that HMD is being evasive or trying to conceal evidence, HMD provided Plaintiffs' counsel with dash camera video of the Incident on March 24, 2023, less than a month after the Incident occurred and within one week of Plaintiffs' counsel's letter of representation. (Exhibit 9, HMD's email to Plaintiffs' attorney).  Additionally, HMD preserved and produced an August 4, 2023 safety and compliance review it performed on Mr. Wortham following the Incident based on following distance violations that the Netradyne camera recorded while Mr. Wortham was driving.   (Ex. 8, HMD's Supplemental Document Production produced as Confidential, bates stamped HMD TRUCKING 000119).

### c.    Procedural History

Plaintiffs filed their Complaint in the Circuit Court of Marion County, Tennessee on February 26, 2024, and HMD timely removed the case to the United States District Court for the

---

[2] The actual responses titled HMD's Supplemental Document Production are attached as Exhibit 13.
[3] A OneDrive link will permit access to the dash camera clips.
[4] In downloading Netradyne videos, like HMD did after the subject incident, HMD can download two different types of videos from the outward facing camera, one with overlaid data and one without it.  HMD downloaded the outward facing dash camera videos that had overlaid data.  The overlaid data shows speed, date and time, distance from vehicle one is trailing, and other data.  The left and right facing cameras do not have overlaid data on them.  (Ex. 11, Declaration, ¶ 6).

5

Eastern District of Tennessee at Chattanooga on April 19, 2024.  In the Answers to the Complaint, HMD and Mr. Wortham admitted that Mr. Wortham's actions were the cause of the Incident and did not assert the fault of Plaintiffs.  (Docs. 10 and 13).  The parties participated in a Rule 26(f) discovery conference, the Court's Rule 16 conference, made their Rule 26(a)(1) initial disclosures and engaged in written discovery over the course of several months.

Plaintiffs served two sets of written discovery – one on HMD and a separate one on Mr. Wortham.  The set served on HMD included twenty-seven (27) interrogatories and sixty-two (62) requests for production of documents.  (Ex. D to Plaintiff's Motion, HMD's Discovery Responses, doc. 43-4).  The set served on Mr. Wortham included twenty-five (25) interrogatories and forty (40) requests for production of documents.  (Exhibit 10, Wortham's Discovery Responses).  A vast majority of the interrogatories and requests for production were overly broad, not limited in temporal scope and not proportional to the needs of a case where no injuries were reported at the scene, no citations were issued, vehicle tows were not needed, the involved parties drove away from the scene without any issues, dash camera existed showing the Incident, and both Defendants conceded liability as to the Incident in their Answers.  While the objections raised were warranted, there were only two interrogatories that HMD did not answer after objecting and five requests for production that HMD did not answer after objecting (Doc. 43-4; RPD no. 11 (related to Wortham's compensation); RPD no. 22: RPD no. 52 (requesting hierarchy information of HMD); RPD no. 55 (requesting HDM's accident register), and RPD No.  56 (requesting transcripts of all deposition testimony for HMD designees for the past five years for rear end incidents).

HMD provided its original discovery responses on November 12, 2024.  (Doc. 43-4).  As noted above, HMD's discovery responses specifically identified Jacob Clary in interrogatory response number 25.  His name was also on two safety and compliance reviews done on Mr.

Wortham, one on August 10, 2022, and another on March 10, 2023, both of which were part of HMD's document production. Through discovery, HMD produced the text message exchange where Mr. Wortham reported the Incident, phone recordings of Mr. Wortham reporting the Incident, and twenty-five different one minute dash camera clips showing before, at, and after the Incident. (Doc. 43-4, HMD's responses to Plaintiffs' First Interrogatories and Requests for Production of Documents, nos. 20, 24, 27; HMD TRUCKING 000043 – HMD TRUCKING 000045 (Exhibit E to Plaintiff's Motion, doc. 43-5); Exhibit 7, HMD's Document Production, HMD TRUCKING 000026 – HMD TRUCKING 000030[5]; and HMD TRUCKING 000001 – HMD TRUCKING 000025).

Plaintiffs did not raise any issues or concerns with HMD's discovery responses, notably what they now claim as boilerplate objections, until the Motion. Plaintiffs never outlined, by letter or otherwise, discovery deficiencies in HMD or Mr. Wortham's discovery responses. Plaintiffs did not engage in good faith efforts to discuss any concerns Plaintiffs had with HMD or Mr. Wortham's discovery responses. Plaintiffs never filed a motion to compel under Rule 37(a) of the Federal Rules of Civil Procedure. The pending Motion is not one.

Plaintiffs took the deposition of Mr. Wortham on February 4, 2025. Plaintiffs took the deposition of a corporate representative for HMD on March 10, 2025. HMD did not waive signature at the completion of the March 10, 2025 deposition. Veritext Legal Solutions provided the transcript for review on March 24, 2025. The transcript was reviewed and changes were made pursuant to Rule 30(e) of the Federal Rules of Civil Procedure. The errata sheets were returned on April 16, 2025. (Ex. F to Plaintiff's Motion, filed under seal).

---

[5] Like the dash camera clips, the phone recordings of Mr. Wortham will be shared via a OneDrive link.

## II.        LEGAL STANDARD

Federal Rule of Civil Procedure 37 governs discovery disputes between parties.  While not clearly set forth, Plaintiff's Motion seems to be premised on Rule 37(e).  Rule 37(e) governs the preservation of electronically stored information. It provides that:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  There are four initial requirements under Rule 37(e) that must be met before a court may consider sanctions under (e)(1) and (e)(2): "(a) the existence of ESI of a type that should have been preserved; (b) ESI is lost; (c) the loss results from a party's failure to take reasonable steps to preserve it; and (d) it cannot be restored or replaced through additional discovery." *Konica Minolta Bus. Sols., U.S.A. Inc. v. Lowery Corp.*, No. 15-cv-11254, 2016 U.S. Dist. LEXIS 117120, 2016 WL 4537847, at *2 (E.D. Mich. Aug. 31, 2016).   For the first requirement, one must determine that a reasonable person would determine that the particular ESI now at issue was going to be relevant to future litigation.  The second requirement is self-explanatory.  For the third step, Rule 37(e) asks whether the loss was a result of a party failing to take reasonable measures to preserve it. The fourth requirement before sanctions can be imposed requires the moving party to show that the ESI cannot be restored or replaced through additional discovery.  If and only if the four requirements are shown, then a court may order certain remedies as defined.

A party does not have a duty to preserve evidence under Rule 37(e) until a triggering event occurs that puts the party on "notice that the [particular piece of] evidence is relevant to litigation" or where the party "should have known that the [particular piece of] evidence may be relevant to future litigation." *Black v. Costco Wholesale Corp.*, 542 F. Supp. 750, 753 (M.D. Tenn. 2021) (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008)). Courts apply an objective standard to determine whether a triggering event has occurred and must determine "'whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation [,]'" and believed that the particular evidence would have been relevant to the litigation. *Hargis v. Overton Cnty.*, No. 2:22-cv-00011, 2023 U.S. Dist. LEXIS 220824, at *24 (M.D. Tenn. Dec. 12, 2023) (internal citations omitted). Establishing reasonable foreseeability requires "more than 'the mere existence of a potential claim or the distant possibility of litigation.'" *Id.* (internal citations omitted). While a preservation letter can trigger a duty to preserve, a boilerplate form letter not articulating what specific documents be preserved permits the receiving party to use its best efforts to reasonably determine what might be relevant and proportional to future litigation. When the recipient of a preservation letter responds and outlines exactly what is being preserved and invites further conversation if such documents as outlined are not enough, the original sender of the preservation letter has an obligation of asking for more or risk the documents not being preserved.

Spoliation of evidence occurs when a party destroys or alters evidence or fails to preserve evidence once a duty to preserve that particular piece of evidence arises. *Yoe v. Crescent Sock Co.*, No. 1:15-cv-3-SKL, 2017 U.S. Dist. LEXIS 187900, at *18 (E.D. Tenn. Nov. 14, 2017) (citing *Ross v. Am. Red Cross*, 567 F. App'x 296, 301-02 (6th Cir. 2014)). The party claiming spoliation bears the burden of proof. *Id.* at *19.

To the extent Plaintiffs are claiming other procedural rules apply, and as this Court is aware, Rule 37(a) allows a party to file a motion to compel if the opposing party "fails to answer an interrogatory" or gives an "evasive or incomplete" answer. Fed. R. Civ. P. 37(a)(3)(B)(iii), (a)(4). If the motion to compel is granted, or if the discovery is provided after the filing of the motion, the court "must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." *Id.* R. 37(a)(5)(A). But, the court need not award fees if the opposing party was "substantially justified" in withholding discovery, or if "circumstances make an award of expenses unjust." *Id.* R. 37(a)(5)(A)(ii)-(iii). Rule 37(b) allows a party to move for sanctions if the court has issued a discovery order and the opposing party has failed to comply. "'Rule 37(b) usually has no application if there has not been a court order.'" *United States v. Reyes,* 307 F.3d 451, 457 (6th Cir. 2002) (quoting 8A Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2289 (2d ed. 1994)).

## III.    ARGUMENT

### a.    Sanctions against HMD for not preserving Netradyne data, which is ESI, are not warranted because Plaintiffs have not shown it was lost and cannot be restored or replaced through additional discovery.

In sections A through F of the Argument section of the Motion, Plaintiffs argue that HMD should be sanctioned because it destroyed Netradyne driver data related to defendant Antonio Wortham, and that this data would be a key source of insight into Wortham's driving behavior and HMD's oversight of him. Plaintiffs have not identified precisely what Netradyne data HMD has allegedly destroyed. Moreover, Plaintiffs have not established that such data has been lost or destroyed. In fact, the contrary is true, and HMD informed Plaintiffs on April 16, 2025 that it possessed data showing Mr. Wortham's Netradyne score as of March 1, 2023.

10

Despite serving sixty-two (62) requests for production on HMD, Plaintiff did not request data specific to Netradyne, including but not limited to scorecards, and Plaintiffs knew the tractor was equipped with Netradyne dash camera software as of March 21, 2023. (Doc. 43-1). Even after receiving HMD's discovery responses in November of 2024, where HMD again relayed to Plaintiffs that the tractor was equipped with Netradyne dash camera software, Plaintiffs did not serve a discovery request asking for specific Netradyne data. Knowing that the tractor was equipped with Netradyne dash camera software, Plaintiffs never conferred in good faith or moved to compel the production of additional Netradyne data other than the dash camera that HMD produced. It is HMD's position that anything more than the Netradyne dash camera is not responsive to Plaintiff's boilerplate, form written discovery. Following the deposition of the HMD corporate representative on March 10, 2025, where further details of the Netradyne camera software was discussed, Plaintiff did not serve a discovery request asking for specific Netradyne data. And even more, after receiving the errata sheets signed on April 16, 2025, where HMD clarified its response to the question "On March 1st, 2023, the company had the data to indicate Mr. Wortham's score, correct?" and answer "Correct" and question "And the company no longer has this data, correct?" and answer "Incorrect, we have this data", Plaintiffs did not follow up and request Netradyne data HMD has in its possession for Mr. Wortham. Rather, Plaintiffs allege that HMD has destroyed Netradyne data and has asked for a myriad of sanctions.

Plaintiffs have failed to show that the Netradyne data has been lost. Plaintiffs have not shown, assuming arguendo it is lost, that such data cannot be restored or replaced through additional discovery. Plaintiffs issued a subpoena duces tecum to Netradyne, and Netradyne responded that data had been located and was being searched but the search was cumbersome and expensive. (Exhibit B to Plaintiff's Motion, Email chain with Netradyne, doc. 43-2). According

11

to other filings from Plaintiffs, Netradyne requested a meet and confer to discuss the scope of the subpoena duces tecum.

Netradyne's March 28, 2025 email references data found "in cold storage due to a data hold." Plaintiffs jump to the conclusion that this data hold is related to their litigation but such is incorrect. The data hold refenced in the email is unrelated to Plaintiff's litigation. (Ex. 11, ¶ 10). The data hold concerns a class action lawsuit in Illinois related to biometric data based on the Illinois Biometric Information Privacy Act. (*Id.*, ¶ 11). The data hold does not relate in any way to incidents, accidents, or driver safety. (*Id.*, ¶ 12). Fausta Mikniute served as HMD's corporate representative on March 10, 2025. Ms. Mikniute is a Safety Director at HMD. (*Id.*, at ¶ 1). She has held the position of Safety Director since 2022. (*Id.*, at ¶ 2). At the time of her deposition, she was unaware of the data hold in place because of the class action lawsuit in Illinois related to biometric data. (*Id.*, at ¶ 13). As the class action did not involve driving safety related issues at HMD, her involvement in the class action has not been needed. (*Id.*, at ¶ 14). After the deposition, she learned of the data hold and that HMD possessed Netradyne scorecards on Mr. Wortham. (*Id.*, at ¶ 15). She clarified her deposition testimony accordingly. (Ex. F, Errata Sheets, doc. 43-6).

**b.** **Sanctions against HMD for not preserving Netradyne data are not warranted because Plaintiffs have not been prejudiced since there are other documents showing Mr. Wortham's driving behavior and HMD's oversight of him.**

While Plaintiffs argue that the Netradyne data is a key source of insight into Mr. Wortham's driving behavior and HMD's oversight of him, there are other sources of data that have been produced that show Mr. Wortham's driving behavior and HMD's oversight of him. Thus, Plaintiffs are not prejudiced. HMD produced four safety and compliance reviews on Mr. Wortham. HMD also produced the driver file it maintains on Mr. Wortham, which contains a motor vehicle record, annual review of driving record, and certificates of completion for various training courses at

HMD.  HMD testified that drivers falling below 750 were coached and drivers that fell below 600 were written up.  Plaintiffs contend that because HMD has not produced Mr. Wortham's scores for a time period before the Incident, HMD cannot establish that Mr. Wortham was operating above the thresholds.  Such is not true.  If he was operating below 750 before the Incident, there would be a written record of it.  As there is no written record that shows coaching or training, HMD can unequivocally testify that Mr. Wortham's score remained above the 750 threshold and did so in the deposition.  Other documents show that HMD was coaching and training its drivers on Netradyne data as there is an August 4, 2023 safety and compliance review report whereby Mr. Wortham received training/coaching based on following distance violations that the Netradyne camera recorded.  (Ex. 8, HMD's Supplemental Document Production, bates stamped Confidential 000121).  While HMD would argue this August 4, 2023 training record is not relevant to the subject matter since it occurred *after* the Incident, it is relevant for the purpose of corroborating and verifying HMD's deposition testimony about coaching or training following a Netradyne triggering event.

Plaintiffs misrepresent the testimony of HMD's corporate representative when they state "HMD testified it had no knowledge of Wortham's score prior to the crash and allowed relevant records to be deleted." (Plaintiff's Motion, page 3).  HMD admitted it did not know Mr. Wortham's precise score but testified it "wasn't lower than the set thresholds" "because if there was a score lower than the threshold there would be a training session reported, a verbal conversation or a write-up." (Ex. 5, full deposition transcript of HMD Corporate Representative, p. 27, ll. 2-19).

Plaintiffs claim they have suffered concrete and irreversible prejudice because they do not have access to Netradyne data on Wortham.  Plaintiffs claim that without such data, they do not have "objective insight into how he drove, how HMD monitored him, and whether company

policies were actually enforced." (Plaintiffs' Motion, p. 8-9). Like many other hyperboles offered in their Moton, this too is unsupported. Plaintiffs have Wortham's personnel file, driver qualification file, and notes from HMD's recruiting system related to its recruitment of Mr. Wortham. Plaintiffs possess more than 200 pages that HMD maintains on Mr. Wortham that provides insight into his driving and HMD's monitoring of him. The documents include multiple motor vehicle records on Mr. Wortham, safety and compliance reviews for Mr. Wortham, training and coaching events given to Mr. Wortham, certifications of completion for various trainings provided by HMD, driver/vehicle examination reports performed on Mr. Wortham, Mr. Wortham's long form physical and medical certification, Mr. Wortham's CDL, a background check on Mr. Wortham, a PSP detailed report on Mr. Wortham, and Mr. Wortham's application with HMD. Plaintiffs have HMD's Company Policy and Operating Procedures and HMD's Driver Policy Manual. Plaintiffs have Mr. Wortham's driver daily logs for the day of the incident and seven days prior.[6]

     **c.**     **Sanctions against HMD for allowing their drivers to cover their inward-facing cameras are unwarranted.**

Plaintiffs suggest that HMD did not exercise meaningful supervision through the Netradyne system because it allowed its drivers to place a lens over the inward facing camera. Again, Plaintiffs provide no support for their position. Plaintiffs mischaracterize covering the lens as a "camera obstruction." HMD permits its driver to cover the inward facing camera lens for privacy related reasons. (Ex. 5, Deposition of HMD Representative, p. 32 – 34). HMD would not classify such as a camera obstruction. The vast majority of HMD drivers cover the lens of their inward facing camera. (Ex. 11, ¶ 16). Mr. Wortham covers the inward facing camera lens. Mr.

---

[6] To the extent this Court wants to see the documents identified, HMD is willing to file or share the documents with the Court.

Wortham's wife Summer Elzy rides with him so his privacy concerns are heightened. She was riding with him at the time of the Incident. (Ex. 1). The prevalence of covering the inward facing camera is clear by the fact that Netradyne supplies a cap HMD drivers can use to cover their inward facing camera. (Ex. 5, Deposition of HMD Representative, p. 32 – 34). Even if the inward facing camera is covered, HMD has outward facing, left facing, and right facing cameras on its tractors that allow it to understand what is going on inside the tractor without invading their driver's privacy. (Ex. 11, ¶ 17).

Dash cameras are not mandated by the Federal Motor Carrier Safety Administration ("FMCSA"), the regulatory body that governs motor carriers. Plaintiffs have not cited to any statute or law that mandates the use of dash cameras in commercial vehicles. Plaintiffs have not cited to one because none exist. Plaintiffs' claim that HMD "relaxed safety enforcement" "at the expense of accountability and public safety" and place "profit ahead of risk mitigation" is a farce. HMD goes above what is required by the FMCSA. Use of the Netradyne dash camera system alone establishes that but combine that with HMD's orientation program (ex. 5, Deposition of HMD Representative, p. 16-17), in person training sessions at the HMD office two times per year (*id.*, p. 17-20), coaching and training after triggering events or when the Netradyne score falls below a certain number (*id.*, p. 22), and other training as needed (*id.*, p. 21) shows that HMD is not relaxing its safety enforcement, is not putting profits ahead of risk management, and is not ignoring accountability and public safety.

### d. Sanctions against HMD are not warranted for continuing to allow Mr. Wortham to drive for it.

While not entirely clear, it seems as though Plaintiffs are seeking sanctions against HMD for allowing Mr. Wortham to continue driving for it after the Incident or because he had four other property damage only incidents for which he was disciplined in the years before the Incident.

15

(Plaintiffs' Motion, p. 12-14). Either way, or both, sanctions are not warranted for such. Plaintiffs are portraying Mr. Wortham as dishonest and a repeat offender of policy violations such that the continued employment of Mr. Wortham was sanctionable. A motion for sanctions has no relationship to a company's decision to retain, or not to retain, a driver. But more, Plaintiffs include misleading and false statements in making these unsupported statements.

First, Plaintiffs contend that "HMD conducted no reassessment of [Mr. Wortham's] employment and took no meaningful action after the March 1, 2023 Incident." This is blatantly false – HMD reviewed the video; HMD reviewed the circumstances of the Incident; HMD issued a written warning to Mr. Wortham; HMD required additional training and coaching on maintaining lanes; HMD explained to Mr. Wortham what needed to be improved in his driving to prevent this type of incident from occurring in the future; and HMD assessed a fine to Mr. Wortham. (Ex. 7, HMD's Document Production, bates stamped HMD TRUCKING 000047). Plaintiffs suggest that because Mr. Wortham relayed a different version of the Incident than what is shown on the dash camera, Mr. Wortham is dishonest. Ironically, Plaintiffs told the investigating officer and Mr. Wortham that they were not injured in the Incident but now claim injuries. Are Plaintiffs' calling themselves dishonest?

Second, in attempting to portray Mr. Wortham as dishonest and a repeat offender, Plaintiffs focus on four prior property damage only incidents. Plaintiffs give false and misleading information with respect to those as well. Plaintiffs claim that Mr. Wortham "lied about a fatal crash" (p. 13) and such is patently false. There is no evidence to suggest that Mr. Wortham has ever been involved in a fatal crash. Plaintiffs further claim that Mr. Wortham could not remember the details of the four prior incidents that lead to his August 2022 written warning and that HMD did nothing about the four prior incidents. Both are false. Mr. Wortham could not recall the details

16

of three of these prior incidents at his deposition but Mr. Wortham is the one who wrote in the box underneath "Driver Statement" so he had a recollection of the prior incidents in 2022 closer in time to when they occurred.   (Ex. 6, Wortham Deposition, p. 57 – 58).  Mr. Wortham could recall the details of one of the prior incidents – it occurred in Wisconsin, Mr. Wortham was at the dock, and another tractor trailer backed into him.  (*Id.*, p. 27).  Plaintiffs also claim HMD did nothing after learning of the four prior incidents but again this is false.  HMD issued a written warning to Mr. Wortham, required Mr. Wortham to complete safety training at the HMD yard, explained what needed to be improved in his driving behavior, and assessed a fine to him.  (Ex. 8, bates stamped Confidential HMD TRUCKING 000123).

> **e.** **Not identifying Jacob Clary by name in Rule 26(a)(1) initial disclosures and not specifically identifying the members of HMD's orientation team is not a basis for awarding sanctions against HMD.**

Section IV(I) of the Motion suggests that HMD has concealed witnesses that would have given unfavorable testimony and thus sanctions under Rule 37 are warranted.  Again, Plaintiffs offer conclusory statements with no support of their allegations of either concealment or unfavorable testimony.   Despite not being specifically named in the Rule 26(a)(1) initial disclosures, Jacob Clary was specifically identified in HMD's interrogatory response number 25, and his name was also on two safety and compliance reviews done on Mr. Wortham, one on August 10, 2022, and another on March 10, 2023, both of which were part of HMD's document production. Plaintiffs have been in possession of HMD's interrogatory responses and the March 10, 2023 safety and compliance review since November 12, 2024.  Plaintiffs have been in possession of the August 10, 2022 safety and compliance review since January 14, 2025.  As to members of HMD's orientation team, HMD did not conceal their names.  HMD stated that HMD safety department personnel provided the training and education to Mr. Wortham at the time of his hire and

afterwards. (Doc. 43-4, HMD's Discovery Responses, Interrogatory response no. 13). Despite having these responses during the first half of November, 2024, Plaintiffs never followed up to ascertain the specific names of these individuals. Plaintiffs want to shift blame to HMD for not providing the information yet Plaintiffs have done nothing to try and obtain it until filing their Motion.

HMD is not hiding the ball or concealing witnesses. It has no plans to call multiple members of its safety department at trial to provide testimony. It has no plans to call Jacob Clary as a witness at trial. Such would be duplicative and a waste of time. HMD will have a representative at trial to testify about its hiring, training, and safety processes as it relates to Mr. Wortham, if such testimony is necessary.

Plaintiffs' statement that they "formally requested deposition dates for Mr. Clary on March 12, 2025" is taken out of context. In the midst of a flurry of emails following HMD's corporate representative deposition, that included potential dates for medical doctors' depositions, Plaintiffs' Rule 26 Expert Disclosures, and the Netradyne subpoena, Plaintiffs' attorney sent the following email[7]:

> Mary Beth:
>
> After hearing HMD testify - I think I need to speak to Mr. Clary. I apologize for not asking about this earlier however the extent of his role in post crash only really became apparent from the testimony. I do see that he was listed as the compliance manager who signed the post crash safety audit but he was not listed in the ROGs or initial disclosures. I need him for like 45 mins to an hour. Do you think we can get this done?

Following this email, HMD does not recall a follow up email specific to deposing Mr. Clary or having a telephone call about potential dates for Mr. Clary, and counsel have talked often since March 12, 2025 about this case and the progression of it as it moves towards trial. If Plaintiffs want to depose him, HMD has no objection to it. Plaintiffs' counsel said "I think", not anything more concrete. To now claim that HMD is running out the clock and denying Plaintiffs access to

---

[7] A copy of the March 12, 2025 email is attached, redacted in part as it is not pertinent to the issue, as Exhibit 12.

key testimony before dispositive motion deadlines is ludicrous. Plaintiffs have known the names of these individuals since last year and have done nothing to obtain testimony from them. HMD is not taking part in "strategic witness concealment." Rather, Plaintiffs sat on their hands for many months and now falsely accuse HMD of engaging in "a broader pattern of discovery misconduct, including destruction of critical data, false testimony about evidence preservation and strategic witness concealment." Through the above, HMD has shown that the nondisclosure of Mr. Clary and the specific names of those working in HMD's safety department, assuming the Court finds such is the case, is either substantially justified or harmless such that an imposition of any sanctions is unwarranted.

      **f.**     **Sanctions are not appropriate against HMD for its Discovery Responses that were provided on November 12, 2024 and supplemented on January 14, 2025 since the objections were warranted and Plaintiffs never claimed any deficiencies with them prior to the Motion.**

Less than thirty (30) days before the dispositive motion deadline and despite having HMD's discovery responses since November 12, 2024, Plaintiffs now claim, for the first time, that HMD's answers to written discovery "violates the plain requirements of the discovery rules" because HMD offered boilerplate objections and did not identify what materials were being withheld. HMD disagrees that its objections were unwarranted. HMD further states it did not withhold any documents and thus did not provide a privilege log to accompany its discovery responses. Assuming this Court finds either valid, however, Plaintiffs should not be awarded sanctions on this basis since Plaintiffs never consulted in good faith with what they now claim to be discovery deficiencies. It is well settled that if a party has concerns with an opposing party's discovery responses, the parties must first confer in good faith to resolve the issues and if such good faith discussions do not resolve the issue, the party must file an appropriate motion to compel with the Court under Rule 37(a). The pending Motion is not a motion to compel. Plaintiffs neither

19

conferred in good faith discussions nor moved to compel but instead waited until fifteen days before the deadline to complete all discovery to claim that HMD has "obstructed discovery". As such, Plaintiffs' Motion for sanctions based on HMD's discovery responses should be denied.

## IV. CONCLUSION

Plaintiffs' assertion that HMD has "fundamentally compromised" discovery and demonstrated a pattern of obstruction is self-serving. Plaintiffs have failed to prove the loss of Netradyne data or that it cannot be recovered from another source, assuming it has been lost. Plaintiffs have failed to show that HMD is concealing witnesses -- the one particular witness primarily at issue was identified in discovery provided to Plaintiffs last year. Plaintiffs' claim that there have been "months-long delay in producing witnesses whose depositions were formally requested" is blatantly false and unsupported. There was one witness, the deposition was informally asked for with a "I think" email on March 12, 2025, and Plaintiffs never followed up on the email. Plaintiffs have failed to show precisely what prejudice they have suffered other than perhaps recognizing they do not have proof to support their direct allegations of negligence against or their request for punitive damages against Defendants. Plaintiffs' claim that HMD's "discovery misconduct" prevents "Plaintiffs' ability to fully and fairly present their claims—including their right to pursue punitive damages" is inaccurate. Plaintiffs had HMD's discovery responses in November of 2024, but apparently set them aside and did not analyze them until months later. To now call HMD's actions as "dishonest", "evasive", "untrustworthy", "reckless", and acting in "bad faith" is unfounded. Plaintiffs simply do not like the position they are now in as the discovery in this case ends and they realize they do not have support for certain claims they have made or damages they are seeking. Plaintiffs have resorted to an unfounded and unsupported Motion for Sanctions.

20

HMD has not engaged in evasive discovery tactics, has not concealed evidence or witnesses, has not offered misleading testimony, and has not destroyed evidence. HMD has not acted in bad faith or engaged in spoliation. Plaintiffs have mischaracterized deposition testimony, at times misquoting it completely. Plaintiffs have misled the Court with how discovery has unfolded in this case. Plaintiffs never conferred in good faith with HMD's counsel about issues raised in the Motion before filing it.

Plaintiffs have requested sanctions in the form of an adverse inference instruction, evidentiary preclusion, witness preclusion or limitations, cost shifting and attorneys' fees, striking of defenses, formal findings of bad faith and sanctions, mandatory supplemental discovery, forensic inspection of HMD's files at HMD's cost and any other relief the court deems appropriate. While HMD does not believe any of the sanctions are warranted under the full and complete facts of this case as now explained, HMD will agree to not call Jacob Clary as a witness at trial. As to supplementing discovery, a motion for sanctions is not the proper vehicle to demand supplemental discovery. If this Court, however, deems that supplementation is necessary and orders it, HMD will comply with such an order. All other sanctions suggested are unsupported and inappropriate. At the foundation, Plaintiffs have failed to show that ESI has been lost or destroyed or cannot be restored or replaced through additional discovery. On such ground alone, Plaintiffs' Motion should be denied. Moreover, Plaintiffs have failed to show prejudice or that HMD acted with the intent to deprive Plaintiffs of the information's use. Assuming arguendo that this Court finds that (1) ESI has been lost or destroyed, (2) cannot be replaced through additional discovery, and (3) upon a finding of prejudice to Plaintiffs, this Court should "order measures no greater than necessary to cure the prejudice." Rule 37(e)(1). HMD concedes this could include Plaintiffs' ability to depose Jacob Clary after the discovery deadline or preclude HMD from calling Mr. Clary as a witness at

trial.  There has been no evidence or support that HMD acted with the intent to deprive Plaintiffs of the Netradyne data, the ESI at issue.

As set forth above, Plaintiff's Motion is unwarranted and lacks tangible support, and this Court should deny Plaintiffs' Motion for Sanctions in its entirety.  HMD believes a hearing could be appropriate for Plaintiffs' Motion and thus requests a hearing as permitted under Local Rule 7.2.  Further pursuant to Local Rule 37.2, HMD hereby seeks the imposition of costs and its attorneys' fees for having to respond to Plaintiff's unnecessary discovery motion.

Respectfully submitted,

LEWIS THOMASON, P.C.

By:/s/*Mary Beth White*_____
    Mary Beth White, BPR #24462
    424 Church Street, Suite 2500
    Nashville, TN  37219
    (615) 259-1366
    mbwhite@lewisthomason.com

*Attorney for defendant HMD Trucking, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing DEFENDANT HMD TRUCKING, INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS has been served on the following counsel of record via Court's ECF system:

Tim O. Henshaw, Esq.
Alexander Shunnarah Trial Attorneys
1604 Reggie White Blvd., Suite 102
Chattanooga, TN 37402
thenshaw@asilpc.com


This the 14th day of May 2025.


*/s/Mary Beth White*_____