Confidential

**In The Matter Of:**

*Radha Bolivar and Angelica Goatache v.*
*HMD Trucking, Inc., and Antonio Wortham*

---

*Video Deposition of Antonio Wortham*
*February 4, 2025*

---

**nashvillecourtreporters**

Online Scheduling: **ncrdepo.com** | **615.885.5798**

*Original File 2025-02-04 Antonio Wortham.txt*
*Min-U-Script® with Word Index*

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

RADHA BOLIVAR AND ANGELICA )
GOATACHE, )
                   )
      Plaintiffs, ) DOCKET NO. 1:24-cv-00155
                   )
v. ) JUDGE VARLAN
                   )
HMD TRUCKING, INC., AND ) JURY DEMANDED
ANTONIO WORTHAM, )
                   )
      Defendants. )

------------------------------------------------

TRANSCRIPT CONTAINS CONFIDENTIAL INFORMATION

WEB CONFERENCE DEPOSITION OF

ANTONIO WORTHAM

Tuesday, February 4, 2025

------------------------------------------------

**Page 2**

APPEARANCES via ZOOM:

For the Plaintiffs:   Mr. Tim O. Henshaw
                   Alexander Shunnarah Trial
                     Attorneys
                   1604 Reggie White Boulevard
                   Suite 102
                   Chattanooga, TN 37402
                   423-417-9205
                   thenshaw@asilpc.com

For the Defendants:   Ms. Mary Beth White
                   Lewis Thomason, P.C.
                   424 Church Street, Suite 2500
                   P.O. Box 198615
                   Chattanooga, TN 37219-8615
                   615-259-1366
                   mbwhite@lewisthomason.com

Also Present:       Mr. Jason Polk
                   HMD Trucking, Inc.

The Videographer:   Mr. Frank Erwin
                   Erwin Video
                   1013 River Ridge Terrace
                   Nashville, TN 37221
                   615-604-9784
                   cerwinvideo@comcast.net

Reported By:
Jennifer B. Carollo, LCR, RPR, CCR

**Page 3**

1        The web conference video deposition of
2  Antonio Wortham was taken by counsel for the
3  Plaintiffs. The witness appeared via Zoom at the
4  office of HMD Trucking, Inc., on Tuesday, February 4,
5  2025, beginning at 2:34 P.M., for all purposes allowed
6  under the Federal Rules of Civil Procedure.
7        It is agreed that Jennifer B. Carollo,
8  Licensed Court Reporter, Registered Professional
9  Reporter, and Certified Court Reporter for the State of
10  Tennessee, may swear the witness via Zoom, take the
11  deposition, and afterwards reduce same to typewritten
12  form, and that the reading and signing of the completed
13  deposition by the witness was not discussed.
14        All formalities as to caption, certificate,
15  transmission, filing, etc., are waived. All objections
16  except as to the form of the questions are reserved to
17  on or before the hearing.
18  ------------------------------------------------
19        (Note: The spelling of the witness,
20        Antonio Wortham, throughout this
21        transcript is spelled according to the
22        Notice of Deposition.)

**Page 4**

                   INDEX

ANTONIO WORTHAM                           PAGE

Examination By Mr. Henshaw .........................6
Examination By Ms. White ..........................54
Reexamination By Mr. Henshaw ......................59

                   EXHIBITS

NUMBER      DESCRIPTION                   PAGE

Exhibit 1    Safety Improvement Review,        28
            Bates-stamped HMD TRUCKING 000123
            (CONFIDENTIAL UNDER PROTECTIVE ORDER)

Exhibit 2    Photocopy of Commercial Driver's   36
            License, HMD TRUCKING 000139
            (CONFIDENTIAL UNDER PROTECTIVE ORDER)

Exhibit 3    Photocopy of Paper copy of Commercial 37
            Driver's License, Bates-stamped HMD
            TRUCKING 000131 (CONFIDENTIAL UNDER
            PROTECTIVE ORDER)

Exhibit 4    Company Policy and Operating     46
            Procedures, Bates-stamped HMD TRUCKING
            000408 through 000422 (CONFIDENTIAL
            UNDER PROTECTIVE ORDER)

Exhibit 5    Safety & Compliance Review,      52
            Bates-stamped HMD TRUCKING 000121
            (CONFIDENTIAL UNDER PROTECTIVE ORDER)

Exhibit 6    Driver Policy Manual, Section:    61
            Emergencies, Bates-stamped HMD
            TRUCKING 000373 (CONFIDENTIAL UNDER
            PROTECTIVE ORDER)

Confidential

Page 5

1  THE VIDEOGRAPHER: We are on the
2  record. This is the Zoom video deposition of Ant --
3  Antanio -- Antania -- Antonio Wortham.
4  Today is Tuesday, February 4, 2025, and
5  the time is now 2:34.
6  Will counsel, please, identify
7  yourselves, state whom you represent, and then
8  stipulate on the record that there's no objection to
9  the court reporter administering a binding oath to the
10  witness today via Zoom. And let's start with the
11  plaintiffs' attorney, please.
12  MR. HENSHAW: Yeah. My name is Tim
13  Henshaw. I represent Radha and Angelica in this case.
14  I don't have any objection.
15  THE VIDEOGRAPHER: Mary Beth, introduce
16  yourself.
17  MS. WHITE: Mary Beth White here on
18  behalf of HMD Trucking, Inc., and Antonio Wortham, and,
19  likewise, I have no objection.
20  THE VIDEOGRAPHER: And will the court
21  reporter, please, swear in the witness?
22  THE COURT REPORTER: Do you swear or
23  affirm the testimony you are going to give in this case
24  will be the truth, the whole truth, and nothing but the
25  truth so help you God?

Page 6

1  THE WITNESS: Yes.
2  ANTONIO WORTHAM,
3  called as a witness, having been duly sworn, was
4  examined and testified as follows:
5  EXAMINATION
6  BY MR. HENSHAW:
7  Q.  Sir, could you, please, briefly just state
8  your name for the record?
9  A.  Antonio Wortham.
10  Q.  Awesome. Have you ever given a deposition
11  before?
12  A.  No.
13  Q.  All right. Well, you're doing a good job so
14  far. This is a little wonky because we're doing it via
15  Zoom, but it generally helps everybody to do it that
16  way. What I am going to ask you to do is, first of
17  all, try to be careful about making sure that even
18  though you might anticipate my question that you wait
19  until I finish the entire question before you try to
20  answer. Does that make sense?
21  A.  Yes.
22  Q.  All right. And the second thing I am going
23  to ask from you is if you don't understand my
24  question -- sometimes I get a little wordy. I spent --
25  you know, I'll ask stupid questions or whatever. If I

Page 7

1  do that, and you don't understand, please, let me know
2  before you answer rather than trying to, you know,
3  answer a question you don't understand because
4  generally speaking, I am going to hold you to your
5  answers if you start answering. Does that make sense?
6  A.  Yes.
7  Q.  All right. Where do you live, sir?
8  A.  Tuscaloosa, Alabama.
9  Q.  What's your date of birth?
10  A.  ████████
11  Q.  Do you currently have a Class A CDL in the
12  state of Alabama?
13  A.  Yes.
14  Q.  How long have you had a license in the state
15  of Alabama?
16  A.  Seven years.
17  Q.  Okay. And have you ever had a CDL in any
18  other state?
19  A.  No.
20  Q.  Who is your current employer?
21  A.  HMD Trucking.
22  Q.  How long have you worked for them?
23  A.  Three years.
24  Q.  I was reviewing your personnel file. It
25  looks like maybe you started with them in about

Page 8

1  November of 2021. Does that sound right? I'm sorry.
2  I didn't catch your answer if you said it.
3  A.  Yes.
4  Q.  All right. Before HMD Trucking, where were
5  you working?
6  A.  Publix Distribution Center.
7  Q.  Also in Alabama?
8  A.  Yes.
9  Q.  And how long did you work there?
10  A.  About seven years.
11  Q.  So I understand your testimony so far to be
12  that you got a CDL approximately 2017? So -- is that
13  right?
14  A.  Yes. Or I got a CDL around 2018.
15  Q.  2018? Okay. So part of your time with
16  Publix you did not have a CDL, and then I guess you got
17  that CDL during your time at Publix?
18  A.  Yes.
19  Q.  How did you get that? What prompted you to
20  do that?
21  A.  Can you repeat that again?
22  Q.  Sure. Why did you get your CDL?
23  A.  Oh, yeah. I got the CDL just because I just
24  wanted to start driving a truck.
25  Q.  Okay. And so were you driving before that,

Page 9

1 or was it something new you started doing when you got
2 your CDL?
3 A.      It was something when I -- once I got my
4 CDL.
5 Q.      What were you doing at Publix before you got
6 your CDL?
7 A.      Working inside the warehouse.
8 Q.      Okay.  Did you see getting your CDL as just
9 a way to have better opportunities, make more money;
10 that sort of thing?
11 A.      Yes.  Better business -- for a better
12 business opportunity.
13 Q.      Okay.
14 A.      Opportunities.
15 Q.      And how -- has that worked out for you well
16 so far?
17 A.      Oh, yes.  I've been doing -- I've been doing
18 pretty good.  I've been working fine.
19 Q.      Now, I understand that your relationship
20 with HMD is that you are a leased operator; is that
21 right?
22 A.      Yes.
23 Q.      Has it been that way since November of 2021?
24 A.      No.
25 Q.      What -- did it start out as a W-2 driver or

Page 10

1 when did it change?
2 A.      It's always been -- I've always been 1099.
3 It changed January of 2022.
4 Q.      Okay.  So after about three months working
5 for them, they changed you over to a lease operator?
6 A.      Yes.
7 Q.      Was that, like, a probationary period you
8 were working for them or how did that -- what was the
9 arrangement from November to January?
10 A.      Well, I always wanted to be a lease
11 operator, but the standard was to be a company driver
12 for 45 days.  Being a company driver for 45 days, you
13 have to -- like, they see how you operate the vehicle,
14 see everything like that before they -- before you
15 become a leased person -- operator.  I guess they want
16 to just see how you work as a company driver and see
17 will you be fit to be a leased person's operator.
18 Q.      Okay.  So during those first 45 days, there
19 were no issues, and then they transitioned you over to
20 a lease operator?
21 A.      Yes.
22 Q.      And tell me about your time with HMD.  Have
23 you had any disciplinary issues or any write-ups that
24 you have been given?
25 A.      Yes.

Page 11

1 Q.      Tell me what those were for.
2 A.      December of last year, I had got a speeding
3 ticket.
4 Q.      Is that the only thing that you've had with
5 them?
6 A.      Yes.
7 Q.      When you came on with HMD, did they provide
8 you with any training?
9 A.      Yes.
10 Q.      What -- how did they train you?
11 A.      Through orientation.
12 Q.      Okay.  So you did an orientation.  Was that
13 somewhere up in Chicago?
14 A.      Yes.
15 Q.      And how long was that?
16 A.      One day.
17 Q.      All right.  And is that also where they gave
18 you your road test?
19 A.      Yes.
20 Q.      So we did a one-day orientation.  We did our
21 road test, and then when -- how long was it after those
22 things before you were on the road working for HMD?
23 A.      The next day.
24 Q.      The next day?  Was anybody sent out with
25 you, or were you sent on your own?

Page 12

1 A.      On my own.
2 Q.      Now, had you ever had any safety violations
3 or crashes prior to coming over to HMD?
4         MS. WHITE: Object to the form.
5 BY MR. HENSHAW:
6 Q.      Let me break that up into two questions.
7 Did you ever have any crashes prior to coming over
8 to HMD?
9 A.      Yes.
10 Q.      Okay.  Tell me about that.
11 A.      Yes.  I was in a Publix truck, and a motor
12 vehicle hit my trailer tire, and she took 100 percent
13 fault in the accident.
14 Q.      Okay.  When was that?
15 A.      I can't remember.  I think it was around
16 2020.
17 Q.      And that was not your fault; correct?
18 A.      Yes.  Yes, sir.
19 Q.      Any other track -- any other crashes since
20 you've had a CDL?
21 A.      Yes.
22 Q.      Okay.  Tell me about that.
23 A.      I was sitting still on Highway 65 in Indiana
24 in traffic, and an 18-wheeler hit me from the back.
25 Q.      When did that happen?

Case 1:24-cv-00155-TRM-MJD   Document 55-5   Filed 05/14/25   Page 4 of 24
PageID #: 467

Page 13

1  A.　　　February of 2024.
2  Q.　　　All right.  So February of 2024, that was
3  after this.  Have you had any other crashes?
4  A.　　　No.
5  Q.　　　Have you ever had any moving violations
6  while you were in possession of a CDL?
7  　　　　MS. WHITE: Object to the form.  Go
8  ahead and answer, Mr. Wortham.
9  　　　　THE WITNESS: No.
10 BY MR. HENSHAW:
11 Q.　　　All right.  Did you ever have -- have you
12 ever been involved in any lawsuits before?
13 　　　　Sorry.  I didn't get your answer if you gave
14 it.  Sorry.
15 A.　　　Well, what are you talking -- I'm trying to
16 see, are you talking about as of today?
17 Q.　　　Sure.  Yeah.  Has anybody sued you before?
18 A.　　　Oh, no.
19 Q.　　　Have you ever sued anybody before?
20 A.　　　Well, I do have an attorney going to the
21 accident for what I had last year.
22 Q.　　　Okay.  You have -- so you have your own case
23 going on with your accident from February of 2024?
24 A.　　　Yes.
25 Q.　　　Okay.  You have an attorney for that?

Page 14

1  A.　　　Yes.
2  Q.　　　Who is that attorney?
3  A.　　　Alfreda Williams.
4  Q.　　　Is that some -- somewhere in Alabama or
5  somewhere else?
6  A.　　　She's located in Georgia.
7  Q.　　　Okay.  Is that where it happened is in
8  Georgia?
9  A.　　　Oh, no.  It happened in Indiana.
10 Q.　　　Got ya.  And you said she?  I thought you
11 said Alfredo.  I think you said Alfreda now?
12 A.　　　Yeah.  Alfreda.
13 Q.　　　Okay.
14 A.　　　Alfreda Williams.
15 Q.　　　Got ya.  All right.  But it sounds like
16 that's not -- like, maybe there's a claim, but there's
17 not a lawsuit that's actually been filed.  Is that the
18 status of that matter?
19 A.　　　Yes.
20 Q.　　　Okay.  So let's talk about the crash on
21 March 1st, 2023.  Do you remember it?
22 A.　　　Portions of it.  Somewhat, yes.
23 Q.　　　Okay.  So there are some parts of it that
24 you remember and some parts of it that you don't.
25 What -- what's the reason for that?  It's just been a

Page 15

1  long time, or do you have, like, a specific memory
2  issue?
3  A.　　　It's just been -- been a long time.
4  Q.　　　Okay.  Tell me what you can remember.
5  　　　　MS. WHITE: Object to the form.  It
6  calls for -- is there a specific question, Tim, that
7  you have?
8  BY MR. HENSHAW:
9  Q.　　　Yeah.  Can you tell me what you remember
10 about the crash on March 1st, 2023?
11 A.　　　Well, I remember going down Highway 24 in
12 Tennessee behind a -- behind a dark-colored vehicle.
13 Turned my signal light on to get in the left lane.  I
14 passed the vehicle.  I got over and got back over into
15 the right lane.  And from that time, I guess, that's
16 when the accident happened.
17 Q.　　　So the accident happened as you were merging
18 from the left lane to the right lane?
19 A.　　　Yes.
20 Q.　　　Okay.  So it sounds like you agree that you
21 hit the vehicle my clients were driving in the right
22 lane?
23 A.　　　Yes.
24 Q.　　　All right.  I am a little curious about that
25 though, because it seems like when you review the

Page 16

1  police officer that you told the police officer
2  something different.  Was he incorrect about that?
3  A.　　　What you mean?
4  Q.　　　I'll share it with you.  Hang on one second.
5  Have you ever reviewed the police report associated
6  with this case?
7  A.　　　No.
8  Q.　　　Okay.  And nobody ever -- from HMD has ever
9  gone over it with you?
10 　　　　MS. WHITE: Over the police report?
11 　　　　MR. HENSHAW: Correct.
12 　　　　THE WITNESS: No, not the -- not the
13 police report.
14 BY MR. HENSHAW:
15 Q.　　　Okay.  All right.  Mr. Wortham, are you able
16 to see my screen?
17 A.　　　I've got my glasses on.  It's a little
18 small.
19 　　　　MR. POLK: Yeah.  If you can zoom --
20 zoom in on it, that would be helpful.  It's pretty
21 small here.
22 　　　　MR. HENSHAW: Okay.  Got ya.  Is that
23 better?
24 　　　　THE WITNESS: Yes.
25 ///

Page 17

1 BY MR. HENSHAW:
2 Q.      All right.  Do you remember Trooper Larry
3 Anderson from the day of the crash?
4 A.      It was -- it was two of them.  So I don't
5 know them by name.
6 Q.      Okay.  You remember being in Tennessee.  You
7 remember the police coming out after the crash
8 happened; is that fair?
9 A.      Yes.
10 Q.      Okay.  And then you spoke to two troopers?
11 Is that --
12 A.      Yes.
13 Q.      All right.  Now, the troopers put down in
14 the police report that -- and I am going to show you
15 this here in the narrative.  They show -- they put down
16 that there was conflicting statements from the drivers
17 and no evidence in the roadway to support either
18 drivers claims.  Do you see that?
19 A.      Yes.
20 Q.      Okay.  So what I am trying to as -- what I
21 am trying to find out is, I mean, did you tell the
22 troopers at the scene that you were merging from left
23 to right when you hit Mr. Bolivar's car?
24 A.      Well, I -- I can't remember if I told them
25 that.

Page 18

1 Q.      Okay.  Do you think that you told them the
2 same thing that you told me today?
3 A.      Well, really I don't know what I told them.
4 Q.      Okay.  So if those officers wrote down that
5 there was a conflicting statement about who came over
6 in whose lane, you have no idea why they put that?
7 A.      No.
8 Q.      And it wouldn't be based on anything that
9 you said to them; correct?
10      MS. WHITE: Object to the form.
11      You can go ahead and answer, if you
12 know, Mr. Wortham, what the police officer said.
13      THE WITNESS: What was the question
14 again?
15 BY MR. HENSHAW:
16 Q.      Yeah.  The reason -- these officers wouldn't
17 have that there were conflicting statements based on
18 anything you said; correct?
19      MS. WHITE: Object to the form.
20 BY MR. HENSHAW:
21 Q.      You can answer the question.
22 A.      Yes.  Yes.
23 Q.      Okay.  Here's why I'm asking you the
24 question is because I am a little concerned about the
25 fact that sitting here today, you -- you know, we have

Page 19

1 the video of what had happened, but it seems like -- at
2 least from what these police officers were told or what
3 they put in their report, that they were told something
4 different at the scene than what you testified to here
5 today.  And so before we move on from that, I just want
6 to get your honest truth about that.
7      Do you remember telling them a conflicting
8 story with something besides you were merging from left
9 to right and hit Mr. Bolivar in his lane?
10 A.      No.
11 Q.      Okay.  Have you ever watched the video of
12 the crash?
13 A.      Yes.
14 Q.      The video of the crash is consistent with
15 what you just said; correct?  That you were merging
16 from left to right and hit Mr. Bolivar in his lane;
17 correct?
18 A.      Yes.
19 Q.      Okay.  What specifically -- do you know
20 anything about HMD's policies or training are with
21 regard to lane change maneuvers?
22      MS. WHITE: Object to the form.
23      MR. HENSHAW: You can answer.
24      THE WITNESS: No.
25 ///

Page 20

1 BY MR. HENSHAW:
2 Q.      Okay.  Have you ever received any training
3 on lane change maneuvers from HMD?
4 A.      Yes.
5 Q.      Okay.  What was the training?
6 A.      Turn on your turn -- turn your turn signal
7 on; make sure the lane is clear before you merge over.
8 Q.      Okay.  And would you agree that you didn't
9 do those things on this occasion, March 1, 2023?
10 A.      Yes.  I turned the signal light on, and I
11 thought the lane was clear, but they was in my blind
12 spot.
13 Q.      Okay.
14 A.      From where I was sitting -- from where I was
15 sitting in the lane, they was . . .
16 Q.      They were in your blind spot?
17 A.      Yes.
18 Q.      Is that what you're saying, they were in
19 your blind spot?
20 A.      Yes.
21 Q.      Okay.  Were you injured in the crash?
22 A.      No.
23 Q.      Okay.  After the crash, did you go -- did
24 you keep driving, or did you stop or what happened?
25 A.      Yes.  I drove to -- I drove to a truck stop.

Page 21

1 Q.    Okay.  And once you got to the truck stop,
2 what did you do next?
3 A.    Went to sleep.
4 Q.    What truck stop did you stop at?
5 A.    It was a Love's, the nearest Love's that was
6 up the street from where the accident was.
7 Q.    The one in Marion County there?  You don't
8 know.  I probably know better than you.
9 A.    It was near -- the nearest Love's that I got
10 to.
11 Q.    Okay.  Yeah.  Was the Love's -- was it --
12 did you go up the mountain some more and stop there; is
13 that right?
14 A.    Yes.
15 Q.    Okay.  All right.
16      MR. HENSHAW: Mary Beth, I need to step
17 out for just one sec.  Can we get like five minutes,
18 and then I'll be right back?
19      MS. WHITE: Sure.
20      MR. HENSHAW: All right.
21      THE VIDEOGRAPHER: Going off the
22 record.  The time is 3 o'clock.
23      (Recess taken from 3:00 to 3:05 P.M.)
24      THE VIDEOGRAPHER: We're back on the
25 record.  The time is 3:05.

Page 22

1 BY MR. HENSHAW:
2 Q.    Thank you.  All right.  So, Mr. Wortham, was
3 there anything about the scene or the area -- like,
4 here's kind of what I am trying to find out.  If this
5 case goes to trial, are you going to tell the jury
6 that, you know, you couldn't see or there was some --
7 something in your way or something like that that kept
8 you from being able to see my client, something to do
9 with the roadway specifically that you remember?
10 A.    No.
11 Q.    Okay.  I know it was nighttime; right?
12 A.    Yes.
13 Q.    Okay.  After this happened, did you receive
14 any sort of disciplinary action from HMD?
15 A.    Yes.
16 Q.    Okay.  Tell me what happened.
17 A.    Well, I got routed back to the HMD yard in
18 Chicago.  Reid in safety went over with me what
19 happened, and -- and I signed a disciplinary form.
20 Q.    Okay.  Okay.  How long after the crash was
21 that?
22 A.    I can't remember.
23 Q.    Was it months or weeks?  Or days?
24 A.    Probably like weeks after the accident.
25 Q.    Okay.  Did you ever speak to Mr. Bolivar or

Page 23

1 Miss Angelica after the crash happened?
2      MS. WHITE: And just for clarification,
3 those were the other two people in the vehicle,
4 Antonio.
5      THE WITNESS: Were you asking at the
6 scene or after the scene or --
7 BY MR. HENSHAW:
8 Q.    In the next day or in the weeks that
9 followed?
10 A.    No.
11 Q.    Is it fair to say that you assumed if they
12 had any issues, that your company would take care of
13 that?
14      MS. WHITE: Object to the form.
15 BY MR. HENSHAW:
16 Q.    Let me rephrase the question because I think
17 maybe it's a confusing question.
18      You did not follow up after the crash with
19 Mr. Bolivar or Miss Angelica to see if they were having
20 any pain or any injuries that manifested after y'all
21 left the scene of the crash.  Fair?
22 A.    No.
23 Q.    Okay.  And you mean no as in you didn't do
24 that; right?
25 A.    Right.

Page 24

1 Q.    Okay.  And is the reason you did not do that
2 because you assumed that your company or your insurance
3 or somebody like that would take care of them if they
4 needed to be taken care of?
5      MS. WHITE: Object to the form.
6 BY MR. HENSHAW:
7 Q.    You can answer.
8 A.    I can't speak on what HMD did.
9 Q.    Sure.  Well, I guess let me ask it to you
10 this way.  Were you concerned at all with what --
11 whether they may be injured?
12 A.    No.
13 Q.    Okay.  Did you care about following up with
14 them to see if they had any problems getting home?  No?
15 A.    No.
16 Q.    Okay.  Why not?
17 A.    Because at the scene they were -- they were
18 walking pretty fine, and they drove off pretty fine.
19 So in my acknowledgment, they was okay.
20 Q.    Okay.  So after the crash, you were sleeping
21 at the Love's Truck Stop.  You said somewhere up the
22 road from where the accident happened; correct?
23 A.    Yes.
24 Q.    Prior to this crash happening, how many
25 hours had you been driving?

Case 1:24-cv-00155-TRM-MJD   Document 60-5   Filed 05/14/25   Page 7 of 24
PageID #: 470

Page 25

1  A.      I can't remember.
2  Q.      Were you tired when the crash happened?
3  A.      No.
4  Q.      Okay.  Did you get tired after the crash
5  happened?
6  A.      No.
7  Q.      Okay.  Why did you feel the need to pull up
8  and stop and go to sleep up the road from where it
9  happened?
10  A.      Because my -- I do remember my hours of
11  service had expired.  So DOT regulation, I had to stop.
12  Q.      Okay.  Okay.  So your hours of service, were
13  they expired at the time the crash happened, or did
14  they expire soon after the crash happened?
15  A.      No.  That had expired after.
16  Q.      How -- how long after?
17  A.      Well, they had expired while we were waiting
18  on the officer to get there?
19  Q.      Oh, okay.
20  A.      My -- my time was still running on the side
21  of the road.
22  Q.      How long were you waiting on the side of the
23  road?
24  A.      A couple of hours.
25  Q.      And how long into waiting did your hours of

Page 26

1  service expire?
2  A.      I can't remember.  I just -- I just know
3  once everything got resolved, and I got back in the
4  truck, my hours of service was -- had expired.
5  Q.      Okay.  Do you remember where you came from
6  that day?
7  A.      I can't remember.
8  Q.      Do you remember where you were going with
9  that trip?
10  A.      No.  I can't remember that.  I'm sorry.
11  Q.      Do you have -- did you have a load that you
12  had picked up?
13  A.      Yes.
14  Q.      Do you remember where you picked it up?
15  A.      No.
16  Q.      Do you remember what time you picked it up?
17  A.      No.
18  Q.      Did you fall asleep at the wheel?
19  A.      No.
20  Q.      Now, did your company give you a drug test
21  after this crash happened?
22  A.      No.
23  Q.      Do you know why not?
24  A.      No.
25  Q.      Did the officer tell you why he wasn't

Page 27

1  giving you a citation after the crash happened?
2  A.      No.  He didn't tell me.
3  Q.      Okay.  You just knew that he wasn't giving
4  you one?
5  A.      Correct.
6  Q.      Did you ever get in trouble while working
7  for HMD for not reporting crashes?
8  A.      No.
9  Q.      Did you ever get in trouble while working at
10  HMD for not reporting damage to vehicles you were
11  driving?
12  A.      Yes.
13  Q.      Tell me about that.
14  A.      I can't remember when it was, but I was -- I
15  do remember I was in Wisconsin, and I was at a -- I was
16  at the dock, and this other 18-wheeler truck backed
17  into -- backed into my truck and hit it, and I didn't
18  say anything.  I didn't -- I didn't -- I didn't call
19  the police.  I didn't tell HMD about it.  I brought my
20  truck to the shop for service, and they seen the
21  scratch on the side of the fender, and then they asked
22  me what happened.  And when I told them what happened,
23  they got on to me about -- about that situation.
24  Q.      Okay.  Is that the only reason -- is that
25  the only incident involving unreported damage that you

Page 28

1  had?
2  A.      Yes.  That I can remember, yes.
3  Q.      Do you remember anything about making a
4  U-turn in Indiana?
5  A.      No.
6  Q.      Okay.  All right.  So I am going to share
7  with you a document that I got that was produced to me
8  as HMD, Bates-stamped, 000123.  Do you remember signing
9  this, Mr. Wortham?
10  A.      Yes.
11  Q.      Okay.  And it looks to me like there are
12  four separate instances there on unreported damage that
13  you got a warning about.  Am I reading this form
14  correctly, or am I reading it incorrectly?
15  A.      Yeah.
16  Q.      Am I reading it correctly?
17  A.      Yes.
18          MR. HENSHAW: Okay.  I am going to make
19  this Exhibit 1 to the deposition.
20          (Marked Exhibit 1.)
21  BY MR. HENSHAW:
22  Q.      What -- tell me, if you can, what led to
23  this warning that you got in August of 2022?
24  A.      I don't remember.
25  Q.      You don't remember?

Page 29

1 A.        I remember signing, but I don't -- I don't
2 remember what -- the incident.
3 Q.        Okay.  Did they make you pay for damage to
4 the truck?
5 A.        Yes.
6 Q.        Okay.  Did you have to pay for damage to the
7 truck after this incident with my clients?
8 A.        Yes.
9 Q.        How -- do you know how much it was that you
10 paid for damage to this truck after this incident in
11 March of 2023?
12 A.        I think like 2500.
13 Q.        $2,500?
14 A.        Yes.
15 Q.        Okay.  Do you -- when you got this warning
16 it describes that you got safety training.  What was
17 that safety training that you got?
18            MS. WHITE: Object to the form.
19 BY MR. HENSHAW:
20 Q.        In August of '22, did you get safety
21 training related to the failing to report damage?
22 A.        I can't remember.
23 Q.        Okay.  Do you remember signing or
24 acknowledging any company manuals when you went to work
25 for HMD?

Page 30

1 A.        I can't remember that.
2 Q.        You don't remember signing or acknowledging
3 any company manuals?
4 A.        In orientation we signed a lot of -- I can't
5 remember.
6 Q.        Fair enough.  How did you report this crash
7 to HMD?
8 A.        Through -- through a phone call.
9 Q.        Okay.  Who did you call?
10 A.        After-hours safety.
11 Q.        And is that like a phone number you had in
12 the truck somewhere?
13 A.        It's saved in my phone.
14 Q.        Okay.  So is it like when you went through
15 orientation, they give you this number and said if you
16 ever get in a crash, call this number, and yow saved it
17 that day?
18 A.        Yes.  It's -- it's just a -- a business
19 phone.  A business phone number.
20 Q.        Oh, okay.  All right.  So you called it.
21 You reported it.  Do you remember who you spoke to?
22 A.        No.
23 Q.        What was that call like?
24 A.        I -- I called after-hours, and I told them
25 that, I think, I was in an accident, but I wasn't for

Page 31

1 sure.  And I told them I pulled over on the side of the
2 road with the -- with the car that I designated.  At
3 the time, I didn't know if I was in an accident at that
4 time or not.
5            And they told me, "Okay."  And they said,
6 "Once you get everything sorted out, let us know what
7 happened."
8 Q.        Okay.  So then did you talk to the police
9 next, or had you already talked to the police by that
10 point?
11 A.        I -- I talked to the police next.
12 Q.        Okay.  When did you -- at what point did you
13 get everything sorted out?  How long did that take?
14 A.        About -- like once the police was called,
15 and they got everybody's information.  I can't remember
16 how long -- how long it took.
17 Q.        Okay.  But you got like a police report
18 number or something and then called HMD to let them
19 know, I presume?
20 A.        Yes.
21 Q.        All right.  And what did HMD tell you as far
22 as the -- what to do next?
23 A.        Somebody from safety they -- they text and
24 asked for my statement.
25 Q.        So you sent in a text message statement

Page 32

1 about what happened?
2 A.        Yes.
3 Q.        Do you remember what you put in the text
4 message statement about what happened?
5 A.        No, I can't remember.
6 Q.        All right.  Do you remember the number that
7 you texted?
8 A.        No.
9 Q.        This calling and texting and stuff, was this
10 all done on a device that you purchased, or was it a
11 device that HMD gave you?
12 A.        Something that I -- I purchased.
13 Q.        Okay.  The report lists a phone number of
14 ▮▮▮▮▮▮▮▮.  Was that -- was that the number that you
15 were using for this back and forth?
16 A.        Yes.
17 Q.        Okay.  Who was your carrier at the time?
18 A.        AT&T.
19 Q.        Got it.  Is it still AT&T to this day?
20 A.        No.
21 Q.        Do you still have that phone, or has it been
22 traded in or somethings?
23 A.        Yes.  I no longer have the phone.
24 Q.        Okay.  When did you lose the phone?
25 A.        Like, July of '24.

Page 33

1  Q.      Okay.  Did you -- you had Summer Elzy with
2  you in the vehicle.  Who is Summer Elzy?
3  A.      My wife.
4  Q.      Okay.  Were y'all married at the time?
5  A.      Yes.
6  Q.      Are you still married?
7  A.      Yes.
8  Q.      When did y'all get married?
9  A.      October -- October twenty -- 28th, 29th,
10  2019.
11  Q.      Got ya.  Do y'all have children together?
12  A.      No.
13  Q.      Does she also drive trucks?
14  A.      Yes.
15  Q.      Does she work for HMD too?
16  A.      No.
17  Q.      Okay.  Who is U.S. Leasing, LLC?  Do you
18  know who that is:  U.S. Leasing, LLC?  It's listed on
19  the police report as the owner of the vehicle.
20  A.      No.
21  Q.      Okay.  The load that you had at the time,
22  did you pick that up outside of Tennessee?
23  A.      Yes.  I got it -- yes, I got it.  Yes.
24  Q.      Okay.  Was your ultimate destination in
25  Tennessee, or was it somewhere else?

Page 34

1  A.      Somewhere else.
2  Q.      All right.  So you're going across state
3  lines.  Were you operating under HMD's DOT authority?
4  A.      Yes.
5  Q.      All right.  How does that work?  How do you
6  get loads?  How do you get work from them?  Describe
7  that to me.
8  A.      We have a dispatcher.  The dispatcher will
9  dispatch -- dispatch our loads.
10  Q.      Okay.  And you just say yes or no?
11  A.      Yes.  Yes.
12  Q.      Okay.  Has your CDL ever been suspended for
13  any reason?
14  A.      No.
15  Q.      I was going through some documents, and
16  there was like a document that indicated -- it's --
17  it's like you had two different copies of your CDL.
18  There was, like, a plastic one, and then there was,
19  like, a paper one.  Do you know what I'm talking about?
20  Do you want me to show it to you?  I can show it to
21  you.  That was just a little confusing.  I was trying
22  to make sure I understood what -- what the deal was
23  with that.  So hang on one sec.
24          All right.  So you see my screen here?
25  A.      Yes.

Page 35

1  Q.      I can zoom in so you can see it a little
2  easier.  So, like, this is in your personnel file and
3  is issued May of 2021 in Alabama.  Do you see that?
4  A.      Yes.
5  Q.      Okay.  And it says it expires 10/19 of 2022.
6  I presume you've gotten this reissued at some point
7  since 2022?
8  A.      Yes.
9  Q.      Okay.  Now, one of the first questions I
10  have about this is this was issued in 2021 in the state
11  of Alabama.  Now, you indicated to me earlier you got
12  your CDL back in 2018.  How -- what -- which of these
13  things is correct?
14          MS. WHITE: Object to the form.
15  BY MR. HENSHAW:
16  Q.      You can answer the question.  Sorry.
17  A.      I'm trying to figure out -- I'm trying to
18  understand what you're asking.
19  Q.      Sure.  Well, I guess my question is, is it
20  possible that you got your CDL in another state prior
21  to getting it issued in the state of Alabama?
22  A.      No.
23  Q.      Okay.  The -- this CDL that I have shows
24  that you got your CDL issued to you, your Class A
25  license in May of 2021.  You see that; correct?

Page 36

1  A.      Yes.
2  Q.      But you told me it was issued in 2018;
3  right?
4  A.      Correct.
5  Q.      Well, how do I make sense of those?
6  That's -- three years is a lot.  How do I make sense of
7  that?
8  A.      Let me see.  Well, I don't know.  I don't
9  know how that -- the driver's license place it did,
10  but, yeah, I've had my license since '18 -- 2018.
11  Q.      Okay.  So you have no idea basically.  It
12  just doesn't make any sense to you; is that fair?
13  A.      Yeah.
14          MR. HENSHAW: All right.  Well, I am
15  going to mark this as Exhibit --
16          MS. WHITE: What was the Bates-stamp on
17  that, Tim?
18          MR. HENSHAW: 000139.  That will be
19  Exhibit 2.
20          (Marked Exhibit 2.)
21  BY MR. HENSHAW:
22  Q.      All right.  So then I've got this document.
23  Are you able to see it?
24  A.      Yes.
25  Q.      Okay.  This is -- looks to me like a paper

Page 37

1 copy of your commercial driver's license that was
2 issued in September of 2022. Do you see that?
3 A.      Yes.
4 Q.      Okay. And it looks like the name is spelled
5 wrong and stuff like that. What -- my question to you
6 is what is this document? Where did this come from?
7 Why did you have this as opposed to the other document
8 we showed you in Exhibit 2?
9 A.      I got my driver's license renewed, and my
10 name is not spelled incorrectly.
11 Q.      Okay. Did somebody, like, print you out a
12 paper copy of your license for some temporary reason or
13 something?
14 A.      I had got -- I got my license renewed --
15 Q.      Okay.
16 A.      -- my driver's license. And you get a paper
17 copy before you get the hardback copy in the mail.
18 Q.      Oh, okay. All right.
19      MS. WHITE: And, Tim, for -- for the
20 record, what is the Bates-stamp of that document that's
21 the paper copy, please.
22      MR. HENSHAW: It is 001 -- 000131.
23      MS. WHITE: Thank you.
24      (Marked Exhibit 3.)
25 ///

Page 38

1 BY MR. HENSHAW:
2 Q.      All right. Now -- okay. So you got your
3 license issued about a month before you -- and then
4 about a month before it was going to expire in October
5 of 2022, Exhibit 3 that we just looked it, they just --
6 you went in -- you went in and renewed your license,
7 and they gave you a paper copy to use until you got
8 your new one in the mail; is that right? Yes?
9 A.      Yes.
10 Q.      Okay. Some of this stuff is just weird
11 stuff that we have to ask about because people do all
12 kinds of weird things with their licenses. So . . .
13      And then I think I've got this here.
14 (Counsel reviews document.)
15      All right. So in -- when did you first
16 realize that you were going to have a crash with my
17 clients?
18      MS. WHITE: Object to the form. Go
19 ahead and answer, Mr. Wortham.
20      THE WITNESS: Rephrase it. I am trying
21 to figure out what you're trying to ask me.
22 BY MR. HENSHAW:
23 Q.      Sure. Well, when did you first, like --
24 well, okay. Let me ask -- let me ask it this way
25 because sometimes this helps. Before the actual

Page 39

1 impact, did you ever have a thought like, oh, no, I am
2 about to be in a crash?
3 A.      No.
4 Q.      Okay. The moment of the impact was the
5 first time you had any realization that it was going to
6 happen?
7 A.      Yes.
8 Q.      Okay. So you did not take any action to
9 avoid the crash; correct?
10 A.      Yes.
11 Q.      Did you feel the impact or did you hear it?
12 A.      Neither.
13 Q.      Neither one?
14 A.      (Witness moves head from side to side.)
15 Q.      How did it occur to you that there was a
16 crash?
17 A.      When the -- when HM -- when I seen the clip.
18 When I seen --
19 Q.      Well --
20 A.      -- the dash cam footage is what I . . .
21 Q.      Well, I mean, long before you ever saw the
22 dash cam footage, you pulled over and stopped and
23 talked to the police and all that; right? Yes?
24 A.      Yes.
25 Q.      I'm not trying to be a smart aleck. I just

Page 40

1 want -- Miss Jennifer needs you to give your answers
2 out loud. Does that make sense?
3 A.      Oh, okay. Yes. Sorry.
4 Q.      All right. So you knew there was a crash
5 before you ever saw the dash cam. My question is how
6 did you know that a crash had happened?
7      MS. WHITE: Object to the form. It
8 misstates his prior testimony.
9 BY MR. HENSHAW:
10 Q.      Okay. Let me ask it this way. Why did you
11 stop and talk to the police and pull the truck over?
12 A.      Because I seen -- I seen the vehicle pull
13 over to the side, so I pulled in behind them.
14 Q.      Okay. Why did you do that if you neither
15 felt nor heard the crash?
16 A.      It could have been a possibility, but I
17 wasn't sure.
18 Q.      Okay. So you just pulled over because it
19 was possible that you had been in a crash?
20 A.      Yes.
21 Q.      All right. What made you think that it was
22 possible you had been in a crash?
23 A.      I seen him -- I seen the car pull over to
24 the shoulder, so I pulled in behind them. I wasn't
25 sure at the time. So it was just safety precautions.

Page 41

1  Q.        Okay.  Well, I guess my question -- I'm not
2  trying to trick you, man.  I'm just trying to find out
3  like what made you think, oh, I need to pull over
4  instead of just, oh, I wonder why that guy is pulling
5  over?
6  A.        It kind of -- the vehicle was in my blind
7  spot, so when they pulled over to the side of the
8  shoulder, I wasn't -- and I -- I wasn't sure at the
9  time that I was in an accident or not.  I was just
10 pulling over to make sure that I was or was not in a --
11 in an accident.
12 Q.        Okay.  Was that because of something that
13 you saw as they drove past?
14 A.        Yes.  Well, I did see them swerve a little
15 bit, so I didn't know it was because -- if they swerved
16 on their own or because of an accident.  So I pulled
17 over behind them to make sure of what happened.
18 Q.        Okay.  So is it fair to say then that you
19 saw their car in their lane swerve a little bit, and
20 that made you concerned you might have hit their car?
21 A.        Correct.
22 Q.        Okay.  And so because of that concern, you
23 pulled over, and you talked with the police officer and
24 now we're here today?
25 A.        Yes.

Page 42

1  Q.        All right.  Who all at HMD did you end up
2  speaking to about this crash?
3          MS. WHITE: Outside -- Tim, similar to
4  what you had said.
5          MR. HENSHAW: Yeah.  Yeah.  Yeah.
6          MS. WHITE: Outside of my involvement,
7  Mr. Wortham.  Prior to the lawsuit being filed and my
8  involvement, you can -- you can tell Mr. Henshaw who it
9  was that you talked to.
10         MR. HENSHAW: Yeah.  Don't tell me
11 about any lawyer's stuff.
12         THE WITNESS: HMD safety.
13 BY MR. HENSHAW:
14 Q.        Okay.  Did you have a dispatcher that you
15 had to talk to about anything?
16 A.        No.
17 Q.        Okay.  Did anyone at HMD tell you what to
18 say to the police?
19 A.        No.
20 Q.        Did you take any photographs at the scene?
21 A.        Yes.
22 Q.        Have you given all of those photographs to
23 Miss Mary Beth?
24 A.        No.  I -- I sent those to HMD.
25         MR. HENSHAW: Okay.  I am just going

Page 43

1  over some of my notes to make sure there's nothing else
2  we need to get into today.
3  BY MR. HENSHAW:
4  Q.        Sir, I am going to share with you -- this
5  starts on HMD, Bates-stamp, 000408 through 422.  Have
6  you ever seen this document?
7  A.        I could have at orientation, but I don't
8  remember.
9  Q.        Do you remember signing a copy of it?
10 A.        Yeah.  It was done at orientation, yes, sir.
11 I have a copy of it.
12 Q.        Okay.  And this looks to be like an employee
13 handbook from HMD; is that consistent with your memory
14 of it?  I am -- I can scroll up or down as much as you
15 want.  It's about 15 pages.
16 A.        Oh, yes.
17 Q.        Okay.  Under the Guidelines for Appropriate
18 Conduct, do you see here where one of the things that
19 is prohibited in your company's manual is failing to
20 report a safety incident or accident?  Do you see that?
21         MR. POLK: Could you zoom in a little
22 bit, please?
23         MR. HENSHAW: Sure.
24         THE WITNESS: Oh, yes.
25 ///

Page 44

1  BY MR. HENSHAW:
2  Q.        Okay.  And we've gone over previously that
3  you got a warning for engaging in that prohibited
4  conduct while you were working at HMD; correct?
5          MS. WHITE: Object to the form.
6  BY MR. HENSHAW:
7  Q.        Sir, I am -- it's not a trick question.  I'm
8  just trying to ask.  You got a warning for failing to
9  report a safety incident or an accident; correct?
10 A.        Yes.
11 Q.        Okay.  And that's prohibited conduct under
12 the company man -- handbook, isn't it?
13 A.        Yes.
14 Q.        Okay.  My question to you is you also see
15 here that dishonesty is part of the prohibited conduct
16 in the company handbook; correct?
17 A.        Yes.
18 Q.        Okay.  You would agree with me that telling
19 a police officer that someone came into your lane when
20 that's not what happened would be dishonest; correct?
21         MS. WHITE: Object to the -- object to
22 the basis of the question.
23 BY MR. HENSHAW:
24 Q.        You can answer the question, sir.
25 A.        I didn't -- I didn't tell the police that.

Min-U-Script®

**Jennifer B. Carollo, LCR, RPR, CCR**
**Nashville Court Reporters 615.885.5798**

(11) Pages 41 - 44

Case 1:24-cv-00155-TRM-MJD   Document 56-2   Filed 05/14/25   Page 12 of 24
PageID #: 475

Page 45

1  Q.      I know.  You would agree with me that if you
2  had told the police that Mr. Bolivar came in your lane
3  that would have been dishonest; correct?
4          MS. WHITE: Object to the form.
5          THE WITNESS: Yes.
6  BY MR. HENSHAW:
7  Q.      And that dishonesty would -- is also
8  prohibited conduct in your company's handbook; correct?
9  A.      Yes.
10  Q.      And so if that's what had happened that
11  would have been at least the second time that you'd
12  engaged in prohibited conduct under the company
13  handbook; correct?
14          MS. WHITE: Object to the form.
15          THE WITNESS: Yes.
16  BY MR. HENSHAW:
17  Q.      But, fortunately, that's not what happened
18  because you told the police that Mr. -- you came over
19  and hit Mr. Bolivar in his lane; correct?
20          MS. WHITE: Object to the form.
21          THE WITNESS: I can't remember what
22  I -- exactly what I told the police that night.
23          MR. HENSHAW: Okay.  We'll mark this
24  document as Exhibit 2 to the -- or Exhibit 4 to the
25  deposition.  Sorry.

Page 46

1          MS. WHITE: And what's the page range?
2          MR. HENSHAW: 408 through 422,
3  something like that.
4          (Marked Exhibit 4.)
5          MS. WHITE: Okay.  And just for the
6  record, the documents that you have marked I believe
7  starting with Exhibit 1, 2, and 3, are documents -- and
8  4, were document that were produced subject to the
9  agreed protective order.
10          MR. HENSHAW: Yeah.  And I am not -- I
11  would keep this deposition confidential as a result.
12  So . . .
13          MS. WHITE: Sure.
14  BY MR. HENSHAW:
15  Q.      All right.  Now, one of the other issues
16  that -- that was brought up is -- I am not sure if you
17  remember this earlier, but subsequent to this, you got
18  another violation while working for HMD where the
19  Netradyne camera caught you engaging in following
20  distance violations.  Do you remember that?
21  A.      No.
22  Q.      Okay.  You don't remember getting a safety
23  and compliance review in August of 2023 for that?
24  A.      No.
25  Q.      Okay.  Sir, I -- do you see that document

Page 47

1  that I have shared with you here?
2  A.      Yes.
3  Q.      Okay.  And that's your name at the top of it
4  with the Safety & Compliance Review; correct?
5  A.      Yes.
6  Q.      And the review date is August 4th of 2023;
7  correct?
8  A.      Yes.
9  Q.      And down here at the bottom, it's stamped.
10  We've got -- it's Bates-stamped 000121, and to the left
11  it looks like it has a driver signature.  Is that your
12  signature?
13  A.      Yes.
14  Q.      And a company representative named Erica
15  Alisavskaite -- I might be butchering that -- went over
16  this with you.  Do you remember Erica going over this
17  with you?
18  A.      Yes.
19  Q.      Okay.  And so the event date is 8/4/23 and
20  the description is following distance violations that
21  Netradyne camera records while driver driving.  Did I
22  get that correct?
23  A.      Yes.
24  Q.      You don't remember anything about this?
25  A.      Yes.  I -- yes, I remember.

Page 48

1  Q.      Okay.  Tell me what you remember now.
2  A.      I had a -- I got a phone call from Erica
3  saying that I had a -- I need to improve on my
4  following distance.
5  Q.      Okay.  What's the Netradyne camera?  What is
6  that?
7  A.      That's the dash cam that we have in the
8  window of an HMD truck.
9  Q.      Okay.  Similar to the camera that captured
10  this crash?
11  A.      Yes, the same one.
12  Q.      Okay.  So does Netradyne -- does it send, I
13  guess, warnings or something to HMD if there's a
14  problem with your driving?
15          MS. WHITE: Object to the form.
16          THE WITNESS: Yes.
17  BY MR. HENSHAW:
18  Q.      Okay.  So, like, if it -- I guess, like, a
19  coachable event or something like that.  Is there a
20  terminology that you guys use for these sorts of
21  reports or incidents?
22  A.      No.
23  Q.      Are there -- are there any other safety and
24  compliance reviews that you're aware of at HMD where,
25  you know, it's like this where it shows that you've got

Page 49

1 a violation or some type of safety behavior, but it's
2 not listed as a violation or a warning or anything like
3 that? Do you get what I'm talking about here?
4 A. No.
5 Q. Okay. So I notice on this safety and
6 compliance review that you got -- the description of
7 the event is that you've got a following distance
8 violation. We agree on that; correct?
9 A. Yes.
10 Q. But then under the type of event, there's
11 no, you know, for example, violation received. There's
12 nothing like that checked not even, you know, low
13 Netradyne score or anything like that. It's just
14 listed as "other." Do you see that?
15 A. Yes.
16 Q. My question to you is are there any other
17 safety and compliance review items that you're aware of
18 during your time with HMD that are listed as this sort
19 of thing where you had a safety violation, but then the
20 type of event was listed as "other" or wasn't actually
21 recorded as a violation?
22 A. No.
23 Q. Okay. Were you aware that this incident
24 wasn't recorded as a violation?
25 A. Yes.

Page 50

1 Q. One of the other questions I had about this
2 document was the -- under the "Resulting Actions." Do
3 you see here?
4 A. Yes.
5 Q. It -- it says -- it's got
6 "training/coaching" is what's checked. Do you see
7 that?
8 A. Yes.
9 Q. But then it -- the -- the corresponding box
10 on the other side corresponds up here with "written
11 warning." Do you see that? It's on that same level.
12 Do you know why there's a difference between those two
13 things? Has anybody ever explained that to you?
14 MS. WHITE: Object to the form.
15 THE WITNESS: No.
16 BY MR. HENSHAW:
17 Q. Okay. Well, let me ask you this. When you
18 were talking to Erica about this, did you understand
19 this as being you were just going to receive some
20 coaching? Or did you understand you were actually
21 getting a warning for this?
22 A. (Inaudible.)
23 Q. Sorry?
24 A. The training -- the conversation is the
25 training and the coaching.

Page 51

1 Q. Okay. So the conversation was the coaching
2 she gave you?
3 A. Yes.
4 Q. Okay. So she just gave that to you in that
5 phone call?
6 A. Yes.
7 Q. And how long was that phone call?
8 A. I can't remember. I can't remember.
9 Q. Okay. Was it 10 minutes, 20 minutes,
10 30 minutes?
11 A. I'd say between -- well, I can't remember.
12 Probably 5, 15 minutes.
13 Q. Okay. And then you got a certificate of
14 completion for space management training. It says down
15 here HMD 000122. You got that for -- it looks like
16 about -- a few days later, maybe a week later. This
17 certificate -- is this like a portal? Did you have to
18 go on and, like, take a test or something? How did you
19 get this?
20 A. Yes. You -- you watch videos -- watch
21 videos and answer questions.
22 Q. Okay. Did you have to do a training after
23 the March 1, 2023, incident?
24 A. Yes.
25 Q. Okay. Was it similar to space management

Page 52

1 training, or was it something different?
2 A. Something different.
3 Q. Okay. Do you remember what it was?
4 A. Maintaining lane.
5 Q. Got ya. Okay.
6 MR. HENSHAW: All right. I am going to
7 mark this as Exhibit 5.
8 (Marked Exhibit 5.)
9 BY MR. HENSHAW:
10 Q. Who is Victoria Sabotkoska?
11 A. A recruiter.
12 Q. Okay. That's what I was wondering. Other
13 than recruitment, have you ever talked to her about
14 anything else?
15 A. No.
16 Q. Okay. All right. Lyra Kissun. That looks
17 like somebody -- is that, like, a friend of yours or
18 something? I was looking through your personnel file.
19 A. Mother.
20 Q. Tyree Threadcraft. That's the guy, I guess,
21 who referred you to HMD?
22 A. Yes.
23 Q. Does he still work for HMD?
24 A. I don't know.
25 Q. Okay. There was another company you worked

Case 1:24-cv-00155-TRM-MJD   Document 62-2   Filed 05/14/25   Page 14 of 24
PageID #: 477

Page 53

1  at where it -- it was like Annett Holdings or
2  something?  Do you remember that?  Annett Holdings
3  or -- I can look it up if I need to.  It looked like
4  maybe there was a little space there between Publix
5  and HMD where you worked for somebody for a couple of
6  months?
7  A.       Yes.
8  Q.       And do you remember who I am talking about?
9  A.       Yes.
10 Q.       What was that company?
11 A.       Martin Transportation.
12 Q.       Oh, okay.  And how long -- how long were you
13 with them?
14 A.       Probably a few months.
15 Q.       And what happened with them?
16 A.       I just left.
17 Q.       You just didn't like it?
18 A.       I was -- I left there to come to HMD to do
19 the lease purchase of one day owning my truck.  I
20 didn't want to -- that's why I left that company.
21 Q.       Okay.  So you've got Martin and then what
22 about Annett Holdings, Inc.?  Do you remember them?
23 A.       No.  I don't -- I don't know who that is.
24 Q.       Okay.  There was another name for them.  So
25 let me see if that jogs your memory TMC Transportation?

Page 54

1  A.       Oh, yes.
2  Q.       Yeah?  What happened there?
3  A.       I -- I didn't like it.  I tried flatbedding,
4  and I didn't like it.  So . . .
5  Q.       Okay.  They said that you quit in training,
6  so that's -- you -- you knew quickly you didn't want to
7  do that?
8  A.       Yes.
9  Q.       All right.  Is there anything else that's
10 important that we haven't talked about that you think
11 we should?
12 A.       No.
13          MR. HENSHAW: All right.  That's all
14 I've got for you.  Thank you, sir.
15          MS. WHITE: I need to clear up a few
16 questions with -- with Mr. Wortham.
17          THE VIDEOGRAPHER: Mary Beth, let me
18 ask you, do you need more than about 20 minutes or
19 something like that?
20          MS. WHITE: No.
21          THE VIDEOGRAPHER: Okay.  We can
22 continue.
23                    EXAMINATION
24 BY MS. WHITE:
25 Q.       Mr. Wortham, you testified earlier you

Page 55

1  obtained your CDL from the state of Alabama in 2018; is
2  that correct?
3  A.       Yes.
4  Q.       Mr. Wortham, did you say something?
5  A.       I said yes.
6  Q.       Oh, okay.  Sorry.  And every time that you
7  obtained your CDL from the state of Alabama, were you
8  given a new physical copy of your CDL?
9  A.       Yes.
10 Q.       Okay.  And would that then explain why one
11 of the CDLs that Mr. Henshaw showed you showed that it
12 was issued in 2022 when, in fact, your first CDL was
13 issued to you by the state of Alabama in 2018?
14 A.       Yes.
15 Q.       Okay.  As it relates to other moving
16 violations, you testified that you've had a speeding
17 ticket in a personal vehicle; is that correct?
18 A.       Yes.
19 Q.       Okay.  And have you also had an overweight
20 citation while driving a commercial motor vehicle?
21 A.       Yes.
22 Q.       Okay.  And you have driven commercial
23 vehicles now for about seven years; is that correct?
24 A.       Yes.
25 Q.       And might there be other moving violations

Page 56

1  in your past that -- that you're not recalling as we
2  sit here today?
3  A.       Can you repeat that?
4  Q.       Could there be -- over the seven years that
5  you've had a commercial driver's license, might there
6  be some other moving violations that you've had in a
7  commercial vehicle that you simply don't recall as
8  we're sitting here today?
9  A.       No.
10 Q.       Okay.  As it relates to the incident that
11 occurred on March the 1st, 2023, the one involving
12 Mr. Henshaw's clients, now that you've talked with HMD
13 and seen the video, are you taking responsibility for
14 causing the incident?
15 A.       Yes.
16 Q.       Okay.  And at the scene, were -- were you
17 being untruthful to the officer in any way?
18 A.       No.
19 Q.       Were you telling the officer what you either
20 remembered or saw or heard?
21 A.       Yes.
22 Q.       And if the officer was asking you questions,
23 were you answering his questions?
24 A.       Yes.
25 Q.       And did you try to in any way run from the

Page 57

1 scene of this incident?
2 A.      No.
3 Q.      Okay.  And did you cooperate with the
4 officers the entire time during their investigation?
5 A.      Yes.
6 Q.      At the scene, did either of the occupants of
7 the other vehicle tell you that they were injured?
8 A.      No.
9 Q.      Now, I want to look specifically at what
10 Mr. Henshaw has identified and marked as Exhibit 1 to
11 your deposition.  And I am going to pull that up on my
12 screen.  If you can't see it because it's not big
13 enough, please let me know.  Okay?
14 A.      Okay.
15 Q.      Are you able to see this?
16 A.      Yes.
17 Q.      Okay.  And is it -- is it big enough for you
18 to read, Mr. Wortham?
19 A.      Yes.
20 Q.      Okay.  Now, this occurred on August the 10th
21 of 2022 per the record itself; correct?
22 A.      Yes.
23 Q.      Okay.  Now, in the box marked "driver
24 statement," there's some handwriting.  That's all of
25 your handwriting; correct?

Page 58

1 A.      Yes.
2 Q.      Okay.  And the four items that are
3 identified here, it looks like three of them were
4 incidents with property; is that accurate?
5 A.      You said three of them including property?
6 Q.      Three of them were property damage only;
7 correct?
8 A.      Oh, yes.
9 Q.      Okay.  And one of them somebody backed into
10 you and hit you; correct?
11 A.      Yes.
12 Q.      Okay.  So your understanding in talking with
13 HMD is that you were to report accidents that -- that
14 you caused; is that accurate?
15 A.      Yes.
16 Q.      Okay.  So you weren't trying to hide
17 anything from HMD by not telling about what's included
18 here in Exhibit 1; correct?
19 A.      Yeah.  That's correct.
20 Q.      Okay.  And with respect to the incident on
21 March the 1st of 2023 when you were on the shoulder of
22 the road, you promptly reported that to HMD, didn't
23 you?
24 A.      Yes.
25 Q.      Okay.  So at no time prior to this incident

Page 59

1 or since this incident, you have not been dishonest
2 with HMD, have you?
3 A.      No.
4 Q.      Okay.  And you simply had a miscommunication
5 about what you understood you were to report to HMD
6 when you -- when you didn't tell them about the
7 property damage that was done to your vehicle; isn't
8 that correct?
9 A.      Yes; that's correct.
10          MS. WHITE: Okay.  Those are all of the
11 questions that I have.
12          REEXAMINATION
13 BY MR. HENSHAW:
14 Q.      Just one follow-up.  Sir, have you seen --
15          MR. HENSHAW: Oh, can you take your
16 share screen down?
17          MS. WHITE: Oh.  Thank you.  Sorry
18 about that.
19          MR. HENSHAW: Yeah.
20 BY MR. HENSHAW:
21 Q.      All right.  Sir, have you seen -- have you
22 seen this document before?
23 A.      Yes.
24 Q.      All right.  And I am going to just take you
25 down to these documents here.  Do you know what this

Page 60

1 manual -- this is the HMD driver manual; right?
2 A.      Yes.
3 Q.      All right.  All right.  And if we go down
4 to HMD 000373 -- you got this manual before you ever
5 started driving; right?
6 A.      Yes.
7 Q.      All right.  And you see here that you were
8 instructed that all damages must report -- must be
9 reported to the safety department regardless of
10 severity; correct?  That's what it says.
11 A.      Yes.
12          MS. WHITE: Object to form.
13 BY MR. HENSHAW:
14 Q.      And they said "Unreported incidents will be
15 considered an admission that you could have prevented
16 the incident"; correct?
17 A.      Yes.
18 Q.      And knowing that, you did not report four
19 separate incidents of damage to company truck; correct?
20 A.      Yes.  I was thinking this was when I was in
21 a company truck.  So I would think this -- I thought
22 this was for a company -- company -- their company
23 trucks only.
24 Q.      Uh-huh.  Well, and you can understand the
25 danger that exists with allowing drivers to not report

Page 61

1 anything; fair?
2            MS. WHITE: Object to the form.
3 BY MR. HENSHAW:
4 Q.        I mean, we can agree you can't have drivers
5 out here hitting things with trucks and not telling the
6 company about it; right?
7            MS. WHITE: Object to the form.
8 BY MR. HENSHAW:
9 Q.       Can we agree on that?
10           MS. WHITE: Object to the form.  Is
11 there a question?  What's the question, Mr. Henshaw?
12 BY MR. HENSHAW:
13 Q.       Mr. Wortham, my question is can we agree
14 that you can't have drivers running around hitting
15 stuff and not telling the company about it?
16           MS. WHITE: Object to the form.
17           THE WITNESS: Yes.
18           MR. HENSHAW: All right.  I appreciate
19 your honesty, sir.
20           We'll mark this page Exhibit 6
21 unless -- did you mark -- did you -- you were just
22 pulling up 1, so this will be -- I'll make 373
23 Exhibit 6.
24           (Marked Exhibit 6.)
25           MR. HENSHAW: That's all I have.  Thank

Page 62

1 you for your time, sir.
2            MS. WHITE: I have no further
3 questions.
4            THE VIDEOGRAPHER: This concludes the
5 video deposition.  The time is 4:20.
6            (Proceedings concluded at 4:20 P.M.)

Page 63

1                    ERRATA PAGE
2            I, ANTONIO WORTHAM, the witness herein,
  have read the transcript of my testimony and the
3 same is true and correct, to the best of my
  knowledge, with the exception of the following
4 changes noted below, if any:
5 Page/Line   Change                Reason
6 _____   _____
7 _____   _____
8 _____   _____
9 _____   _____
10 _____   _____
11 _____   _____
12 _____   _____
13 _____   _____
14 _____   _____
15 _____   _____
16 _____   _____
17 _____   _____
18 _____   _____
19
20         _____
          ANTONIO WORTHAM
21
22           Sworn to and subscribed before me, this
  the _____ day of _____, 2025.
23
24         _____
          Notary Public
25         My Commission Expires:

Page 64

1                REPORTER'S CERTIFICATE
2            I, Jennifer B. Carollo, Licensed Court
3 Reporter, Registered Professional Reporter, and
4 Certified Court Reporter for the State of Tennessee,
5 hereby certify that I reported the foregoing
6 proceedings at the time and place set forth in the
7 caption thereof; that the proceedings were
8 stenographically reported by me; and that the foregoing
9 proceedings constitute a true and correct transcript of
10 said proceedings to the best of my ability.
11           I FURTHER CERTIFY that I am not related to
12 any of the parties named herein, nor their counsel, and
13 have no interest, financial or otherwise, in the
14 outcome or events of this action.
15           IN WITNESS WHEREOF, I have hereunto affixed
16 my official signature on this 15th day of March, 2025.
17
18
19
20
21
22         _____
          JENNIFER B. CAROLLO, LCR, RPR, CCR
23         LCR No. 432, Expires 6/30/2026
24
25

Case 1:24-cv-00155-TRM-MJD   Document 50-5   Filed 05/14/25   Page 17 of 24
PageID #: 480

## $

**$2,500 (1)**
29:13

## /

**/// (4)**
16:25;19:25;37:25;
43:25

## A

**able (4)**
16:15;22:8;36:23;
57:15
**accident (15)**
12:13;13:21,23;
15:16,17;21:6;22:24;
24:22;30:25;31:3;41:9,
11,16;43:20;44:9
**accidents (1)**
58:13
**accurate (2)**
58:4,14
**acknowledging (2)**
29:24;30:2
**acknowledgment (1)**
24:19
**across (1)**
34:2
**action (2)**
22:14;39:8
**Actions (1)**
50:2
**actual (1)**
38:25
**actually (3)**
14:17;49:20;50:20
**administering (1)**
5:9
**admission (1)**
60:15
**affirm (1)**
5:23
**After-hours (2)**
30:10,24
**again (2)**
8:21;18:14
**agree (8)**
15:20;20:8;44:18;
45:1;49:8;61:4,9,13
**agreed (1)**
46:9
**ahead (3)**
13:8;18:11;38:19
**Alabama (11)**
7:8,12,15;8:7;14:4;
35:3,11,21;55:1,7,13
**aleck (1)**
39:25
**Alfreda (4)**

14:3,11,12,14
**Alfredo (1)**
14:11
**Alisavskaite (1)**
47:15
**allowing (1)**
60:25
**always (3)**
10:2,2,10
**Anderson (1)**
17:3
**Angelica (3)**
5:13;23:1,19
**Annett (3)**
53:1,2,22
**Ant (1)**
5:2
**Antania (1)**
5:3
**Antanio (1)**
5:3
**anticipate (1)**
6:18
**Antonio (5)**
5:3,18;6:2,9;23:4
**appreciate (1)**
61:18
**Appropriate (1)**
43:17
**approximately (1)**
8:12
**area (1)**
22:3
**around (3)**
8:14;12:15;61:14
**arrangement (1)**
10:9
**asleep (1)**
26:18
**associated (1)**
16:5
**assumed (2)**
23:11;24:2
**AT&T (2)**
32:18,19
**attorney (4)**
5:11;13:20,25;14:2
**August (5)**
28:23;29:20;46:23;
47:6;57:20
**authority (1)**
34:3
**avoid (1)**
39:9
**aware (3)**
48:24;49:17,23
**Awesome (1)**
6:10

## B

**back (8)**
12:24;15:14;21:18,

24;22:17;26:3;32:15;
35:12
**backed (3)**
27:16,17;58:9
**based (2)**
18:8,17
**basically (1)**
36:11
**basis (1)**
44:22
**Bates-stamp (3)**
36:16;37:20;43:5
**Bates-stamped (2)**
28:8;47:10
**become (1)**
10:15
**behalf (1)**
5:18
**behavior (1)**
49:1
**behind (5)**
15:12,12;40:13,24;
41:17
**besides (1)**
19:8
**Beth (5)**
5:15,17;21:16;42:23;
54:17
**better (5)**
9:9,11,11;16:23;21:8
**big (1)**
57:12,17
**binding (1)**
5:9
**birth (1)**
7:9
**bit (3)**
41:15,19;43:22
**blind (1)**
20:11,16,19;41:6
**Bolivar (6)**
19:9,16;22:25;23:19;
45:2,19
**Bolivar's (1)**
17:23
**bottom (1)**
47:9
**box (2)**
50:9;57:23
**break (1)**
12:6
**briefly (1)**
6:7
**brought (2)**
27:19;46:16
**business (2)**
9:11,12;30:18,19
**butchering (1)**
47:15

## C

**call (8)**

24;22:17;26:3;32:15;
35:12
**called (5)**
6:3;30:20,24;31:14,
18
**calling (1)**
32:9
**calls (1)**
15:6
**cam (4)**
39:20,22;40:5;48:7
**came (6)**
11:7;18:5;26:5;
44:19;45:2,18
**camera (4)**
46:19;47:21;48:5,9
**Can (27)**
8:21;15:4,9;16:19;
18:11,21;19:23;21:17;
24:7;28:2,22;34:20;
35:1,1,16;42:8,8;
43:14;44:24;53:3;
54:21;56:3;59:15;
60:24;61:4,9,13
**captured (1)**
48:9
**car (5)**
17:23;31:2;40:23;
41:19,20
**care (4)**
23:12;24:3,4,13
**careful (1)**
6:17
**carrier (1)**
32:17
**case (5)**
5:13,23;13:22;16:6;
22:5
**catch (1)**
8:2
**caught (1)**
46:19
**caused (1)**
58:14
**causing (1)**
56:14
**CDL (24)**
7:11,17;8:12,14,16,
17,22,23;9:2,4,6,8;
12:20;13:6;34:12,17;
35:12,20,23,24;55:1,7,
8,12
**CDLs (1)**
55:11
**Center (1)**
8:6
**certificate (2)**
51:13,17
**change (3)**
10:1;19:21;20:3
**changed (2)**
10:3,5
**checked (2)**

27:18;30:8,9,16,23;
48:2;51:5,7
**called (5)**
6:3;30:20,24;31:14,
18
**calling (1)**
32:9
**calls (1)**
15:6
**cam (4)**
39:20,22;40:5;48:7
**came (6)**
11:7;18:5;26:5;
44:19;45:2,18
**camera (4)**
46:19;47:21;48:5,9
**captured (1)**
48:9
**car (5)**
17:23;31:2;40:23;
41:19,20
**care (4)**
23:12;24:3,4,13
**careful (1)**
6:17
**carrier (1)**
32:17
**case (5)**
5:13,23;13:22;16:6;
22:5
**catch (1)**
8:2
**caught (1)**
46:19
**caused (1)**
58:14
**causing (1)**
56:14

49:12;50:6
**Chicago (2)**
11:13;22:18
**children (1)**
33:11
**citation (2)**
27:1;55:20
**claim (1)**
14:16
**claims (1)**
17:18
**clarification (1)**
23:2
**Class (2)**
7:11;35:24
**clear (3)**
20:7,11;54:15
**client (1)**
22:8
**clients (4)**
15:21;29:7;38:17;
56:12
**clip (1)**
39:17
**coachable (1)**
48:19
**coaching (3)**
50:20,25;51:1
**coming (3)**
12:3,7;17:7
**commercial (5)**
37:1;55:20,22;56:5,7
**company (22)**
10:11,12,16;23:12;
24:2;26:20;29:24;30:3;
44:12,16;45:12;47:14;
52:25;53:10,20;60:19,
21,22,22,22;61:6,15
**company's (2)**
43:19;45:8
**completion (1)**
51:14
**compliance (5)**
46:23;47:4;48:24;
49:6,17
**concern (1)**
41:22
**concerned (3)**
18:24;24:10;41:20
**concluded (1)**
62:6
**concludes (1)**
62:4
**Conduct (6)**
43:18;44:4,11,15;
45:8,12
**confidential (1)**
46:11
**conflicting (4)**
17:16;18:5,17;19:7
**confusing (2)**
23:17;34:21
**considered (1)**

Min-U-Script®

Jennifer B. Carollo, LCR, RPR, CCR
Nashville Court Reporters 615.885.5798

(1) $2,500 - considered

Case 1:24-cv-00155-TRM-MJD   Document 50-5   Filed 05/14/25   Page 18 of 24
PageID #: 481

60:15
**consistent (2)**
19:14;43:13
**continue (1)**
54:22
**conversation (2)**
50:24;51:1
**cooperate (1)**
57:3
**copies (1)**
34:17
**copy (9)**
37:1,12,17,17,21;
38:7;43:9,11;55:8
**correctly (2)**
28:14,16
**corresponding (1)**
50:9
**corresponds (1)**
50:10
**counsel (2)**
5:6;38:14
**County (1)**
21:7
**couple (2)**
25:24;53:5
**court (3)**
5:9,20,22
**crash (33)**
14:20;15:10;17:3,7;
19:12,14;20:21,23;
22:20;23:1,18,21;
24:20,24;25:2,4,13,14;
26:21;27:1;30:6,16;
38:16;39:2,9,16;40:4,6,
15,19,22;42:2;48:10
**crashes (5)**
12:3,7,19;13:3;27:7
**curious (1)**
15:24
**current (1)**
7:20
**currently (1)**
7:11

**D**

**damage (10)**
27:10,25;28:12;29:3,
6,10,21;58:6;59:7;
60:19
**damages (1)**
60:8
**danger (1)**
60:25
**dark-colored (1)**
15:12
**dash (4)**
39:20,22;40:5;48:7
**date (3)**
7:9;47:6,19
**day (9)**
11:16,23,24;17:3;

23:8;26:6;30:17;32:19;
53:19
**days (5)**
10:12,12,18;22:23;
51:16
**deal (1)**
34:22
**December (1)**
11:2
**department (1)**
60:9
**deposition (7)**
5:2;6:10;28:19;
45:25;46:11;57:11;
62:5
**Describe (1)**
34:6
**describes (1)**
29:16
**description (2)**
47:20;49:6
**designated (1)**
31:2
**destination (1)**
33:24
**device (2)**
32:10,11
**difference (1)**
50:12
**different (5)**
16:2;19:4;34:17;
52:1,2
**disciplinary (1)**
10:23;22:14,19
**dishonest (3)**
44:20;45:3;59:1
**dishonesty (1)**
44:15;45:7
**dispatch (2)**
34:9,9
**dispatcher (3)**
34:8,8;42:14
**distance (4)**
46:20;47:20;48:4;
49:7
**Distribution (1)**
8:6
**dock (1)**
27:16
**document (13)**
28:7;34:16;36:22;
37:6,7,20;38:14;43:6;
45:24;46:8,25;50:2;
59:22
**documents (4)**
34:15;46:6,7;59:25
**done (3)**
32:10;43:10;59:7
**DOT (2)**
25:11;34:3
**down (10)**
15:11;17:13,15;18:4;
43:14;47:9;51:14;

59:16,25;60:3
**drive (1)**
33:13
**driven (1)**
55:22
**driver (8)**
9:25;10:11,12,16;
47:11,21;57:23;60:1
**drivers (5)**
17:16,18;60:25;61:4,
14
**driver's (5)**
36:9;37:1,9,16;56:5
**driving (10)**
8:24,25;15:21;20:24;
24:25;27:11;47:21;
48:14;55:20;60:5
**drove (4)**
20:25,25;24:18;
41:13
**drug (1)**
26:20
**duly (1)**
6:3
**during (4)**
8:17;10:18;49:18;
57:4

**E**

**earlier (3)**
35:11;46:17;54:25
**easier (1)**
35:2
**either (3)**
17:17;56:19;57:6
**else (6)**
14:5;33:25;34:1;
43:1;52:14;54:9
**Elzy (2)**
33:1,2
**employee (1)**
43:12
**employer (1)**
7:20
**end (1)**
42:1
**engaged (1)**
45:12
**engaging (2)**
44:3;46:19
**enough (3)**
30:6;57:13,17
**entire (2)**
6:19;57:4
**Erica (2)**
47:14,16;48:2;50:18
**even (2)**
6:17;49:12
**event (5)**
47:19;48:19;49:7,10,
20
**everybody (1)**

6:15
**everybody's (1)**
31:15
**evidence (1)**
17:17
**exactly (1)**
45:22
**EXAMINATION (2)**
6:5;54:23
**examined (1)**
6:4
**example (1)**
49:11
**Exhibit (19)**
28:19,20;36:15,19,
20;37:8,24;38:5;45:24,
24;46:4,7;52:7,8;
57:10;58:18;61:20,23,
24
**exists (1)**
60:25
**expire (3)**
25:14;26:1;38:4
**expired (3)**
25:11,13,15,17;26:4
**expires (1)**
35:5
**explain (1)**
55:10
**explained (1)**
50:13

**F**

**fact (2)**
18:25;55:12
**failing (3)**
29:21;43:19;44:8
**fair (7)**
17:8;23:11,21;30:6;
36:12;41:18;61:1
**fall (1)**
26:18
**far (4)**
6:14;8:11;9:16;
31:21
**fault (2)**
12:13,17
**February (4)**
5:4;13:1,2,23
**feel (2)**
25:7;39:11
**felt (1)**
40:15
**fender (1)**
27:21
**few (3)**
51:16;53:14;54:15
**figure (2)**
35:17;38:21
**file (3)**
7:24;35:2;52:18
**filed (2)**

14:17;42:7
**find (3)**
17:21;22:4;41:2
**fine (2)**
9:18;24:18,18
**finish (1)**
6:19
**first (5)**
6:16;10:18;35:9;
38:15,23;39:5;55:12
**fit (1)**
10:17
**five (1)**
21:17
**flatbedding (1)**
54:3
**follow (1)**
23:18
**followed (1)**
23:9
**following (5)**
24:13;46:19;47:20;
48:4;49:7
**follows (1)**
6:4
**follow-up (1)**
59:14
**footage (2)**
39:20,22
**form (25)**
12:4;13:7;15:5;
18:10,19;19:22;22:19;
23:14;24:5;28:13;
29:18;35:14;38:18;
40:7;44:5;45:4,14,20;
48:15;50:14;60:12;
61:2,7,10,16
**forth (1)**
32:15
**fortunately (1)**
45:17
**four (3)**
28:12;58:2;60:18
**friend (1)**
52:17
**further (1)**
62:2

**G**

**gave (6)**
11:17;13:13;32:11;
38:7;51:2,4
**generally (2)**
6:15;7:4
**Georgia (2)**
14:6,8
**given (4)**
6:10;10:24;42:22;
55:8
**giving (2)**
27:1,3
**glasses (1)**

Min-U-Script®

Jennifer B. Carollo, LCR, RPR, CCR
Nashville Deposition Reporters 615.885.5798

(2) consistent - glasses
Page 19 of 24

Case 1:24-cv-00155-TRM-MJD   Document 50-5   Filed 05/14/25   Page 19 of 24
PageID #: 482

16:17
**God (1)**
5:25
**goes (1)**
22:5
**good (2)**
6:13;9:18
**guess (9)**
8:16;10:15;15:15;
24:9;35:19;41:1;48:13,
18;52:20
**Guidelines (1)**
43:17
**guy (2)**
41:4;52:20
**guys (1)**
48:20

**H**

**handbook (5)**
43:13;44:12,16;45:8,
13
**handwriting (2)**
57:24,25
**Hang (2)**
16:4;34:23
**happen (2)**
12:25;39:6
**happened (31)**
14:7,9;15:16,17;
17:8;19:1;20:24;22:13,
16,19;23:1;24:22;25:2,
5,9,13,14;26:21;27:1,
22,22;31:7;32:1,4;
40:6;41:17;44:20;
45:10,17;53:15;54:2
**happening (1)**
24:24
**hardback (1)**
37:17
**head (1)**
39:14
**hear (1)**
39:11
**heard (2)**
40:15;56:20
**help (1)**
5:25
**helpful (1)**
16:20
**helps (2)**
6:15;38:25
**HENSHAW (65)**
5:12,13;6:6;12:5;
13:10;15:8;16:11,14,
22;17:1;18:15,20;
19:23;20:1;21:16,20;
22:1;23:7,15;24:6;
28:18,21;29:19;35:15;
36:14,18,21;37:22;
38:1,22;40:9;42:5,8,10,
13,25;43:3,23;44:1,6,

23;45:6,16,23;46:2,10,
14;48:17;50:16;52:6,9;
54:13;55:11;57:10;
59:13,15,19,20;60:13;
61:3,8,11,12,18,25
**Henshaw's (1)**
56:12
**Here's (2)**
18:23;22:4
**hide (1)**
58:16
**Highway (2)**
12:23;15:11
**hit (10)**
12:12,24;15:21;
17:23;19:9,16;27:17;
41:20;45:19;58:10
**hitting (2)**
61:5,14
**HM (1)**
39:17
**HMD (49)**
5:18;7:21;8:4;9:20;
10:22;11:7,22;12:3,8;
16:8;20:3;22:14,17;
24:8;27:7,10,19;28:8;
29:25;30:7;31:18,21;
32:11;33:15;42:1,12,
17,24;43:5,13;44:4;
46:18;48:8,13,24;
49:18;51:15;52:21,23;
53:5,18;56:12;58:13,
17,22;59:2,5;60:1,4
**HMD's (1)**
19:20;34:3
**hold (1)**
7:4
**Holdings (3)**
53:1,2,22
**home (1)**
24:14
**honest (1)**
19:6
**honesty (1)**
61:19
**hours (6)**
24:25;25:10,12,24,
25;26:4

**I**

**idea (2)**
18:6;36:11
**identified (2)**
57:10;58:3
**identify (1)**
5:6
**impact (3)**
39:1,4,11
**important (1)**
54:10
**improve (1)**
48:3

**Inaudible (1)**
50:22
**Inc (2)**
5:18;53:22
**incident (15)**
27:25;29:2,7,10;
43:20;44:9;49:23;
51:23;56:10,14;57:1;
58:20,25;59:1;60:16
**incidents (4)**
48:21;58:4;60:14,19
**included (1)**
58:17
**including (1)**
58:5
**incorrect (1)**
16:2
**incorrectly (2)**
28:14;37:10
**Indiana (3)**
12:23;14:9;28:4
**indicated (2)**
34:16;35:11
**information (1)**
31:15
**injured (3)**
20:21;24:11;57:7
**injuries (1)**
23:20
**inside (1)**
9:7
**instances (1)**
28:12
**instead (1)**
41:4
**instructed (1)**
60:8
**insurance (1)**
24:2
**into (8)**
12:6;15:14;25:25;
27:17,17;43:2;44:19;
58:9
**introduce (1)**
5:15
**investigation (1)**
57:4
**involved (1)**
13:12
**involvement (2)**
42:6,8
**involving (2)**
27:25;56:11
**issue (1)**
15:2
**issued (9)**
35:3,10,21,24;36:2;
37:2;38:3;55:12,13
**issues (4)**
10:19,23;23:12;
46:15
**items (2)**
49:17;58:2

**J**

**January (2)**
10:3,9
**Jennifer (1)**
40:1
**job (1)**
6:13
**jogs (1)**
53:25
**July (1)**
32:25
**jury (1)**
22:5

**K**

**keep (2)**
20:24;46:11
**kept (1)**
22:7
**kind (2)**
22:4;41:6
**kinds (1)**
38:12
**Kissun (1)**
52:16
**knew (3)**
27:3;40:4;54:6
**knowing (1)**
60:18

**L**

**lane (18)**
15:13,15,18,18,22;
18:6;19:9,16,21;20:3,7,
11,15;41:19;44:19;
45:2,19;52:4
**Larry (1)**
17:2
**last (2)**
11:2;13:21
**later (2)**
51:16,16
**lawsuit (2)**
14:17;42:7
**lawsuits (1)**
13:12
**lawyer's (1)**
42:11
**lease (4)**
10:5,10,20;53:19
**leased (3)**
9:20;10:15,17
**Leasing (2)**
33:17,18
**least (2)**
19:2;45:11
**led (1)**
28:22
**left (10)**

15:13,18;17:22;19:8,
16;23:21;47:10;53:16,
18,20
**level (1)**
50:11
**license (12)**
7:14;35:25;36:9,10;
37:1,9,12,14,16;38:3,6;
56:5
**licenses (1)**
38:12
**light (2)**
15:13;20:10
**likewise (1)**
5:19
**lines (1)**
34:3
**listed (5)**
33:18;49:2,14,18,20
**lists (1)**
32:13
**little (11)**
6:14,24;15:24;16:17;
18:24;34:21;35:1;
41:14,19;43:21;53:4
**live (1)**
7:7
**LLC (3)**
33:17,18
**load (2)**
26:11;33:21
**loads (1)**
34:6,9
**located (1)**
14:6
**long (18)**
7:14,22;8:9;11:15,
21;15:1,3;22:20;25:16,
22,25;31:13,16,16;
39:21;51:7;53:12,12
**longer (1)**
32:23
**look (2)**
53:3;57:9
**looked (2)**
38:5;53:3
**looking (1)**
52:18
**looks (9)**
7:25;28:11;36:25;
37:4;43:12;47:11;
51:15;52:16;58:3
**lose (1)**
32:24
**lot (2)**
30:4;36:6
**loud (1)**
40:2
**Love's (5)**
21:5,5,9,11;24:21
**low (1)**
49:12
**Lyra (1)**

Min-U-Script®

Jennifer B. Carollo, LCR, RPR, CCR
Nashville Court Reporters 615.885.5798

**(3) God - Lyra**

Case 1:24-cv-00155-TRM-MJD   Document 50-5   Filed 05/14/25   Page 20 of 24
PageID #: 483

52:16

## M

**mail (2)**
37:17;38:8
**Maintaining (1)**
52:4
**making (2)**
6:17;28:3
**man (2)**
41:2;44:12
**management (2)**
51:14,25
**maneuvers (2)**
19:21;20:3
**manifested (1)**
23:20
**manual (4)**
43:19;60:1,1,4
**manuals (2)**
29:24;30:3
**many (1)**
24:24
**March (7)**
14:21;15:10;20:9;
29:11;51:23;56:11;
58:21
**Marion (1)**
21:7
**mark (5)**
36:15;45:23;52:7;
61:20,21
**Marked (9)**
28:20;36:20;37:24;
46:4,6;52:8;57:10,23;
61:24
**married (3)**
33:4,6,8
**Martin (2)**
53:11,21
**Mary (5)**
5:15,17;21:16;42:23;
54:17
**matter (1)**
14:18
**may (3)**
24:11;35:3,25
**maybe (5)**
7:25;14:16;23:17;
51:16;53:4
**mean (5)**
16:3;17:21;23:23;
39:21;61:4
**memory (3)**
15:1;43:13;53:25
**merge (1)**
20:7
**merging (4)**
15:17;17:22;19:8,15
**message (2)**
31:25;32:4
**might (5)**

6:18;41:20;47:15;
55:25;56:5
**minutes (6)**
21:17;51:9,9,10,12;
54:18
**miscommunication (1)**
59:4
**Miss (4)**
23:1;19;40:1;42:23
**misstates (1)**
40:8
**moment (1)**
39:4
**money (1)**
9:9
**month (2)**
38:3,4
**months (4)**
10:4;22:23;53:6,14
**more (3)**
9:9;21:12;54:18
**Mother (1)**
52:19
**motor (2)**
12:11;55:20
**mountain (1)**
21:12
**move (1)**
19:5
**moves (1)**
39:14
**moving (4)**
13:5;55:15,25;56:6
**much (2)**
29:9;43:14
**must (2)**
60:8,8

## N

**name (7)**
5:12;6:8;17:5;37:4,
10;47:3;53:24
**named (1)**
47:14
**narrative (1)**
17:15
**near (1)**
21:9
**nearest (2)**
21:5,9
**need (8)**
21:16;25:7;41:3;
43:2;48:3;53:3;54:15,
18
**needed (1)**
24:4
**needs (1)**
40:1
**Neither (3)**
39:12,13;40:14
**Netradyne (5)**
46:19;47:21;48:5,12;

49:13
**new (3)**
9:1;38:8;55:8
**next (7)**
11:23,24;21:2;23:8;
31:9,11,22
**night (1)**
45:22
**nighttime (1)**
22:11
**nobody (1)**
16:8
**nor (1)**
40:15
**notes (1)**
43:1
**notice (1)**
49:5
**November (3)**
8:1;9:23;10:9
**number (8)**
30:11,15,16,19;
31:18;32:6,13,14

## O

**oath (1)**
5:9
**Object (25)**
12:4;13:7;15:5;
18:10,19;19:22;23:14;
24:5;29:18;35:14;
38:18;40:7;44:5,21,21;
45:4,14,20;48:15;
50:14;60:12;61:2,7,10,
16
**objection (3)**
5:8,14,19
**obtained (2)**
55:1,7
**occasion (1)**
20:9
**occupants (1)**
57:6
**occur (1)**
39:15
**occurred (2)**
56:11;57:20
**o'clock (1)**
21:22
**October (3)**
33:9,9;38:4
**off (2)**
21:21;24:18
**officer (10)**
16:1,1;18:12;25:18;
26:25;41:23;44:19;
56:17,19,22
**officers (4)**
18:4,16;19:2;57:4
**once (5)**
9:3;21:1;26:3;31:6,
14

**One (20)**
11:16;16:4;21:7,17;
27:4;34:18,19,23;35:9;
38:8;39:13;43:18;
46:15;48:11;50:1;
53:19;55:10;56:11;
58:9;59:14
**one-day (1)**
11:20
**only (5)**
11:4;27:24,25;58:6;
60:23
**operate (1)**
10:13
**operating (1)**
34:3
**operator (6)**
9:20;10:5,11,15,17,
20
**opportunities (2)**
9:9,14
**opportunity (1)**
9:12
**opposed (1)**
37:7
**order (1)**
46:9
**orientation (7)**
11:11,12,20;30:4,15;
43:7,10
**out (15)**
9:15,25;11:24;17:7,
21;21:17;22:4;31:6,13;
35:17;37:11;38:21;
40:2;41:2;61:5
**outside (3)**
33:22;42:3,6
**over (29)**
10:5,19;12:3,7;
15:14,14;16:9,10;18:5;
20:7;22:18;31:1;39:22;
40:11,13,18,23;41:3,5,
7,10,17,23;43:1;44:2;
45:18;47:15,16;56:4
**overweight (1)**
55:19
**own (4)**
11:25;12:1;13:22;
41:16
**owner (1)**
33:19
**owning (1)**
53:19

## P

**page (2)**
46:1;61:20
**pages (1)**
43:15
**paid (1)**
29:10
**pain (1)**

23:20
**paper (6)**
34:19;36:25;37:12,
16,21;38:7
**part (2)**
8:15;44:15
**parts (2)**
14:23,24
**passed (1)**
15:14
**past (2)**
41:13;56:1
**pay (2)**
29:3,6
**people (2)**
23:3;38:11
**per (1)**
57:21
**percent (1)**
12:12
**period (1)**
10:7
**person (1)**
10:15
**personal (1)**
55:17
**personnel (3)**
7:24;35:2;52:18
**person's (1)**
10:17
**phone (12)**
30:8,11,13,19,19;
32:13,21,23,24;48:2;
51:5,7
**photographs (2)**
42:20,22
**physical (1)**
55:8
**pick (1)**
33:22
**picked (3)**
26:12,14,16
**place (1)**
36:9
**plaintiffs' (1)**
5:11
**plastic (1)**
34:18
**please (8)**
5:6,11,21;6:7;7:1;
37:21;43:22;57:13
**PM (2)**
21:23;62:6
**point (3)**
31:10,12;35:6
**police (25)**
16:1,1,5,10,13;17:7,
14;18:12;19:2;27:19;
31:8,9,11,14,17;33:19;
39:23;40:11;41:23;
42:18;44:19,25;45:2,
18,22
**policies (1)**

19:20
**POLK (2)**
 16:19;43:21
**portal (1)**
 51:17
**Portions (1)**
 14:22
**possession (1)**
 13:6
**possibility (1)**
 40:16
**possible (3)**
 35:20;40:19,22
**precautions (1)**
 40:25
**presume (2)**
 31:19;35:6
**pretty (4)**
 9:18;16:20;24:18,18
**prevented (1)**
 60:15
**previously (1)**
 44:2
**print (1)**
 37:11
**prior (4)**
 12:3;7;24:24;35:20;
 40:8;42:7;58:25
**probably (4)**
 21:8;22:24;51:12;
 53:14
**probationary (1)**
 10:7
**problem (1)**
 48:14
**problems (1)**
 24:14
**Proceedings (1)**
 62:6
**produced (2)**
 28:7;46:8
**prohibited (6)**
 43:19;44:3,11,15;
 45:8,12
**prompted (1)**
 8:19
**promptly (1)**
 58:22
**property (4)**
 58:4,5,6;59:7
**protective (1)**
 46:9
**provide (1)**
 11:7
**Publix (6)**
 8:6,16,17;9:5;12:11;
 53:4
**pull (6)**
 25:7;40:11,12,23;
 41:3;57:11
**pulled (8)**
 31:1;39:22;40:13,18,
 24;41:7,16,23

**pulling (3)**
 41:4,10;61:22
**purchase (1)**
 53:19
**purchased (2)**
 32:10,12
**put (5)**
 17:13,15;18:6;19:3;
 32:3

**Q**

**quickly (1)**
 54:6
**quit (1)**
 54:5

**R**

**Radha (1)**
 5:13
**range (1)**
 46:1
**rather (1)**
 7:2
**read (1)**
 57:18
**reading (3)**
 28:13,14,16
**realization (1)**
 39:5
**realize (1)**
 38:16
**really (1)**
 18:3
**reason (6)**
 14:25;18:16;24:1;
 27:24;34:13;37:12
**recall (1)**
 56:7
**recalling (1)**
 56:1
**receive (2)**
 22:13;50:19
**received (2)**
 20:2;49:11
**Recess (1)**
 21:23
**record (8)**
 5:2,8;6:8;21:22,25;
 37:20;46:6;57:21
**recorded (2)**
 49:21,24
**records (1)**
 47:21
**recruiter (1)**
 52:11
**recruitment (1)**
 52:13
**REEXAMINATION (1)**
 59:12
**referred (1)**
 52:21

**regard (1)**
 19:21
**regardless (1)**
 60:9
**regulation (1)**
 25:11
**Reid (1)**
 22:18
**reissued (1)**
 35:6
**related (1)**
 29:21
**relates (2)**
 55:15;56:10
**relationship (1)**
 9:19
**remember (58)**
 12:15;14:21,24;15:4,
 9,11;17:2,6,7,24;19:7;
 22:9;22;25:1,10;26:2,5,
 7,8,10,14,16;27:14,15;
 28:2,3,8,24,25;29:1,2,
 22,23;30:1,2,5,21;
 31:15;32:3,5,6;43:8,9;
 45:21;46:17,20,22;
 47:16,24,25;48:1;51:8,
 8,11;52:3;53:2,8,22
**remembered (1)**
 56:20
**renewed (3)**
 37:9,14;38:6
**repeat (2)**
 8:21;56:3
**rephrase (2)**
 23:16;38:20
**report (17)**
 16:5,10,13;17:14;
 19:3;29:21;30:6;31:17;
 32:13;33:19;43:20;
 44:9;58:13;59:5;60:8,
 18,25
**reported (3)**
 30:21;58:22;60:9
**reporter (3)**
 5:9,21,22
**reporting (2)**
 27:7,10
**reports (1)**
 48:21
**represent (2)**
 5:7,13
**representative (1)**
 47:14
**resolved (1)**
 26:3
**respect (1)**
 58:20
**responsibility (1)**
 56:13
**result (1)**
 46:11
**Resulting (1)**
 50:2

**review (6)**
 15:25;46:23;47:4,6;
 49:6,17
**reviewed (1)**
 16:5
**reviewing (1)**
 7:24
**reviews (2)**
 38:14;48:24
**right (61)**
 6:13,22;7:7;8:1,4,13;
 9:21;11:17;13:2,11;
 14:15;15:15,18,21,24;
 16:15;17:2,13,23;19:9,
 16;21:13,15,18,20;
 22:2,11;23:24,25;28:6;
 30:20;31:21;32:6;34:2,
 5,24;36:3,14,22;37:18;
 38:2,8,15;39:23;40:4,
 21;42:1;46:15;52:6,16;
 54:9,13;59:21,24;60:1,
 3,3,5,7;61:6,18
**road (9)**
 11:18,21,22;24:22;
 25:8,21,23;31:2;58:22
**roadway (2)**
 17:17;22:9
**routed (1)**
 22:17
**run (1)**
 56:25
**running (2)**
 25:20;61:14

**S**

**Sabotkoska (1)**
 52:10
**safety (19)**
 12:2;22:18;29:16,17,
 20;30:10;31:23;40:25;
 42:12;43:20;44:9;
 46:22;47:4;48:23;49:1,
 5,17,19;60:9
**same (3)**
 18:2;48:11;50:11
**saved (2)**
 30:13,16
**saw (5)**
 39:21;40:5;41:13,19;
 56:20
**saying (2)**
 20:18;48:3
**scene (11)**
 17:22;19:4;22:3;
 23:6,6,21;24:17;42:20;
 56:16;57:1,6
**score (1)**
 49:13
**scratch (1)**
 27:21
**screen (4)**
 16:16;34:24;57:12;

59:16
**scroll (1)**
 43:14
**sec (2)**
 21:17;34:23
**second (3)**
 6:22;16:4;45:11
**seems (2)**
 15:25;19:1
**send (1)**
 48:12
**sense (6)**
 6:20;7:5;36:5,6,12;
 40:2
**sent (4)**
 11:24,25;31:25;
 42:24
**separate (2)**
 28:12;60:19
**September (1)**
 37:2
**service (5)**
 25:11,12;26:1,4;
 27:20
**Seven (4)**
 7:16;8:10;55:23;
 56:4
**severity (1)**
 60:10
**share (4)**
 16:4;28:6;43:4;
 59:16
**shared (1)**
 47:1
**shop (1)**
 27:20
**shoulder (3)**
 40:24;41:8;58:21
**show (4)**
 17:14,15;34:20,20
**showed (3)**
 37:8;55:11,11
**shows (2)**
 35:23;48:25
**side (9)**
 25:20,22;27:21;31:1;
 39:14,14;40:13;41:7;
 50:10
**signal (3)**
 15:13;20:6,10
**signature (2)**
 47:11,12
**signed (2)**
 22:19;30:4
**signing (5)**
 28:8;29:1,23;30:2;
 43:9
**similar (3)**
 42:3;48:9;51:25
**simply (2)**
 56:7;59:4
**sit (1)**
 56:2

Min-U-Script® 
Jennifer B. Carollo, LCR, RPR, CCR
Nashville Depo-Court Reporters 615.885.5798
(5) POLK - sit
Case 1:24-cv-00155-TRM-MJD   Document 50-5   Filed 05/14/25   Page 22 of 24
PageID #: 485

**sitting (5)**
12:23;18:25;20:14,
15;56:8
**situation (1)**
27:23
**sleep (2)**
21:3;25:8
**sleeping (1)**
24:20
**small (2)**
16:18,21
**smart (1)**
39:25
**somebody (6)**
24:3;31:23;37:11;
52:17;53:5;58:9
**someone (1)**
44:19
**somethings (1)**
32:22
**sometimes (2)**
6:24;38:25
**Somewhat (1)**
14:22
**somewhere (7)**
11:13;14:4,5;24:21;
30:12;33:25;34:1
**soon (1)**
25:14
**sorry (10)**
8:1;13:13,14;26:10;
35:16;40:3;45:25;
50:23;55:6;59:17
**sort (3)**
9:10;22:14;49:18
**sorted (2)**
31:6,13
**sorts (1)**
48:20
**sound (1)**
8:1
**sounds (2)**
14:15;15:20
**space (3)**
51:14,25;53:4
**speak (2)**
22:25;24:8
**speaking (2)**
7:4;42:2
**specific (2)**
15:1,6
**specifically (3)**
19:19;22:9;57:9
**speeding (2)**
11:2;55:16
**spelled (2)**
37:4,10
**spent (1)**
6:24
**spoke (2)**
17:10;30:21
**spot (4)**
20:12,16,19;41:7

**stamped (1)**
47:9
**standard (1)**
10:11
**start (4)**
5:10;7:5;8:24;9:25
**started (3)**
7:25;9:1;60:5
**starting (1)**
46:7
**starts (1)**
43:5
**state (12)**
5:7;6:7;7:12,14,18;
34:2;35:10,20,21;55:1,
7,13
**statement (5)**
18:5;31:24,25;32:4;
57:24
**statements (2)**
17:16;18:17
**status (1)**
14:18
**step (1)**
21:16
**still (6)**
12:23;25:20;32:19,
21;33:6;52:23
**stipulate (1)**
5:8
**stop (10)**
20:24,25;21:1,4,4,
12;24:21;25:8,11;
40:11
**stopped (1)**
39:22
**story (1)**
19:8
**street (1)**
21:6
**stuff (6)**
32:9;37:5;38:10,11;
42:11;61:15
**stupid (1)**
6:25
**subject (1)**
46:8
**subsequent (1)**
46:17
**sued (2)**
13:17,19
**Summer (2)**
33:1,2
**support (1)**
17:17
**sure (19)**
6:17;8:22;13:17;
20:7;21:19;24:9;31:1;
34:22;35:19;38:23;
40:17,25;41:8,10,17;
43:1,23;46:13,16
**suspended (1)**
34:12

**swear (2)**
5:21,22
**swerve (2)**
41:14,19
**swerved (1)**
41:15
**sworn (1)**
6:3

**T**

**talk (4)**
14:20;31:8;40:11;
42:15
**talked (8)**
31:9,11;39:23;41:23;
42:9;52:13;54:10;
56:12
**talking (7)**
13:15,16;34:19;49:3;
50:18;53:8;58:12
**telling (6)**
19:7;44:18;56:19;
58:17;61:5,15
**temporary (1)**
37:12
**Tennessee (4)**
15:12;17:6;33:22,25
**terminology (1)**
48:20
**test (4)**
11:18,21;26:20;
51:18
**testified (4)**
6:4;19:4;54:25;
55:16
**testimony (3)**
5:23;8:11;40:8
**texted (1)**
32:7
**texting (1)**
32:9
**thinking (1)**
60:20
**though (2)**
6:18;15:25
**thought (4)**
14:10;20:11;39:1;
60:21
**Threadcraft (1)**
52:20
**Three (6)**
7:23;10:4;36:6;58:3,
5,6
**ticket (2)**
11:3;55:17
**Tim (5)**
5:12;15:6;36:17;
37:19;42:3
**tire (1)**
12:12
**tired (2)**
25:2,4

**TMC (1)**
53:25
**Today (10)**
5:4,10;13:16;18:2,
25;19:5;41:24;43:2;
56:2,8
**together (1)**
33:11
**told (15)**
16:1;17:24;18:1,2,3;
19:2,3;27:22;30:24;
31:1,5;36:2;45:2,18,22
**took (2)**
12:12;31:16
**top (1)**
47:3
**track (1)**
12:19
**traded (1)**
32:22
**traffic (1)**
12:24
**trailer (1)**
12:12
**train (1)**
11:10
**training (13)**
11:8;19:20;20:2,5;
29:16,17,21;50:24,25;
51:14,22;52:1;54:5
**training/coaching (1)**
50:6
**transitioned (1)**
10:19
**Transportation (2)**
53:11,25
**trial (1)**
22:5
**trick (2)**
41:2;44:7
**tried (1)**
54:3
**trip (1)**
26:9
**Trooper (1)**
17:2
**troopers (3)**
17:10,13,22
**trouble (2)**
27:6,9
**truck (19)**
8:24;12:11;20:25;
21:1,4;24:21;26:4;
27:16,17,20;29:4,7,10;
30:12;40:11;48:8;
53:19;60:19,21
**Trucking (3)**
5:18;7:21;8:4
**trucks (3)**
33:13;60:23;61:5
**truth (4)**
5:24,24,25;19:6
**try (3)**

6:17,19;56:25
**trying (15)**
7:2;13:15;17:20,21;
22:4;34:21;35:17,17;
38:20,21;39:25;41:2,2;
44:8;58:16
**Tuesday (1)**
5:4
**Turn (4)**
20:6,6,6,6
**Turned (2)**
15:13;20:10
**Tuscaloosa (1)**
7:8
**twenty (1)**
33:9
**two (6)**
12:6;17:4,10;23:3;
34:17;50:12
**type (3)**
49:1,10,20
**Tyree (1)**
52:20

**U**

**ultimate (1)**
33:24
**under (6)**
34:3;43:17;44:11;
45:12;49:10;50:2
**understood (2)**
34:22;59:5
**unless (1)**
61:21
**unreported (3)**
27:25;28:12;60:14
**untruthful (1)**
56:17
**up (21)**
11:13;12:6;21:6,12;
23:18;24:13,21;25:7,8;
26:12,14,16;33:22;
42:1;43:14;46:16;
50:10;53:3;54:15;
57:11;61:22
**use (2)**
38:7;48:20
**using (1)**
32:15
**U-turn (1)**
28:4

**V**

**vehicle (15)**
10:13;12:12;15:12,
14,21;23:3;33:2,19;
40:12;41:6;55:17,20;
56:7;57:7;59:7
**vehicles (2)**
27:10;55:23
**via (2)**

Case 1:24-cv-00155-TRM-MJD Document 50-5 Filed 05/14/25 Page 23 of 24
PageID #: 486

5:10;6:14
**Victoria (1)**
52:10
**video (6)**
5:2;19:1,11,14;
56:13;62:5
**VIDEOGRAPHER (8)**
5:1,15,20;21:21,24;
54:17,21;62:4
**videos (2)**
51:20,21
**violation (8)**
46:18;49:1,2,8,11,19,
21,24
**violations (7)**
12:2;13:5;46:20;
47:20;55:16,25;56:6

**W**

**W-2 (1)**
9:25
**wait (1)**
6:18
**waiting (3)**
25:17,22,25
**walking (1)**
24:18
**warehouse (1)**
9:7
**warning (8)**
28:13,23;29:15;44:3,
8;49:2;50:11,21
**warnings (1)**
48:13
**watch (2)**
51:20,20
**watched (1)**
19:11
**way (9)**
6:16;9:9,23;22:7;
24:10;38:24;40:10;
56:17,25
**week (1)**
51:16
**weeks (3)**
22:23,24;23:8
**weird (2)**
38:10,12
**weren't (1)**
58:16
**What's (7)**
7:9;14:25;46:1;48:5;
50:6;58:17;61:11
**wheel (1)**
26:18
**WHITE (43)**
5:17,17;12:4;13:7;
15:5;16:10;18:10,19;
19:22;21:19;23:2,14;
24:5;29:18;35:14;
36:16;37:19,23;38:18;
40:7;42:3,6;44:5,21;

45:4,14,20;46:1,5,13;
48:15;50:14;54:15,20,
24;59:10,17;60:12;
61:2,7,10,16;62:2
**whole (1)**
5:24
**whose (1)**
18:6
**wife (1)**
33:3
**Williams (2)**
14:3,14
**window (1)**
48:8
**Wisconsin (1)**
27:15
**witness (20)**
5:10,21;6:1,3;13:9;
16:12,24;18:13;19:24;
23:5;38:20;39:14;
42:12;43:24;45:5,15,
21;48:16;50:15;61:17
**wonder (1)**
41:4
**wondering (1)**
52:12
**wonky (1)**
6:14
**wordy (1)**
6:24
**work (7)**
8:9;10:16;29:24;
33:15;34:5,6;52:23
**worked (4)**
7:22;9:15;52:25;
53:5
**working (10)**
8:5;9:7,18;10:4,8;
11:22;27:6,9;44:4;
46:18
**Wortham (16)**
5:3,18;6:2,9;13:8;
16:15;18:12;22:2;28:9;
38:19;42:7;54:16,25;
55:4;57:18;61:13
**write-ups (1)**
10:23
**written (1)**
50:10
**wrong (1)**
37:5
**wrote (1)**
18:4

**Y**

**ya (5)**
14:10,15;16:22;
33:11;52:5
**y'all (4)**
23:20;33:4,8,11
**yard (1)**
22:17

year (2)
11:2;13:21
**years (6)**
7:16,23;8:10;36:6;
55:23;56:4
**yow (1)**
30:16

**Z**

**Zoom (7)**
5:2,10;6:15;16:19,
20;35:1;43:21

**0**

**000121 (1)**
47:10
**000122 (1)**
51:15
**000123 (1)**
28:8
**000131 (1)**
37:22
**000139 (1)**
36:18
**000373 (1)**
60:4
**000408 (1)**
43:5
**001 (1)**
37:22

**1**

**1 (8)**
20:9;28:19,20;46:7;
51:23;57:10;58:18;
61:22
**10 (1)**
51:9
**10/19 (1)**
35:5
**100 (1)**
12:12
**1099 (1)**
10:2
**10th (1)**
57:20
**15 (2)**
43:15;51:12
**18 (1)**
36:10
**18-wheeler (2)**
12:24;27:16
**1st (4)**
14:21;15:10;56:11;
58:21

**2**

**2 (5)**
36:19,20;37:8;45:24;

46:7
**2:34 (1)**
5:5
**20 (2)**
51:9;54:18
**2017 (1)**
8:12
**2018 (7)**
8:14,15;35:12;36:2,
10;55:1,13
**2019 (1)**
33:10
**2020 (1)**
12:16
**2021 (5)**
8:1;9:23;35:3,10,25
**2022 (8)**
10:3;28:23;35:5,7;
37:2;38:5;55:12;57:21
**2023 (9)**
14:21;15:10;20:9;
29:11;46:23;47:6;
51:23;56:11;58:21
**2024 (3)**
13:1,2,23
**2025 (1)**
5:4
**22 (1)**
29:20
**24 (2)**
15:11;32:25
**2500 (1)**
29:12
**28th (1)**
33:9
**29th (1)**
33:9

**3**

**3 (4)**
21:22;37:24;38:5;
46:7
**3:00 (1)**
21:23
**3:05 (2)**
21:23,25
**30 (1)**
51:10
**373 (1)**
61:22

**4**

**4 (4)**
5:4;45:24;46:4,8
**4/13/82 (1)**
7:10
**4:20 (2)**
62:5,6
**408 (1)**
46:2
**422 (2)**

43:5;46:2
**45 (3)**
10:12,12,18
**4th (1)**
47:6

**5**

**5 (3)**
51:12;52:7,8

**6**

**6 (3)**
61:20,23,24
**65 (1)**
12:23

**7**

**770-731-7220 (1)**
32:14

**8**

**8/4/23 (1)**
47:19