IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TENNESSEE

AT CHATTANOOGA

RADHA BOLIVAR and
ANGELICA GOATACHE,

              Plaintiffs,

   vs.                          No. 1:24-cv-00155

HMD TRUCKING, INC.,
and ANTONIO WORRTHAM,

              Defendants.

      The Video-Recorded Deposition of FAUSTA MIKNIUTE, taken remotely via Zoom technology before JEANINE WATKINS, C.S.R., pursuant to the provisions of the Federal Rules of Civil Procedure of the United States District Court, pertaining to the taking of depositions, taken on March 10, 2025, commencing at the hour of approximately 1:00 p.m. Central Time.

Page 1

Case 1:24-cv-00155-TRM-MJD    Document 57-3    Filed 05/16/25    Page 1 of 32
PageID #: 769

BY MR. HENSHAW:

Q. Okay. So help me understand this. You've got these unidentified safety assistants. What are those?

A. This is our safety personnel.

Q. What is -- what do you mean by that? What is a safety assistant and what do they do?

A. Safety assistant is essentially a person that helps drivers on a daily basis, whether it's logbook issue or an accident gets called in, if drivers have any other questions.

Q. Okay. And why, why can't these people be identified?

A. I -- I would be able to provide you names of all the safety assistants, but what I was saying was I wouldn't know at what point and when Antonio talked to any of them as of his employment.

Q. Okay. He is still employed with HMD Trucking to the present day, correct?

A. Yes.

Q. What day did he start?

A. On November 18th of 2021, I believe.

Q. Now, the safety assistants you talked about, do I understand, I guess, that you would have

www.veritext.com     Veritext Legal Solutions     800-556-8974

correct?

    A.    Correct.

    Q.    Anyone else?

    A.    Umm -- orientation team.

    Q.    Okay.  And who were those people?

    A.    I would need to see who were these people at the time if we're talking about the incident timeframe, were when Mr. Antonio was hired.

    Q.    Sure.  So the orientation team would have -- maybe I'm presuming here, but I guess those would be the people around November of 2021 that did that job?

    A.    Correct.

    Q.    Okay.  And you don't know who those people are?

    A.    I don't want to tell you that the names.  I wouldn't be exact.  I would need to check who were working at that time in orientation.

    Q.    Okay.  When you talk about orientation, describe that process.

    A.    So, drivers are being trained on how to pretty much work here as a company, what are our policies and procedures.

        We do also train them how to navigate their

www.veritext.com        Veritext Legal Solutions        800-556-8974

hours of service, their logbooks.  We do train them in how to perform pretrip inspections, safe driving, how to avoid incidents.

Q.    Is every driver given the same orientation?

A.    Yes.

Q.    Even if they have prior experience?

A.    Yes.

Q.    All right.  Did Mr. Wortham complete that orientation?

A.    Yes.  He did.

Q.    You mentioned that he received some other training.  Can you describe what that is?

A.    Other training?

Q.    Yes.

A.    As far as orientation?

Q.    No.  Sorry.  I may have gotten ahead of myself a little bit.  I presume you were not involved in his orientation, correct?

A.    Correct.

Q.    And then you mentioned that there were some other training provided by I think it was Mr. Clary, yourself and the safety assistants. What's the difference -- I assume that's different training than orientation he received --

www.veritext.com                Veritext Legal Solutions                800-556-8974

A. Correct.

Q. -- is that correct?

A. Yes.

Q. All right. What's the other training that he got after orientation?

A. So we do conduct in-person safety classes twice a year here in the office where we do require all of our drivers to come to the terminal and attend the class. So we do those. Mr. Clary performed those incident reviews with the driver. And that's documented in one of the documents that we provided to you.

Like I said, the safety assistants, they do talk to drivers about their hours of service if any questions come up. So those would be the trainings that we provide.

Q. Do you know what days Mr. Wortham attended the in-person safety classes after his November, 2021, hiring?

A. After the accident?

Q. No. After his November, 2021, hire date?

A. I can't give you an exact date right now. I had -- I had it printed out somewhere. I can find it or I can give it to you later.

www.veritext.com          Veritext Legal Solutions          800-556-8974

annual NDR. We do that. And that's -- that's pretty much the biggest review that we do in a year.

Q. Do you provide any active monitoring of the drivers or active supervision of the drivers?

A. Yes. We use a platform for them that notifies us that some of the driver's record changes.

Q. Is that the Netradyne platform, or is that something else?

A. No. That's something else.

Q. How is Netradyne incorporated into your supervision of drivers?

A. So, we do coach our drivers based on some of Netradyne data. At the time of the -- when the incident occurred, we had policies stating that if a driver has a score lower than 750 we would be coaching the driver. If a driver ended up with a score lower than 600, then we would be issuing write-ups. And training sometimes.

THE COURT REPORTER: And what sometimes?

THE WITNESS: Training.

BY MR. HENSHAW:

Q. Between November, 2021, and March 1st of 2023, was the Netradyne system in place and in use

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 6 of 32
PageID #: 774

in Mr. Wortham's truck?

A. Yes.

Q. What devices actually are inside the truck that enable you to monitor and come up with the score?

MS. WHITE: Object to the form of the question.

THE WITNESS: It's a camera.

BY MR. HENSHAW:

Q. Does the camera face externally or does it also face internally?

A. It does have a lens that faces the driver. It also has exterior, obviously.

Q. Now, on March 1st -- well, let me say this. Let me back up.

You mentioned two score thresholds. 750, the driver is what, again? Anything under 750 results in what happening?

A. Coaching session, training.

Q. And anything below 600 results in what happening?

A. Also training and coaching the driver and might also get a write-up.

Q. Okay. How do you as a company get alerted

www.veritext.com          Veritext Legal Solutions          800-556-8974

when a driver's score falls below one of these two thresholds?

A. We do not get alerted. We have to go in into a driver's profile and see the score.

Q. Okay. How often do you check the driver's score?

A. Monthly.

Q. Who does that?

A. At the time when the incident happened or currently?

Q. Well, I guess, are they different people?

A. Yes. Well, the person who will handle that in March of 2023, she's no longer with us.

Q. Okay. So these scores that are pulled for the drivers, are they -- is it basically -- does it come to you in some sort of like Excel spreadsheet that you got to look at, or how does that come to you?

A. We can see those by entering driver's name or, yes, we can download a sheet.

Q. Okay. So in March of 2023 -- let me, I'm going to -- I'm going to talk about actually just because this happened on March 1st so, you know, just being -- and it happened at nighttime, so just

www.veritext.com          Veritext Legal Solutions          800-556-8974

being fair to you guys.  So, February to March.
That sort of, you know, 30 days before and after.

At that time somebody was going in monthly and checking drivers's scores in Netradyne, correct?

A.    Yes.

Q.    That person at that time no longer works for your company?

A.    Correct.

Q.    Who is that person?

A.    Her name is Maria.  And I would need to remember the last name to find out.

Q.    Now, the scores when they got pulled, was she pulling all the scores or just the ones that were below one of these two thresholds?

A.    Below the thresholds.

Q.    Okay.  And then she's sending a -- I guess a report with those drivers monthly to somebody in the safety department for HMD to check on further; is that right?

A.    No.  She would not be sending those reports.  She was the one coaching the drivers if she saw any scores lower than the thresholds.

Q.    Was Maria a safety assistant?

A.    Yes.

www.veritext.com          Veritext Legal Solutions          800-556-8974

Q. Okay. So she did the coaching with the drivers herself after she pulled the reports?

A. Yes.

Q. Between November of 2021 and March 1st of 2023, did we know what Mr. Wortham's average score was?

A. No.

Q. Does that data exist?

MS. WHITE: Object to the form.

THE WITNESS: I don't know.

BY MR. HENSHAW:

Q. Okay. If the company does not know what Mr. Wortham's average score was between November 20, 2021, and March 1st of 2023, how can the company be sure that Mr. Wortham was operating safely during that time frame?

MS. WHITE: Object to the form of the question. You can go ahead and answer.

THE WITNESS: Well, it's not always that we can base our knowledge on camera scores. And if he -- if he was coached, if his score would be lower than what our thresholds were there would be documentation of that, but there is nothing for that.

www.veritext.com          Veritext Legal Solutions          800-556-8974

BY MR. HENSHAW:

Q.   The company actually doesn't know what Mr. Wortham's score was during that timeframe, though, correct?

MS. WHITE:  Object to the form of the question.

THE WITNESS:  Well, we do know that it wasn't lower than the set thresholds.

BY MR. HENSHAW:

Q.   How do you know that if you don't know what it was?

A.   Because if there was a score lower than the threshold there would be a training session reported, a verbal conversation or a write-up.

Q.   Okay.  Where would that be recorded in his file?

A.   It would be under the driver's profile.

Q.   In his driver qualification file?

A.   Correct.

Q.   But sitting here today, the company doesn't actually know that Mr. Wortham's score was ever, say, above 600?

MS. WHITE:  Object to the form of the question.  Misstates prior testimony.

www.veritext.com          Veritext Legal Solutions          800-556-8974

BY MR. HENSHAW:

Q.   Correct?

A.   No, sir.  We would -- as I said, the threshold was 750.  So if his score was lower than 750, there would be training or coaching reported for that matter.

Q.   On March 1st of 2023, the company had the data to indicate Mr. Wortham's score, correct?

A.   Correct.

Q.   And the company no longer has this data, correct?

MS. WHITE:  Object to the form of the question.

THE WITNESS:  The company does not have, yeah.

BY MR. HENSHAW:

Q.   Okay.  So the company is basing its position that Mr. Wortham's score was satisfactory in that system based on data that it got rid of, correct?

MS. WHITE:  Object to the form of the question.

THE WITNESS:  We did not get rid of that information.

Page 28

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 12 of 32
PageID #: 780

letter?

MS. WHITE:  Object to the form of the question.

THE WITNESS:  We did preserve videos of the accident.

MS. WHITE:  Do you have a copy of that preservation letter that you just referred to?

MR. HENSHAW:  I'm sorry.  We can get to that in just a minute.

BY MR. HENSHAW:

Q.  You preserved the video.  How many videos did you preserve?

A.  I can't tell you the exact amount.  I think there were about 20.

Q.  Did any of those videos that were preserved show Mr. Wortham driving?

A.  As in him?

Q.  Yes.

A.  As a person?  No.

Q.  Why not?

A.  Well, because the camera lens that was facing the driver was covered.

Q.  How did you determine that?

A.  Because there was no video available for us

www.veritext.com          Veritext Legal Solutions          800-556-8974

Q. I understand that in August of 2023 -- well, let me back up. I'm not going to go there yet.

Let's talk about -- it reports coachable events. Does it do that based on what it's seeing or does it do that based on the forces of the truck itself?

MS. WHITE: Object to the form of the question.

THE WITNESS: There can be different scenarios. If it's a hard braking event or hard acceleration yes, it would show an alert.

BY MR. HENSHAW:

Q. Okay. When you get the hard brake/ hard acceleration event, does the system notify you if, for example, you're unable to determine what happened because the camera is covered up?

A. I'm -- I'm not sure I understand the question.

Q. Sure. Do you get reports of -- from the Netradyne of, hey, a coachable event happened but the camera is covered; we can't see what happened?

A. No. There is no such report.

Q. Do you get obstructed camera notifications

www.veritext.com          Veritext Legal Solutions          800-556-8974

from Netradyne?

A.   We don't get such notifications, no.

Q.   Okay.  Did the company preserve any other videos of Mr. Wortham's driving between November of 2021 and March of 2023?

A.   No.

Q.   So all the videos that were preserved are related to the crash of March 1st, 2023, correct?

A.   Correct.

Q.   Okay.  When hiring Mr. Wortham, did the company obtain a complete copy of his prior references?

A.   What do you exactly mean by prior reference?

Q.   Sure.  Did you check with his prior employers about his driving history?

A.   Yes.

Q.   And did you get all the responses that you're required to get?

A.   We received those, yes.

Q.   Did -- when you checked his driving history, did it reveal any employers that he did not tell you about?

A.   Not that I remember, no.

Page 36

A. Our goal would be multiple reasons. Sometimes we need to be aware if anything happens so we can notify customers that deliveries or pickups can be made on time. Sometimes the driver might need assistance from us when -- with the incident.

Q. Is there any other --

A. And then sometimes --

Q. Sorry I interrupted you. Go ahead.

A. Yeah. Sometimes cargo needs to be addressed. There might be various reasons.

MS. WHITE: Tim, let me know when you get to a good stopping point. We've been going on about an hour. I'd like to stretch my legs if I can.

MR. HENSHAW: Sure. I'm almost done with this exhibit.

MS. WHITE: Okay.

BY MR. HENSHAW:

Q. All right. Before we move on, this is the -- this is from the driver policy manual that Mr. Wortham would have acknowledged when he came onboard in orientation, correct?

A. Correct.

Q. And HMD 373 is something that he would have understood prior to beginning one day of work at

Page 49

Case 1:24-cv-00155-TRM-MJD    Document 57-3    Filed 05/16/25    Page 16 of 32
PageID #: 784

MS. WHITE: Object to the form of the question.

BY MR. HENSHAW:

Q. Not always, but generally?

MS. WHITE: Object to the form of the question. Calls for speculation.

THE WITNESS: Generally, not always.

BY MR. HENSHAW:

Q. Okay. So as I understand it then, HMD could have implemented a policy to require the driver to let camera record them while they were on duty but it chose not to because, for example, the driver might be recorded scratching their head or their nose, which would violate their rights to privacy, correct?

MS. WHITE: Object to the form of the question.

THE WITNESS: And that is not the only concern obviously. Driver privacy is a big concern but also we have to navigate between driver hiring and retention so it all comes together with that.

BY MR. HENSHAW:

Q. Okay. So you, if you had a policy that required the driver to uncover the camera when they

Page 54

www.veritext.com          Veritext Legal Solutions          800-556-8974

are on duty, it might affect hiring and retention of drivers?

A. It could possibly do that, yes.

Q. Okay. There are companies that require drivers to have the camera on when they are on duty, aren't there?

A. I'm not sure.

Q. Okay. You're not aware -- HMD doesn't -- didn't do anything to take the temperature of the industry when it was making this policy?

A. Well, when he started installing our cameras back in 2018 I'm pretty sure we -- maybe we weren't the first company to do that but it wasn't like every company had cameras in their trucks in general.

Q. Sure. How would requiring drivers to have the camera on when they are on duty affect hiring or retention?

A. I am pretty sure that quite a few drivers would -- would have an issue with their privacy, and they would decide to either resign or to not get on-boarded.

(Court reporter requested that the witness repeat the last part of her

Page 55

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 18 of 32 PageID #: 786

threshold.  So --

Q.   Let me rephrase my question.

The data that was in the Netradyne system existed on March 1st of 2023 but we don't have it here today, do we?

A.   We do not.

Q.   So I can't look at that data and determine what, if anything, was going on with Mr. Wortham's driving habits according to that data between August and March?

A.   No, you cannot do that right now.

Q.   What was the purpose in allowing that data to be purged?

MS. WHITE:  Object to the form of the question.

THE WITNESS:  I'm not sure I understand your question.

BY MR. HENSHAW:

Q.   Sure.  Why was that data not preserved?

A.   Well, we didn't think it was relevant to the incident.

Q.   What other information did HMD have access to that it did not -- because it didn't think it was relevant?

Page 64

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 19 of 32
PageID #: 787

A.   I can't think of anything else.

Q.   Okay.  In the Netradyne videos that were preserved you mentioned that they are all -- none of them -- none of them show the driver.  Do any of them show the -- what the camera was able to see of Mr. Wortham, just covered up?

A.   I'm -- I'm not sure I understand the question.

Q.   Are any of the videos that you preserved like the blank video of Mr. Wortham but you can't see it because the camera is covered up?

A.   Uh-huh.

Q.   They are?

A.   No.  What is the question exactly?

Q.   Are any of the videos that video?

A.   Of a blank screen?

Q.   Yes.

A.   I don't think so, no.

Q.   Okay.  My question, I guess, is did the system record Mr. Wortham, even though it's not actually showing him, during this crash?

A.   No.  It would not.

Q.   Okay.  So, the camera, when the cap is on it, it doesn't even record; is that right?

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 20 of 32 PageID #: 788

A.   Right.

Q.   Okay.  So then does the -- when the cap is not on, does the system record audio information?

A.   No.

Q.   Okay.  So it would only show the driver under any circumstances; it wouldn't record any audio from inside the cab, correct?

A.   Right.

MR. HENSHAW:  All right.

Madam Court Reporter, I need to do some cleanup before we move on to the next area as far as the exhibits go.  Sorry.

THE COURT REPORTER:  Okay.

MR. HENSHAW:  I need to make -- let's see. I think I'm up to the next exhibit would be four, correct?

THE COURT REPORTER:  I have number 1 and 2. What is 3?

MR. HENSHAW:  Number 3 is -- that's what I was going to clear up.  So Number 3 is going to be HMD 373.

(Exhibit Number 3 was

marked for identification.)

And then Number 4 is going to be that one

www.veritext.com                Veritext Legal Solutions                800-556-8974

happen in a split of a second, so he might have misjudged what happened at that time.

BY MR. HENSHAW:

Q. Okay. So did anyone ask Mr. Wortham why he reported that the driver came into his lane when that wasn't true?

A. I believe he did discuss with Jacob Clary when he --

Q. And what did he tell Mr. Clary?

A. Well, I believe Jacob Clary showed him the video of how everything happened exactly and driver acknowledged that he ended up hitting the car.

Q. Okay. But specifically what he wrote down and said in a text to the company was that the other car came into his lane, correct?

A. Right.

Q. Now, did the company -- the company didn't need to go back and explore this in light of the August, 2022, violations, correct?

A. I wouldn't say these things are relevant.

Q. Okay. It's the company's position that him reporting this incident in March and the August, 2022, incidents had nothing to do with each other?

A. I believe so, yes.

www.veritext.com          Veritext Legal Solutions          800-556-8974

That's what we know.

Q. Okay. And yet your policy also states that you are to report all incidents specifically to avoid this type of situation where if something comes up later and you really don't know what happened, correct?

MS. WHITE: Object to the form.

THE WITNESS: I don't think that's how our policy is worded.

BY MR. HENSHAW:

Q. Okay. Isn't it your policy to report all incidents regardless of severity?

A. Correct.

Q. Okay. If the company had accepted Mr. Wortham's version of events then it would have accepted a version of events that is not true without the camera, correct?

MS. WHITE: Object to the form.

THE WITNESS: Can you rephrase?

BY MR. HENSHAW:

Q. Sure. If the company had accepted Mr. Wortham's version of events about March 1st, 2023, then it would have accepted a version that was not true, correct?

Page 86

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 23 of 32
PageID #: 791

MS. WHITE: Object to the form.

THE WITNESS: Not necessarily.

BY MR. HENSHAW:

Q. Okay. Well, Mr. Wortham reported that the other car came into his lane, correct?

A. Yes.

Q. And if the company had accepted that, then they would have accepted something that wasn't true, correct?

MS. WHITE: Object to the form.

THE WITNESS: Well, not necessarily. He would still have completed accident investigation with the police report, what it said there.

BY MR. HENSHAW:

Q. Did the company, after the April, 2022, incident, did the company check to see whether there was any law enforcement reports?

A. Law enforcement reports, what do you mean by that?

Q. With regard to the April, 2022, incident?

A. No.

Q. Do you know whether any were made?

A. No. I mean it was equipment damage. I'm not sure why would it be reported with police.

Page 87

Case 1:24-cv-00155-TRM-MJD    Document 57-3    Filed 05/16/25    Page 24 of 32
PageID #: 792

A. Correct.

Q. And that's again because he -- well, let me back up.

And again, aside from what Mr. Wortham told you about that incident, you have no other information?

A. Correct.

Q. Now, in March of 2023, Mr. Wortham, was he drug or alcohol tested?

A. No.

Q. And that was because he did not receive a citation?

A. Correct. And the accident was not DOT reportable.

Q. Why was it not DOT reportable?

A. Because the only DOT reportable accidents are when there is towing, when there sustained damage to either vehicle, when there is immediate treatment away from the scene, or if there is fatality and driver gets a ticket issued.

Q. Okay. Can we agree that Mr. Wortham did not receive a citation because the officers' investigation stated that there were conflicting statements given?

www.veritext.com          Veritext Legal Solutions          800-556-8974

A. I cannot speak to -- for law enforcement.

Q. You reviewed the police report and saw that the police officer stated that conflicting statements were given about what happened, correct?

A. Correct.

Q. Okay. After reviewing the video footage and saying that Mr. Wortham actually caused this crash he claimed the other driver caused, was he drug tested?

A. No. Because this accident was not DOT reportable accident.

Q. Had there been any other issues with Mr. Wortham's employment subsequent to the March, 2023, incident --

MS. WHITE: Object to the form.

BY MR. HENSHAW:

Q. -- with my clients?

A. Not that I can think of it off the top of my head.

Q. Okay. I have been provided that he received training in July of 2023. Do you know why he received training in July of 2023?

A. Can you show that document to me?

Q. Sure. Yeah. We reviewed it earlier, but

Page 93

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 26 of 32
PageID #: 794

serious violation, no.

Q.   Why not?

A.   Well, there could be a misunderstanding with the driver.  Or there could be mis-communication.

Q.   Would you agree that if a driver fails to report an accident, that means management did not get a chance to investigate it?

A.   Not always.

Q.   Okay.  Explain that.

A.   So in Mr. Wortham's case of the incidents he had to investigate them.  We called the driver. He had a chance to let us know what happened.  And that's part of our investigation process.

Q.   Can we agree that as to the four prior unreported incidents, that the company's only information is what Mr. Wortham reported?

MS. WHITE:  Object to the form.  Asked and answered.

THE WITNESS:  I -- I would say I think Mr. Clary was because he conducted that investigation, sat down with the driver, asked all the right questions and got them.

BY MR. HENSHAW:

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 27 of 32
PageID #: 795

Q. Do you know why Mr. Clary failed to get the name of the other driver who backed into Mr. Wortham's truck?

MS. WHITE: Object to form.

THE WITNESS: I do not know that.

BY MR. HENSHAW:

Q. Would you agree that failing to investigate means that the company does not know whether the driver was at fault?

A. No, I would not agree on that.

Q. Would you agree that a driver who hides accidents is not being truthful?

A. What was that again?

Q. Would you agree that a driver who hides accidents is not being truthful?

A. I'm not sure if maybe I understand the question. In this scenario? In Mr. Wortham's scenario?

Q. In any scenario.

A. Again, I would not say that if a driver does not a report an incident, it doesn't necessarily mean that he's not being truthful or lying.

Q. Would you agree that 100 percent of the

www.veritext.com     Veritext Legal Solutions     800-556-8974

time that a driver who doesn't report an accident is violating company policy?

A. That is true. A driver is not reporting an incident, that's a violation of company policy.

Q. Would you agree that a driver who hides accidents four times has a pattern of dishonesty?

A. What was the second part of your question?

Q. Would you agree that a driver who hides accidents four times has a pattern of dishonesty?

A. I do not agree with that, no.

Q. Would you agree that a driver with the pattern of dishonesty cannot be trusted to accurately report how an accident happened?

A. No, I don't believe so.

Q. Given that Mr. Wortham had a documented history of failing to report incidents accurately, why should anyone believe he said -- anything he ever says?

MS. WHITE: Object to the form. Misstates prior testimony. Go ahead.

THE WITNESS: I can not answer to what -- as to what or could or should everybody believe about that.

BY MR. HENSHAW:

Page 100

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 29 of 32 PageID #: 797

Q.   Given that Mr. Wortham has a documented history of failing to report incidents accurately, why does HMD choose to believe anything that he says?

A.   Well, we did investigate those incidents. We sat down with the driver.  We completed coaching and training with the driver, and driver did not show these behaviors again.

Q.   Do you agree that Mr. Wortham's repeated failure to report incidents should have been a red flag for HMD Trucking?

A.   No, I don't think so.  Not always.

Q.   What steps did HMD Trucking take to monitor Mr. Wortham more closely after he repeatedly failed to report accidents?

MS. WHITE:  Object to the form of the question.

THE WITNESS:  We do not have such policy where we need to monitor drivers more closely.  We follow our standard policies and procedures.

BY MR. HENSHAW:

Q.   Even when they document a history of failing to report accidents?

A.   The same policies would apply.

Page 101

Case 1:24-cv-00155-TRM-MJD   Document 57-3   Filed 05/16/25   Page 30 of 32
PageID #: 798

A.    Correct.

Q.    It wasn't needed, was it?

A.    No.

MS. WHITE:  Okay.  And those are all the questions I have.

MR. HENSHAW:  I have a couple of followups.

FURTHER EXAMINATION

BY MR. HENSHAW:

Q.    Just to be clear, the company's testimony is not changing; that policy that we've spent all this time going over may have been revised in September of 2022, but it was the same policy Mr. Wortham was given when he was hired, correct?

A.    I would need to see -- in terms of incident reporting, yes, it would be the same, the same policy.

Q.    Well, you wouldn't have produced a driver's manual to me that he wasn't given, correct?

A.    Correct.

Q.    Have -- is there an older version that you -- did you bring an older version or produce an older version that indicates that the policy was different?

MS. WHITE:  As it relates to the reporting

Page 114

www.veritext.com            Veritext Legal Solutions            800-556-8974

of incident, Mr. Henshaw?

MR. HENSHAW:  Yes.

MS. WHITE:  I just want -- okay.  Go ahead, Fausta.

THE WITNESS:  There were previous policy manuals that had the same reporting policy, yes.

BY MR. HENSHAW:

Q.    All right.  Thank you.

Mr. Wortham's credibility was necessary in order to keep him employed as a driver for HMD between November of 2021 and March of 2023, correct?

A.    What's the question again?

Q.    Mr. Wortham's credibility was necessary in order to keep him employed as a driver between November of 2021 and March of 2023, correct?

A.    I would say yes.  I mean --

Q.    And it's been necessary to keep him employed since March 1st of 2023, correct?

A.    It's been necessary?

Q.    Uh-huh.

A.    What do you mean by that?

Q.    His credibility has been necessary to keep him employed, correct?

A.    Well, yes.  As long as with other things

www.veritext.com          Veritext Legal Solutions          800-556-8974